**No. 23-55662**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
_____

### COSTAR GROUP, INC.,
### COSTAR REALTY INFORMATION, INC.

*Plaintiffs-Counter-Defendants-Appellees*,

v.

### COMMERCIAL REAL ESTATE EXCHANGE, INC.,

*Defendant-Counter-Plaintiff-Appellant*.
_____

On Appeal from the United States District Court for the Central District
of California, Case No. 2:20-cv-08819-CBM-AS
_____

### APPELLEES' MOTION TO DISMISS APPEAL
_____

Elyse M. Greenwald
LATHAM & WATKINS LLP
10250 Constellation Boulevard, Suite 1100
Los Angeles, CA 90067
(424) 653-5500

Melissa Arbus Sherry
Nicholas J. Boyle
Jordan R. Goldberg
Jeremy L. Brown
LATHAM & WATKINS, LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for CoStar Group, Inc. and
CoStar Realty Information, Inc.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee CoStar Realty Information, Inc. states that it is a wholly owned subsidiary of CoStar Group, Inc., and Appellee CoStar Group, Inc. states that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

*s/ Melissa Arbus Sherry*

Elyse M. Greenwald
LATHAM & WATKINS LLP
10250 Constellation Boulevard, Suite 1100
Los Angeles, CA 90067
(424) 653-5500

Melissa Arbus Sherry
Nicholas J. Boyle
Jordan R. Goldberg
Jeremy L. Brown
LATHAM & WATKINS, LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for CoStar Group, Inc. and
CoStar Realty Information, Inc.*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES .................................................................... iii

INTRODUCTION ................................................................................1

STATEMENT ....................................................................................2

ARGUMENT ....................................................................................7

I.    CREXI'S CLAIMS ON APPEAL OVERLAP SUBSTANTIALLY WITH THE CLAIMS PENDING IN THE DISTRICT COURT ..................9

    A.    CREXi's Dismissed Antitrust Counterclaims Substantially Overlap With CoStar's Pending Copyright And DMCA Claims .........9

    B.    CREXi's Dismissed Antitrust Counterclaims Substantially Overlap With CREXi's Pending Trademark Counterclaims ..............14

    C.    The Substantial Overlap Weighs Heavily Against Certification ........16

II.    THE EQUITIES DISFAVOR DEPARTING FROM THE FINAL JUDGMENT RULE ....................................................................18

CONCLUSION .................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ....................................................................11, 13

*Adrian v. Town of Yorktown*,
210 F. App'x 131 (2d Cir. 2006) .........................................................................20

*Amyndas Pharmaceuticals, S.A. v. Zealand Pharma A/S*,
48 F.4th 18 (1st Cir. 2022).....................................................................................8

*Apple Inc. v. Psystar Corp.*,
658 F.3d 1150 (9th Cir. 2011) .......................................................................11, 12

*Atlantic Richfield Co. v. Laguna Construction Co.*,
No. 17-2002, 2017 WL 11687572 (10th Cir. Nov. 22, 2017)............................19

*Cadillac Fairview/California, Inc. v. United States*,
41 F.3d 562 (9th Cir. 1994) ...................................................................................8

*Carpenter v. Liberty Insurance Corp.*,
850 F. App'x 351 (6th Cir. 2021)....................................................................16, 18

*Clark v. Baka*,
593 F.3d 712 (8th Cir. 2010) ................................................................................8

*Continental Materials Corp. v. Valco, Inc.*,
740 F. App'x 893 (10th Cir. 2018) ....................................................................16

*Curtiss-Wright Corp. v. General Electric Co.*,
446 U.S. 1 (1980)....................................................................................................9

*Dougherty v. City of Covina*,
654 F.3d 892 (9th Cir. 2011) ..............................................................................15

*Ebrahimi v. City of Huntsville Board of Education*,
114 F.3d 162 (11th Cir. 1997) .................................................................15, 17, 20

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ...............................................................................11

**Page(s)**

*Gregorian v. Izvestia*,
   871 F.2d 1515 (9th Cir. 1989) ........................................................8, 9

*International Longshore & Warehouse Union v. ICTSI Oregon, Inc.*,
   863 F.3d 1178 (9th Cir. 2017) ....................................................17, 20

*Jewel v. National Security Agency*,
   810 F.3d 622 (9th Cir. 2015) .........................................8, 9, 13, 16, 19

*Justice v. Pendleton Place Apartments*,
   40 F.3d 139 (6th Cir. 1994) ................................................................15

*Kinsale Insurance Co. v. JDBC Holdings, Inc.*,
   31 F.4th 870 (4th Cir. 2022) ..........................................................8, 17

*Lasercomb America, Inc. v. Reynolds*,
   911 F.2d 970 (4th Cir. 1990) ..............................................................12

*Morrison-Knudsen Co. v. Archer*,
   655 F.2d 962 (9th Cir. 1981) ..................................................7, 18, 19

*Noel v. Hall*,
   568 F.3d 743 (9th Cir. 2009) ..............................................................18

*Novick v. AXA Network, LLC*,
   642 F.3d 304 (2d Cir. 2011) ...............................................................15

*O'Bert ex rel. Estate of O'Bert v. Vargo*,
   331 F.3d 29 (2d Cir. 2003) ...................................................................8

*Pakootas v. Teck Cominco Metals, Ltd.*,
   905 F.3d 565 (9th Cir. 2018) ..............................................................17

*Peden v. Stephens*,
   50 F.4th 972 (11th Cir. 2022) ........................................................8, 18

*Practice Management Information Corp. v. American Medical
   Association*,
   121 F.3d 516 (9th Cir. 1997) ..............................................................13

*Romoland School District v. Inland Empire Energy Center, LLC*,
   548 F.3d 738 (9th Cir. 2008) ................................................................7

**Page(s)**

*Spiegel v. Trustees of Tufts College*,
    843 F.2d 38 (1st Cir. 1988) .................................................................8

*Texaco, Inc. v. Ponsoldt*,
    939 F.2d 794 (9th Cir. 1991) ............................................................7

*Vazquez-Klecha v. Bickerstaff*,
    No. 22-10385, 2023 WL 5321308 (11th Cir. Aug. 18, 2023) ...........20

*Wood v. GCC Bend, LLC*,
    422 F.3d 873 (9th Cir. 2005) ....................................................*passim*

## STATUTES

28 U.S.C. § 1291 ...................................................................................7

28 U.S.C. § 1292(b) ..............................................................................5

## OTHER AUTHORITIES

Fed. R. App. P. 4(a)(2) .........................................................................7

Fed. R. App. P. 4(a)(7)(A)(ii) ...............................................................7

Fed. R. Civ. P. 54(b) .........................................................................5, 7

v

# INTRODUCTION

Appellees CoStar Group, Inc. and CoStar Realty Information, Inc. (together, "CoStar") sued appellant Commercial Real Estate Exchange, Inc. ("CREXi") for copyright infringement and violations of the Digital Millennium Copyright Act ("DMCA"), along with several other claims. All of the claims stem from CREXi's industrial-scale theft of data from CoStar, including from its password-protected database, and the infringement of more than 50,000 of CoStar's copyrighted images. CREXi responded with a slew of counterclaims, including antitrust and trademark infringement claims, and asserted that CoStar's copyright claim is barred by CoStar's "copyright misuse." All of CoStar's claims, CREXi's affirmative defenses (including copyright misuse), and CREXi's trademark counterclaims remain pending in the district court—with trial scheduled for October 2024. But the district court dismissed CREXi's antitrust and other counterclaims, and entered partial final judgment under Federal Rule of Civil Procedure 54(b). That entry of judgment was improper, and this Court should dismiss the appeal for lack of appellate jurisdiction.[1]

The claims on appeal and those still pending in the district court significantly overlap—both factually and legally—and are near-certain to lead to piecemeal

---

[1] On September 29, 2023, CoStar informed CREXi's counsel that it would move to dismiss the appeal for failing to meet Rule 54(b)'s requirements, and sought CREXi's position. CREXi's position is that it does not consent to dismiss its appeal. *See* Circuit Rule 27-1(2) & advisory committee's note 27-1(5).

appeals by the same parties on related facts and legal issues. The district court concluded otherwise only by failing to acknowledge CREXi's copyright misuse defense and the trademark theory underlying its antitrust claims. Reviewed de novo, the interrelationship among the claims and defenses, the likelihood of successive appeals, and the risk that pending district court proceedings may moot aspects of this appeal preclude Rule 54(b) certification.

The district court also abused its discretion in considering the equities. The mere possibility that this appeal might be decided before the October 2024 trial hardly takes this case out of the mainstream. This appeal does not satisfy Rule 54(b).

## STATEMENT

1.  CoStar is the nation's leading provider of commercial real estate ("CRE") information, analytics, and online marketplaces. CoStar Second Am. Compl. ("SAC") ¶ 13, Dkt. 351.[2] CoStar offers a password-protected subscription database for CRE data and owns multiple CRE marketplaces, including LoopNet, the most popular online CRE marketplace in the United States. *Id.* Over 35 years, CoStar has invested billions of dollars in building its platform. *Id.* ¶ 12. Among other things, CoStar employs thousands of researchers who create, research, curate, and verify CRE data, and architectural photographers who photograph properties for CoStar. *Id.* ¶¶ 12, 44, 95.

---

[2] "Dkt. ___" refers to the district court docket.

CREXi is attempting to build a competing CRE business by free-riding on CoStar's investment and hard work. With the aid of off-shore agents, CREXi systematically accesses LoopNet and takes listing data and CoStar's copyrighted photographs to use on its competing CRE platform, carefully cropping the CoStar star watermark to hide the theft. *Id.* ¶¶ 4-6. CREXi also harvests CoStar's copyrighted photographs from third-party sources, and uses stolen passwords to hack into CoStar's database to export yet more data. *Id.* ¶¶ 20, 184-91. To date, CREXi has hit CoStar's LoopNet site more than two million times and infringed more than 50,000 of CoStar's copyrighted images. *Id.* ¶¶ 2-3, 15.

2. In September 2020, CoStar sued CREXi for copyright infringement, for violating the DMCA, and for several other violations. *See* Dkt. 1; *see also* SAC ¶¶ 308-72 (expanding the scope of CoStar's copyright allegations).

CREXi responded with counterclaims. *See* CREXi First Am. Counterclaims ("CREXi FAC"), Dkt. 160-2. Those include federal and state antitrust claims, tortious interference claims based on the same allegations, and trademark infringement claims. *See id.* ¶¶ 265-349. In support of the antitrust claims, CREXi alleged that CoStar adds its watermark to photographs it does not own, "sow[ing] confusion" in the marketplace that deters brokers from working with CoStar's competitors, *see id.* ¶¶ 7, 76-90; "demand[s]" that CREXi use a third-party "image filter" to detect CoStar-owned images appearing on CREXi's website, which

wrongly flags images as CoStar's, *see id.* ¶¶ 9, 91-111; and prevents competitors from using CoStar's data and images, including by blocking competitors' access to its websites and websites CoStar hosts, *see id.* ¶¶ 39-75. Among other things, CREXi also alleges that CoStar engages in anticompetitive conduct by "infring[ing] CREXi's trademark[]." *Id.* ¶¶ 118-35. CoStar does so, CREXi alleges, by buying Google "AdWord[s]" so that some customers searching for "CREXi" see advertisements for CoStar's websites with CREXi's mark in the header. *Id.* ¶¶ 128-32. CREXi's standalone trademark claim, and a similar state law unfair competition claim, are based on the same alleged conduct. *Id.* ¶¶ 350-57, 375(iv).

CREXi also asserted the affirmative defense of "copyright misuse," claiming that CoStar cannot enforce its copyrights because it has "attempted to improperly use [those] copyrights to control competition in areas beyond the scope of [those] copyrights." *See* CREXi Answer to SAC ("CREXi SAC Answer") 69-70, Dkt. 438. Recycling its antitrust theories, CREXi alleges that this "misuse" includes (i) "appl[ying] [CoStar's] name and/or logo to images for which [it] neither own[s] nor hold[s] the copyright" to "sow confusion in the marketplace"; (ii) using "third-party filters" to "falsely claim ownership over brokers' own photographs and third-party images"; and (iii) asserting CoStar's copyrights "to prevent competitors from accessing or using information related to the subject matter of the photographs, including data regarding particular property listings that is not copyrighted."

*Id.* CREXi defends against CoStar's DMCA claim on a related ground, alleging that CoStar's watermark is not properly copyright management information ("CMI") because (CREXi alleges) CoStar adds its watermark to images it does not own. *Id.* ¶ 65; *see also id.* at 73.

3.      In February 2023, having already dismissed most of CREXi's claims once with leave to amend, the district court dismissed CREXi's antitrust and tortious interference claims with prejudice. *See* Ex. B,[3] Second MTD Order, Dkt. 340; *see also* Ex. C, First MTD Order, Dkt. 146. The court held that CREXi failed to state an antitrust claim because it failed to allege both anticompetitive conduct and that CoStar held market power in any relevant market. *See* Ex. B at 5-13. And it dismissed CREXi's tortious interference claims as procedurally improper and meritless in any event. *Id.* at 13-15.

All of CoStar's claims, CREXi's defenses (including its copyright misuse defense), and CREXi's trademark counterclaims remain pending. Trial on all of those claims and defenses is scheduled for October 2024. *See* Order, Dkt. 373.

4.      CREXi sought an immediate appeal of its dismissed counterclaims under Rule 54(b) or 28 U.S.C. § 1292(b). *See* CREXi R. 54(b) Mot., Dkt. 368-1. CoStar opposed, arguing (as relevant here) that Rule 54(b) relief was improper given

---

[3]   "Ex." refers to the exhibits attached hereto.

the overlap between CREXi's dismissed antitrust claims and both its surviving copyright misuse defense and its trademark infringement claim. *See* CoStar Opp. to R. 54(b) Mot. 7-12, Dkt. 374. CoStar also argued that CREXi would suffer no prejudice from waiting to appeal until after trial. *See id.* at 12-16.

In July 2023, the district court denied CREXi's request for certification under Section 1292(b), holding that CREXi had not shown any "substantial ground for difference of opinion." Ex. A, Rule 54(b) Order 7, Dkt. 461. But it granted CREXi's request for Rule 54(b) relief. *See id.* at 5-7. The court held that CREXi's dismissed counterclaims were "not legally or factually related to [CREXi's] remaining counterclaims," *id.* at 6, but did not address CoStar's argument that the dismissed counterclaims overlapped with CoStar's copyright claims given CREXi's copyright misuse defense.[4] The court further held that judicial efficiency favored Rule 54(b) relief because this Court could resolve an interlocutory appeal before the October 2024 trial. *See id.* at 6-7.

Four days later, without a separate judgment, CREXi filed a notice of appeal. *See* Notice of Appeal, Dkt. 466.[5]

---

[4] CoStar did not raise and the court did not address the DMCA claims, which were the subject of a pending motion to dismiss. CREXi MTD SAC, Dkt. 363.

[5] The district court has not entered judgment in a separate document as required by Federal Rule of Civil Procedure 58(a). CREXi's notice of appeal thus will not be "treated as filed" until that happens or until "150 days have run from entry of

# ARGUMENT

Under the "final judgment" and "single appeal" rules, a party may appeal only after a final judgment resolving all claims for all parties. *Romoland Sch. Dist. v. Inland Empire Energy Ctr., LLC*, 548 F.3d 738, 747 (9th Cir. 2008) (citation omitted); *see* 28 U.S.C. § 1291. Piecemeal appeals are disfavored because they "undermine[] the efficient use of judicial resources" and expose "appellate panels to 'the costs of repeated familiarization with the [same] case.'" *Romoland*, 548 F.3d at 747 (citation omitted).

Rule 54(b) is an exception. Under Rule 54(b), a district court "may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). Rule 54(b) relief should be reserved for the "unusual case in which the costs and risks of multiplying the number of proceedings and of overcrowding the appellate docket are outbalanced by pressing needs of the litigants for an early and separate judgment as to some claims or parties." *Morrison-Knudsen Co. v. Archer*, 655 F.2d 962, 965 (9th Cir. 1981) (Kennedy, J.).[6]

---

the . . . order in the civil docket." Fed. R. App. P. 4(a)(2), (a)(7)(A)(ii). Even though the 150 days does not run until December 17, CoStar files this motion now in an abundance of caution given the merits briefing schedule.

[6] Although a panel of this Court has suggested a "present trend" to the contrary over three decades ago, *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 797-98 (9th Cir. 1991), that view has not been embraced by more recent decisions of this Court, *see*

To assess whether there is any "just reason for delay," courts must first evaluate the "interrelationship of the claims or issues" to decide if the claims on appeal are "sufficiently severable factually and legally from the remaining matters" such that "piecemeal appeals" are not likely. *Wood v. GCC Bend, LLC*, 422 F.3d 873, 878, 880 (9th Cir. 2005) (citation omitted). If the "issues raised on appeal" are not "completely distinct from the rest of the action," partial final judgment is appropriate only if "resolving the claims would 'streamline the ensuing litigation.'" *Jewel v. Nat'l Sec. Agency*, 810 F.3d 622, 628 (9th Cir. 2015) (citation omitted). And "[i]t will be a rare case" where that standard will be met "when the contestants on appeal remain . . . contestants below." *Spiegel v. Trs. of Tufts Coll.*, 843 F.2d 38, 44 (1st Cir. 1988) (quoted favorably in *Jewel*, 810 F.3d at 630). If such "juridical concerns" are satisfied, *Jewel*, 810 F.3d at 625, 628, courts then evaluate "traditional equitable principles such as prejudice and delay," *Gregorian v. Izvestia*, 871 F.2d 1515, 1519 (9th Cir. 1989).

This Court's review of a Rule 54(b) determination likewise proceeds in two steps. The "juridical concerns" inquiry is reviewed de novo. *Jewel*, 810 F.3d at 628;

---

*infra*, or other courts of appeals, *see, e.g.*, *Peden v. Stephens*, 50 F.4th 972, 978 (11th Cir. 2022); *Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 28 (1st Cir. 2022); *Kinsale Ins. Co. v. JDBC Holdings, Inc.*, 31 F.4th 870, 876 (4th Cir. 2022); *Clark v. Baka*, 593 F.3d 712, 715 (8th Cir. 2010); *O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 40-41 (2d Cir. 2003); *cf. Cadillac Fairview/Cal., Inc. v. United States*, 41 F.3d 562, 567 (9th Cir. 1994) (per curiam) (Kleinfeld, J., dissenting) ("[A] subsequent panel cannot modify the law of this circuit by a critical remark.").

*see id.* at 625 (requiring close scrutiny of "interrelationship of claims so as to prevent piecemeal appeals" (quoting *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 10 (1980))). The district court's "assessment of the equities" is then reviewed for abuse of discretion. *Gregorian*, 871 F.2d at 1519.

If the requirements of Rule 54(b) are not met, the appeal must be dismissed for lack of appellate jurisdiction. *See Jewel*, 810 F.3d at 625, 627 (granting motion to dismiss Rule 54(b) "appeal for lack of jurisdiction"); *Wood*, 422 F.3d at 877, 883 (*sua sponte* dismissing Rule 54(b) appeal for lack of jurisdiction).

## I. CREXI'S CLAIMS ON APPEAL OVERLAP SUBSTANTIALLY WITH THE CLAIMS PENDING IN THE DISTRICT COURT

CREXi's antitrust counterclaims overlap substantially with (i) CoStar's copyright claims (via CREXi's copyright misuse defense) and CoStar's DMCA claims, and (ii) CREXi's trademark infringement counterclaims—such that piecemeal appeals are inevitable. The district court made no findings on the first point and only conclusory findings on the latter. On de novo review, and applying the scrutiny required, Rule 54(b) relief was "improvidently granted" and the appeal should be dismissed. *Wood*, 422 F.3d at 883.

### A. CREXi's Dismissed Antitrust Counterclaims Substantially Overlap With CoStar's Pending Copyright And DMCA Claims

CREXi's antitrust counterclaims are interrelated—factually and legally— with its copyright misuse defense. That relationship virtually guarantees that the

Court will hear successive appeals on the same issues between the same parties. The district court made no contrary findings, and CREXi's limited response is meritless.

1. Starting with the facts, CREXi's antitrust claims and copyright misuse defense share three pillars of allegations: (i) watermark confusion (which overlaps with the DMCA claims, too), (ii) claimed ownership of third-party images, including through use of a third-party image filter, and (iii) using copyrights to block competitors from accessing listing images and data.

*First,* both CREXi's antitrust claims and its copyright misuse defense allege that CoStar "sow[s] confusion" by adding its star watermark to images it does not own. *Compare, e.g.*, CREXi FAC ¶¶ 7, 237, *with* CREXi SAC Answer 69-70. CREXi's key defense to CoStar's DMCA claims alleges the same: that CoStar's watermark is not CMI because (CREXi alleges) CoStar adds its watermark to images it does not own. CREXi SAC Answer ¶ 65; *see also id.* at 73. *Second*, both CREXi's antitrust claims and its copyright misuse defense assert that CoStar "falsely claim[s] ownership over brokers' own photographs and third-party images," including through use of third-party image filters. *Id.* at 69-70; *see also, e.g.*, CREXi FAC ¶ 9 ("CoStar uses those filters to falsely claim ownership over brokers' own photographs and third-party images . . . ."); *id.* ¶¶ 29, 92-97. *Third*, both CREXi's antitrust claims and its copyright misuse defense allege that CoStar asserts its "copyright protections regarding photographs in an effort to prevent competitors from accessing

or using information related to the subject matter of the photographs." CREXi SAC Answer 69; *see* CREXi FAC ¶¶ 70, 78 (CREXi alleging, as part of its antitrust theory, that CoStar's assertions of copyright "ha[ve] effectively secured [CoStar] a copyright monopoly beyond that legitimately granted by the U.S. Copyright Office," including by preventing "CoStar's competitors from freely using brokers' data and photographs"). On all three grounds, the district court is continuing to assess the evidentiary basis for the antitrust theories now on appeal.

There is substantial legal overlap, too. CREXi's antitrust claims require it to show that CoStar's conduct has anticompetitive effects. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 989-90 (9th Cir. 2020). Assessing that question will require deciding whether CoStar is claiming ownership over images that it does not own through the application of its star watermark, the use of a third-party image filter, or by otherwise asserting copyright protections to prevent others from accessing CRE images and information—and, if so, analyzing that conduct's effect on competition. *See, e.g.*, CREXi FAC ¶¶ 70-117, 137-38 (describing alleged "anticompetitive scheme"). CREXi's copyright misuse defense, similarly, requires it to show that CoStar used its copyrights to "secur[e] an exclusive right or limited monopoly not granted by the Copyright Office," *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001) (citation omitted), such as through "stifl[ing] competition," *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1159 (9th Cir. 2011).

Given these related legal inquiries, any analysis of CREXi's antitrust claims and its copyright misuse defense will be inextricably intertwined. For example, if CREXi's (false) allegation that CoStar systematically applies its watermark to images it does not own fails to plead anticompetitive conduct—as the district court held, *see* Ex. C at 8-9—then that alleged practice almost certainly does not illegitimately expand CoStar's copyright monopoly, either. Conversely, reversal of the dismissal of CREXi's antitrust claims could strengthen CREXi's copyright misuse defense. *See Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 978 (4th Cir. 1990) ("[T]he attempted use of a copyright to violate antitrust law probably would give rise to a misuse of copyright defense . . . .").

This factual and legal overlap makes piecemeal appeals a virtual certainty. In this appeal, CREXi will ask the Court to decide whether CoStar's alleged conduct is plausibly anticompetitive, based on CREXi's allegations that CoStar watermarks images it does not own, uses a third-party filter to claim ownership over images it does not own, and asserts copyrights in a manner that "has effectively *secured for itself a copyright monopoly beyond that legitimately granted by the U.S. Copyright Office*." CREXi FAC ¶ 70 (emphasis added). In a later appeal, this Court will have to consider whether CoStar's copyright claims are barred because those very practices "stifle competition," *Apple*, 658 F.3d at 1159, by improperly "*secur[ing]*

*an exclusive right or limited monopoly not granted by the Copyright Office*," *A&M Recs.*, 239 F.3d at 1026 (emphasis added). Those are the same inquiries.

2. The district court did not disagree; it did not engage with CREXi's copyright misuse defense at all. *See* Ex. A at 6-7; *see also Jewel*, 810 F.3d at 628 (noting absence of district court finding on "interrelationship"); *Wood*, 422 F.3d at 880 (same). CREXi, for its part, had one response: a copyright misuse defense can succeed even where an antitrust claim fails. CREXi Reply ISO R. 54(b) Mot. 2, Dkt. 387. That is true, *see Prac. Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 521 (9th Cir. 1997), but irrelevant.

The Rule 54(b) question is not whether a copyright misuse defense, in the abstract, can succeed even when similar antitrust claims fail; it is whether *CREXi's* copyright misuse defense overlaps substantially with *CREXi*'s antitrust claims. For all the reasons above, it does. Resolving both the antitrust and copyright claims will require considering CREXi's allegations that CoStar applies its watermark to images it does not own to "sow confusion" in the market; that CoStar has acted wrongfully by "demanding" that CREXi use a third-party image filter that wrongly flags images as CoStar-owned; and that CoStar asserts its copyrights to prevent competitors from using images and information it does not own. Because CREXi's copyright misuse theory is *in fact* a repackaged version of its antitrust claims, the interrelationship between the two should have precluded certification.

13

## B. CREXi's Dismissed Antitrust Counterclaims Substantially Overlap With CREXi's Pending Trademark Counterclaims

CREXi's antitrust counterclaims are also substantially related to its still-pending claims for trademark infringement. That relationship has the potential to either moot aspects of this appeal or give rise to successive appeals, further making Rule 54(b) certification inappropriate. The district court disagreed without explanation. *See* Ex. A at 6.

1. One prong of the "anticompetitive scheme" CREXi alleges is that CoStar acted anticompetitively by infringing CREXi's trademark. *See* CREXi FAC ¶¶ 118-35; *see also* CREXi Opp. to MTD FAC 7-8, Dkt. 232 (CREXi arguing that its antitrust claims should survive, in part, based on "CoStar's unlawful attempts to siphon customers away by trademark infringement"); *id.* at 14-15 ("CREXi's trademark infringement allegations form a basis for anticompetitive conduct."). The district court rejected that theory. Although the court "found that CREXi stated a claim for trademark infringement," it held that "such conduct is not enough to constitute anticompetitive conduct." Ex. B at 9. As a result, CREXi is pursuing trademark claims in the district court at the same time it is pursuing an appeal in this Court based, in part, on the theory that the same infringement contributes to several antitrust violations.

That overlap alone should preclude Rule 54(b) certification. The district court's holding that CREXi "stated a claim for trademark infringement" goes only

to the sufficiency of the pleadings. But as that claim proceeds through discovery and beyond, CoStar will likely be able to show that the *evidence* does not support CREXi's claims. If the district court or a jury agree that no such infringement took place, that would moot one of CREXi's core theories of antitrust liability now on appeal. That waste of judicial resources weighs heavily against Rule 54(b) review. *See Wood*, 422 F.3d at 882 (noting "issue could be mooted"); *Justice v. Pendleton Place Apartments*, 40 F.3d 139, 142 (6th Cir. 1994) (similar).

Nor would these concerns disappear if CREXi prevailed on its trademark claims below. This Court could then twice be asked to consider the same facts and legal theories underlying CREXi's trademark claims. In the first appeal, whether CREXi has plausibly alleged the trademark infringement predicate for its antitrust claims. *See Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (this Court may affirm on any ground supported by the record). And in the second appeal, whether the evidence supports liability for trademark infringement. In this Court's words, it "cannot afford the luxury of reviewing the same set of facts in a routine case more than once without a seriously important reason." *Wood*, 422 F.3d at 882; *see Ebrahimi v. City of Huntsville Bd. of Educ.*, 114 F.3d 162, 167 (11th Cir. 1997) (sua sponte dismissing Rule 54(b) appeal where court would "undoubtedly be required to relearn the same set of facts" in second appeal); *Novick v. AXA Network, LLC*, 642 F.3d 304, 310 (2d Cir. 2011) (similar).

2.     The district court said only that "CREXi's dismissed counterclaims are not legally or factually related to the remaining counterclaims related to trademark infringement and unlawful competition predicated on CoStar's alleged trademark infringement." Ex. A at 6. The court did not explain why and, for the reasons set forth above, its conclusion does not withstand scrutiny. Clearly, CREXi's dismissed antitrust claims and its pending trademark infringement claims overlap: one of CREXi's core theories of *antitrust liability*, now on appeal, is that "CoStar has infringed CREXi's *trademarked* name." CREXi FAC at 35 (emphasis added).

### C.     The Substantial Overlap Weighs Heavily Against Certification

The substantial overlap between CREXi's appealed antitrust claims and the claims pending below weighs heavily against certification. In recent years, this Court has twice dismissed appeals (once *sua sponte*) when there were "common and intersecting facts" and the "nature of the claims [made] piecemeal certification" inappropriate. *Jewel*, 810 F.3d at 629; *see Wood*, 422 F.3d at 879-81. And other courts of appeals have routinely and recently dismissed Rule 54(b) appeals in similar circumstances. *See, e.g.*, *Carpenter v. Liberty Ins. Corp.*, 850 F. App'x 351, 355-56 (6th Cir. 2021) (dismissing Rule 54(b) appeal where claims had "close relationship" and "there [wa]s also a possibility that the need for review of [one] claim may be mooted"); *Cont'l Materials Corp. v. Valco, Inc.*, 740 F. App'x 893, 898 (10th Cir. 2018) (same where claims on appeal were "strikingly similar" to pending

16

"affirmative defense[s]"); *Kinsale*, 31 F.4th at 877 (same and noting that "in cases involving two parties, all claims that are intertwined must be 'pursued together,' rather than separately'"); *Ebrahimi*, 114 F.3d at 167 (same where "factual underpinnings of the adjudicated and unadjudicated claims [we]re intertwined").

This appeal also looks nothing like the exceptional cases in which this Court has found Rule 54(b) certification appropriate. Take *International Longshore & Warehouse Union v. ICTSI Oregon, Inc.*, 863 F.3d 1178 (9th Cir. 2017), for example. In what was admittedly a "close call," and where the concurring judge would not have allowed the appeal, this Court denied a motion to dismiss when the issues on appeal were "complicated" and the case had been stayed in the district court. *Id.* at 1185-86; *see id.* at 1196 (Clifton, J., concurring) ("I hope that this is not a course that is repeated in the future"). But even then, the Court emphasized that the district court *should have* certified the appeal under Section 1292(b), and that Rule 54(b) ought to be reserved for "complex and distinct legal issues." *Id.* at 1186. If that was a "close call," this is an easy one: there is both factual and legal overlap, the district court recognized that the issues were neither complicated nor suited for Section 1292(b) certification, and CREXi never moved for a stay.[7]

---

[7] Other recent cases have involved similarly distinct fact patterns. *See, e.g.*, *Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 574, 576 (9th Cir. 2018) (appeal from "summary judgment order and . . . first two phases of trial" in

## II. THE EQUITIES DISFAVOR DEPARTING FROM THE FINAL JUDGMENT RULE

Even if the claims were in some sense separable, that finding would "begin, rather than end" the analysis. *Carpenter*, 850 F. App'x at 355 (citation omitted). In assessing the equities, courts must balance the interests favoring appeal against "the costs and risks of multiplying the number of proceedings and of overcrowding the appellate docket." *Morrison-Knudsen*, 655 F.2d at 965. That balance is crucial because Rule 54(b) certification effectively takes away this Court's discretion, under Section 1292(b), to "protect its docket by determining for itself whether to accept the issue for review." *Id.* at 966. Here, the Court should also dismiss this appeal because the district court abused its discretion in finding the equities favor certification. *See, e.g.*, *Peden*, 50 F.4th at 978 (*sua sponte* dismissing appeal).

The district court held that the equities favored immediate appeal for one reason only: trial is set for October 2024 and this Court could resolve the appeal before then, which would further "judicial efficiency." Ex. A at 6-7. That conclusion is "clearly unreasonable" because it ignores the realities of this case, the other side of the balance, and the Rule 54(b) framework. *Wood*, 422 F.3d at 878-79 (citation omitted).

---

"complex" CERCLA case "that ha[d] been ongoing for fourteen years," where certification facilitated "prompt[] pay[ment]" for contamination); *Noel v. Hall*, 568 F.3d 743, 747 (9th Cir. 2009) (summary judgment "disposed of the case" between two parties).

Let's start with the realities of this case. This appeal on the antitrust claims is proceeding at the same time as the district court proceedings on the copyright and trademark infringement claims. CREXi did not seek a stay of the proceedings below and it did not seek to expedite this appeal. So even if this Court were to decide the appeal before October 2024, it would do so only on the eve of trial and long after the close of discovery. *See* Order, Dkt. 373. And even if CREXi were to prevail, the district court would have to reopen discovery, proceed to summary judgment, and, if needed, hold a trial on CREXi's revived claims. Put simply, there is no chance that the claims could all be tried together without continuing the trial date. *See Jewel*, 810 F.3d at 630 (dismissing appeal where "interlocutory review is more likely to cause additional delay than it is to ameliorate delay problems"). And if the argument is that resolution of this "appeal may influence [the] ongoing district court proceedings," that just shows the "'interrelationship of the dismissed and surviving claims,' which is 'generally a reason for *not* granting a Rule 54(b) certification, not a reason for granting it.'" *Atl. Richfield Co. v. Laguna Constr. Co.*, No. 17-2002, 2017 WL 11687572, at *3 (10th Cir. Nov. 22, 2017) (citation omitted).

The district court also failed to consider the other side of the balance: the "risks of multiplying" appellate proceedings. *Morrison-Knudsen*, 655 F.2d at 965. Although the court said that certification "would not result in unnecessary or duplicative appellate review," it offered no reason beyond the purported lack of

factual and legal overlap between the antitrust and trademark infringement claims. Ex. A at 6-7. That one (or both) parties likely would appeal from any final judgment after summary judgment or trial; that any such appeal likely would be filed in late 2024 or early 2025; and that this second appeal would require a panel of this Court to relearn the same underlying facts and apply similar legal theories presents exactly that risk. The district court's order did not take those "judicial administrative interests" into account. *Wood*, 422 F.3d at 882; *see Ebrahimi*, 114 F.3d at 168.

Finally, the district court's reasoning flouts the principle that Rule 54(b) is an exception, not the rule. Unless trial is imminent, every interlocutory appeal holds the theoretical promise of an appellate decision before trial. But interlocutory dismissals of claims in multi-claim cases are routine, and piecemeal appeals disfavored. Section 1292(b) certification remains available for complex issues of law, where the efficiencies favor immediate appeal. *See Int'l Longshore*, 863 F.3d at 1186. But where Section 1292(b) certification is inappropriate, and "[a]bsent special circumstances," a district court's mere "preference for pretrial appellate review of its dismissal decisions" is not a proper "basis for issuance of partial final judgment." *Vazquez-Klecha v. Bickerstaff*, No. 22-10385, 2023 WL 5321308, at *2 (11th Cir. Aug. 18, 2023) (quoting *Ebrahimi*, 114 F.3d at 168); *see Adrian v. Town of Yorktown*, 210 F. App'x 131, 133 (2d Cir. 2006) (collecting cases holding desire "to avoid a second trial" insufficient for Rule 54(b) certification).

No special circumstances exist here. This is a single case between two parties both of whom remain parties on appeal and in the district court. This appeal does not come early in the litigation; more than three years of litigation have already ensued and the parties are in the midst of extensive discovery. And the district court's decision is bereft of any findings agreeing with CREXi's asserted claims of hardship. *See* CREXi R. 54(b) Mot. 6-8.[8] This is the routine and unexceptional case where the risk of piecemeal appeals is paramount.

## CONCLUSION

For all of the foregoing reasons, the Court should dismiss this appeal.

Dated: October 3, 2023

Respectfully submitted,

*s/ Melissa Arbus Sherry*

Elyse M. Greenwald
LATHAM & WATKINS LLP
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067
(424) 653-5500

Melissa Arbus Sherry
Nicholas J. Boyle
Jordan R. Goldberg
Jeremy L. Brown
LATHAM & WATKINS, LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for CoStar Group, Inc. and*
*CoStar Realty Information, Inc.*

---

[8] Nor does the record provide any support. Contrary to CREXi's assertion, CoStar is not using this litigation to drive CREXi out of business. And regardless, allowing this appeal to go forward now would not ameliorate that purported harm: CREXi will still be facing a contemporaneous trial on CoStar's claims, after which it could appeal the dismissal of its antitrust claims.

**CERTIFICATE OF COMPLIANCE**

This Motion complies with the type-face and type-style rules of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman Font. It also complies with the type-volume limitation of Circuit Rules 27-1(1)(d) and 32-3(2) because it contains 5,084 words, excluding the parts of the Motion exempted by Federal Rule of Appellate Procedure 32(f).

October 3, 2023                                     *s/ Melissa Arbus Sherry*
                                                               Melissa Arbus Sherry

# ADDENDUM

# TABLE OF CONTENTS

| Date | Dkt. No. | Description | Exhibit |
|---|---|---|---|
| 07/20/2023 | 461 | Order re: CREXi's Motion for Entry of Rule 54(b) Partial Final Judgment or Alternatively, Certification for Appeal Under 28 U.S.C. 1292(b) [368] | A |
| 02/23/2023 | 340 | Order re: Counterclaim Defendants' 12(b)(6) Motion to Dismiss Amended Counterclaim [198] | B |
| 06/17/2022 | 146 | Order re: Counterclaim Defendants' 12(b)(6) Motion to Dismiss Counterclaim [82] | C |

# EXHIBIT A

1

2

3

4

5

6

7

8          **UNITED STATES DISTRICT COURT**

9          **CENTRAL DISTRICT OF CALIFORNIA**

10

11   COSTAR GROUP, INC., and
     COSTAR REALTY INFORMATION,          CASE NO. 2:20-cv-08819-CBM-ASx
12   INC.,

13                  Plaintiffs,           **ORDER RE: CREXI'S MOTION FOR**
                                          **ENTRY OF RULE 54(B) PARTIAL**
14          v.                            **FINAL JUDGMENT OR**
                                          **ALTERNATIVELY,**
15   COMMERCIAL REAL ESTATE              **CERTIFICATION FOR APPEAL**
     EXCHANGE, INC.,                      **UNDER 28 U.S.C. 1292(B). [368]**
16
                    Defendant.
17

18   COMMERCIAL REAL ESTATE
     EXCHANGE, INC.,
19
                    Counterclaimant,
20
            v.
21
     COSTAR GROUP, INC., and
22   COSTAR REALTY INFORMATION,
     INC.,
23
                    Counterdefendants.
24

25          The matter before the Court is Defendant and Counterclaimant Commercial

26   Real Estate Exchange, Inc.'s ("CREXi") Motion for Entry of Rule 54(B) Partial

27   Final Judgment or Alternatively, Certification for Appeal Under 28 U.S.C.

28   1292(B). (Dkt. No. 368.)

## I. BACKGROUND

Plaintiffs and Counterdefendants CoStar Group, Inc. and CoStar Realty Information, Inc. ("CoStar") provide commercial real estate ("CRE") services in three relevant markets: CRE information, CRE listings, and CRE auction services. (Counter Compl. ¶ 1, Dkt. 74.)  CREXi is a competitor attempting to build its own online CRE marketplace and technology platform.  (*Id.* ¶ 2.)  CoStar filed this lawsuit on September 25, 2020 alleging that CREXi "harvests content, including broker directories, from CoStar's subscription database without authorization by using passwords issued to other companies.".  (Dkt. 1.)  The operative Complaint is the second amended complaint ("SAC") which alleges the following causes of action: 1) Copyright Infringement, 2) Removal of Copyright Management Information pursuant to 17 U.S.C. §§ 1202(b)(1), 3) Distribution of Works with Removed or Altered CMI pursuant to 17 U.S.C. §§1202(b)(3), 4) Common Law Misappropriation, 5) California Unfair Competition, 6) California False Advertising Law and 7) Breach of Contract.  The Court previously ruled on two motions to dismiss CoStar's First and Second Amended Complaints. (Dkt. Nos. 71, 406.)

CREXi filed Counterclaims on June 23, 2021.  (Dkt. No. 74.)  CREXi alleges CoStar has a 90% market share in each of the three CRE markets and engages in anticompetitive and other illegal conduct in order to block and bankrupt competition.  (*Id.*)  This conduct includes blocking CREXi from accessing any websites hosted by CoStar, altering information and images on websites it hosts including by adding watermarks and its own logo, and using CREXi's trademarked name in the header of advertisements placed on Google.

CoStar filed a Motion to Dismiss CREXi's Counterclaims, which the Court granted with leave to amend except as to CREXi's ninth claim for trademark infringement, thirteenth claim for unlawful violations of the UCL, and fourteenth claim for declaratory judgment.  (Dkt. No. 146.)  On August 5, 2022, CREXi filed

its First Amended Counterclaims, the operative pleading, which asserts fourteen causes of action against CoStar: monopolization and attempted monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, for each of the three (3) relevant markets where CREXi and CoStar compete (Claims 1–6); use of exclusionary contract provisions under Section 1 of the Sherman Act, 15 U.S.C. § 1, and California's Cartwright Act, B&P § 16720, respectively (Claims 7–8); trademark infringement under 15 U.S.C. § 1114 (Claim 9); intentional interference with contract and intentional interference with prospective economic advantage causes of action (Claims 10-11); unfair competition based on the anticompetitive conduct under California's Unfair Competition Law ("UCL"), B&P § 17200 (Claim 12); unlawful competition under the UCL based on the antitrust, trademark, or false advertising claims (Claim 13); and declaratory relief (Claim 14). (Dkt. No. 162.)

CoStar moved to dismiss CREXi's amended counterclaims. (Dkt. No. 198.) CoStar's motion was directed at all of CREXi's amended counterclaims, with the exception of CREXi's claim for trademark infringement and unlawful competition predicated on CoStar's alleged trademark infringement, as the Court previously held that those claims plausibly stated a claim. (*See* Dkt. No. 146.) On February 23, 2023, the Court granted CoStar's Motion to Dismiss CREXi's First Amended Counterclaims, dismissing with prejudice CREXi's counterclaims based on allegations of antitrust violations and tortious interference committed by CoStar (Claims 1–8, 10–12, and 14). (Dkt. No. 340.) The surviving counterclaims are CREXi's claims for trademark infringement and unlawful competition predicated on CoStar's alleged trademark infringement. CREXi now requests that the Court enter partial final judgment on the dismissed claims pursuant to Federal Rule of Civil Procedure 54(b), or alternatively certify the order for interlocutory appeal under 28 U.S.C. § 1292(b), so that CREXi may seek appellate review of the Court's ruling.

## II.    STATEMENT OF THE LAW

### A.    Rule 54(b)

Rule 54(b) provides a device for parties to seek interlocutory review of orders that are not truly "final" because they "do[ ] not dispose of all of the claims" in a suit. *See generally, e.g., Jewel v. Nat'l Sec. Agency*, 810 F.3d 622, 627-28 (9th Cir. 2015). A two-step process guides the Rule 54(b) analysis. "A district court must first determine that it has rendered a 'final judgment,' that is, a judgment that is 'an ultimate disposition of an individual claim entered in the course of a multiple claims action.'" *Wood v. GCC Bend, LLC*, 422 F.3d 873, 878 (9th Cir. 2005) (quoting *Curtiss–Wright Corp. v. Gen. Elec. Co*., 446 U.S. 1, 7 (1980)) (further quotation omitted). "Then it must determine whether there is any just reason for delay." *Wood*, 422 F.3d at 878.  The latter determination should consider: (1) the interrelationship of the certified claims and the remaining claims in light of the policy against piecemeal review; and (2) equitable factors such as prejudice and delay. *See Curtiss-Wright*, 446 U.S. at 8-10; *Gregorian v. Izvestia*, 871 F.2d 1515, 1518-20 (9th Cir. 1989).

Rule 54(b) "was adopted 'specifically to avoid the possible injustice of delay[ing] judgment o[n] a distinctly separate claim [pending] adjudication of the entire case.... The Rule thus aimed to augment, not diminish, appeal opportunity." *Jewel,* 810 F.3d at 628 (quoting *Gelboim v. Bank of Am. Corp.*, 135 S. Ct. 897, 902-03 (2015)). The Ninth Circuit has indicated in this vein that the modern trend is toward permitting Rule 54(b) certification, or, more exactly, "toward greater deference to a district court's decision to certify under Rule 54(b)." *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 798 (9th Cir. 1991). That court has also called the "unusual case" and "pressing needs" limitations of *Morrison-Knudsen Co. v. Archer*, 655 F.2d 962 (1981) "outdated and overly restrictive." *Ponsoldt*, 939 F.2d at 798. This assessment is consistent with the Supreme Court's disavowal of early guidance (from a 1946 Advisory Committee

1  note) that confined Rule 54(b) certification to the "infrequent harsh

2  case." *See Curtiss-Wright*, 446 U.S. at 10.

3       The rule is nevertheless applied "to prevent piecemeal appeals in cases

4  which should be reviewed only as single units." *Jewel*, 810 F.3d at

5  628 (quoting *Curtiss–Wright,* 446 U.S. at 10). The main concern will normally be

6  to adopt the approach that most efficiently disposes of a lawsuit. "It is left to the

7  sound judicial discretion of the district court to determine the 'appropriate time'

8  when each final decision in a multiple claims action is ready for appeal. This

9  discretion is to be exercised 'in the interest of sound judicial

10  administration.'" *Id.* (quoting *Curtiss-Wright*, 446 U.S. at 7) (quoting in turn *Sears,*

11  *Roebuck & Co. v. Mackey,* 351 U.S. 427, 437 (1956)); *see also Jewel,* 810 F.3d at

12  628 ("juridical concerns" regarding piecemeal appeals are reviewed *de novo*;

13  otherwise, "discretionary judgment of the district court should be given substantial

14  deference").

15  **B.**    **28 USC § 1292(b)**

16       Under 28 U.S.C. § 1292(b), parties may take an interlocutory appeal when

17  "exceptional circumstances justify a departure from the basic policy of postponing

18  appellate review until after the entry of a final judgment." *ICTSI Or., Inc. v. Int'l*

19  *Longshore & Warehouse Union*, 22 F.4th 1125, 1130 (9th Cir. 2022) (citing

20  *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978). To certify under Section

21  1292(b), the order at issue must meet the three certification requirements outlined

22  in § 1292(b): "(1) that there be a controlling question of law, (2) that there be

23  substantial grounds for difference of opinion [as to that question], and (3) that an

24  immediate [resolution of that question] may materially advance the ultimate

25  termination of the litigation." *Id.* (citing *In re Cement Antitrust Litig. (MDL No.*

26  *296)*, 673 F.2d 1020, 1026 (9th Cir. 1981).

27       Section 1292(b) embodies a "narrow exception to the final judgment rule."

28  *Couch v. Telescope Inc.,* 611 F.3d 629, 633 (9th Cir. 2010). "The party seeking

certification has the burden of showing that exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Fukuda v. Cty. of L.A.*, 630 F. Supp. 228, 299 (C.D. Cal. 1986) (citing *Livesay*, 437 U.S. at 475 ). Even where the statutory criteria of § 1292(b) are met, the district court "retains discretion to deny permission for interlocutory appeal." *Kuzinski v. Schering Corp.*, 614 F. Supp. 2d 247, 249 (D. Conn. 2009); *see, e.g., Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 47 (1995) ("[D]istrict courts [have] first[-]line discretion to allow interlocutory appeals" under § 1292(b).).

## III.  DISCUSSION

### A.    Rule 54(b) Certification

To grant a Rule 54(b) motion, the Court must first determine if Rule 54(b) is applicable to the proceedings.  First, there must be an action involving multiple claims for relief.  *See Liberty Mutual Ins. Co. v. Wetzel*, 424 U.S. 737, 742–43 (1976).  That requirement is satisfied here by CREXi's fourteen counterclaims for relief.  Second, there must be a "final judgment" with respect to one or more claims —in other words, a decision upon a cognizable claim for relief that it is an "ultimate disposition of an individual claim entered in the course of a multiple claims action." *Curtiss–Wright*, 446 U.S. at 7 (citation omitted).  The Court's Order granting CoStar's Motion to Dismiss Amended Counterclaims is sufficient to fulfill this requirement.

Next, the Court must expressly determine that there is no just reason for the delay and direct the entry of judgment.  *See id.; see also* Fed.R.Civ.P. 54(b). CREXi urges the Court to direct entry of partial final judgment on the following bases: (1) the dismissed counterclaims are substantially different from the remaining trademark infringement and unfair competition claims before the Court, (2) the legal issues to be appealed are complicated and not routine; (3) CREXi will be prejudiced by a delay in its ability to appeal the dismissal of its counterclaims

1   because the case has been pending for two and a half years; (4) immediate

2   appellate examination is important because CoStar's anti-competitive and tortious

3   conduct remains ongoing, disrupting CREXI's relationships with brokers and

4   preventing CREXi from gaining a foothold in numerous geographic markets; and

5   (5) having to wait until this entire case is resolved will inflict significant damage

6   on CREXi and its customers.

7       In opposition, CoStar argues the following: (1) the factual and legal overlap

8   between the dismissed counterclaims and remaining counterclaims will lead to

9   piecemeal appeals and waste judicial resources; (2) the Court's order applied well-

10  settled, controlling law and dismissed CREXI's counterclaims on multiple

11  grounds; and (3) CREXi will suffer no prejudice by waiting until the case

12  concludes to appeal.

13      The Court has considered the factors set forth in *Wood,* and the parties'

14  positions, and has determined that there is no just reason to delay the entry of final

15  judgment dismissing CREXi's antitrust and tortious interference counterclaims.

16  Entering a final judgment under the facts in this case would not result in

17  unnecessary or duplicative appellate review. Any subsequent judgments in this

18  case would not vacate the judgment on CREXi's antitrust and tortious interference

19  counterclaims. Moreover, CREXi's dismissed counterclaims are not legally or

20  factually related to the remaining counterclaims related to trademark infringement

21  and unlawful competition predicated on CoStar's alleged trademark infringement.

22  *See AmerisourceBergen Corp. v. Dialysist W., Inc.,* 465 F.3d 946, 954 (9th Cir.

23  2006).

24      On April 17, 2023, the Court accepted the Special Master's Report and

25  Recommendation to amend the scheduling order in this case. (Dkt. No. 373.) The

26  pretrial conference is set for September 24, 2024. (*Id.*) The trial is set for October

27  22, 2024. (*Id.*) Thus, without certification it may be several years before the

28  dismissed counterclaims are resolved and the dismissal of the antitrust and tortious

interference claims could be considered on appeal. Conversely, if final judgment on the dismissed counterclaims is entered, the appeal of the Court's dismissal may be resolved before final resolution of the underlying case on CoStar's claims and CREXi's remaining counterclaims. Thus, judicial efficiency is furthered by certifying final judgment on CREXi's dismissed counterclaims.

**B.    28 U.S.C. § 1292(b)**

Alternatively, CREXi asks the Court to certify the dismissal order for interlocutory appeal under 28 U.S.C. § 1292(b). Only if all three factors under 28 U.S.C. § 1292(b) are met may the Court certify an order for appeal. *Couch*, 611 F.3d at 633 ("Certification under § 1292(b) requires the district court to expressly find in writing that all three § 1292(b) requirements are met."). However, CREXi does not show that there is substantial ground for difference of opinion. The "substantial ground" prong is satisfied when "novel legal issues are presented, on which fair-minded jurists might reach contradictory conclusions." *Int'l Longshore and Warehouse Union*, 22 F.4th at 1130 (citation omitted). Further, Section 1292(b) is reserved for non-dispositive orders and the Court's Order dismissing CREXi's amended counterclaims is a final order on the merits. *See In re Cement Antitrust Litig.*, 673 F.2d at 1026; *Sateriale v. RJ Reynolds Tobacco Co.,* 2015 WL 3767424, *2 (C.D. Cal. June 17, 2015).

## IV.  CONCLUSION

Accordingly, the Court **GRANTS** CREXi's Motion for Entry of Rule 54(b) Partial Final Judgment with respect to CREXi's dismissed counterclaims.

**IT IS SO ORDERED.**

DATED:  JULY 20, 2023.

_____
CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

# EXHIBIT B

1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

8

**CENTRAL DISTRICT OF CALIFORNIA**

9

10    CoStar Group, Inc., *et al.,*

11             Plaintiff,

      v.

12    Commercial Real Estate Exchange
      Inc.,

13

             Defendant.

14

15

|  |  |
|---|---|
| Case No.:  2:20-cv-08819-CBM-AS | |
| **ORDER RE: COUNTERCLAIM DEFENDANTS' 12(B)(6) MOTION TO DISMISS AMENDED COUNTERCLAIM [198]** | |

16         The matter before the Court is Plaintiffs and Counterclaim Defendants

17    CoStar Group, Inc. and CoStar Realty Information, Inc.'s (collectively "CoStar")

18    Motion to Dismiss the Amended Counterclaims brought by Defendant and

19    Counterclaimant Commercial Real Estate Exchange, Inc. ("CREXi").  (Dkt. No.

20    198.)

21                          **I.    BACKGROUND**

22         The background for this case is set forth in the Court's June 17, 2022 Order

23    granting CoStar's Motion to Dismiss CREXi's Counterclaims.  (*See* Dkt. No.

24    146.)  The original Counterclaims asserted fourteen causes of action against

25    CoStar: monopolization and attempted monopolization under Section 2 of the

26    Sherman Act, 15 U.S.C. § 2, for each of the three (3) relevant markets where

27    CREXi and CoStar compete (Claims 1–6); use of exclusionary contract provisions

28

1

under Section 1 of the Sherman Act, 15 U.S.C. § 1, and California's Cartwright Act, B&P § 16720, respectively (Claims 7–8); trademark infringement under 15 U.S.C. § 1114 (Claim 9); false advertising under 15 U.S.C. § 1125(a)(1)(B) (Claim 10); false advertising under California's False Advertising Law, B&P § 17500 (Claim 11); unfair competition based on the anticompetitive conduct under California's Unfair Competition Law ("UCL"), B&P § 17200 (Claim 12); unlawful competition under the UCL based on the antitrust, trademark, or false advertising claims (Claim 13); and declaratory relief (Claim 14). (Dkt. No. 74 – Counterclaims and Demand for Jury Trial.)  The Court denied CoStar's Motion to Dismiss CREXi's Counterclaims as to the ninth claim for trademark infringement, thirteenth claim for unlawful violations of the UCL, and the fourteenth claim for declaratory judgment, and granted the Motion to Dismiss as to all other claims with leave to amend to correct the deficiencies identified in the Court's Order. (Dkt. No. 146.)

The First Amended Counterclaims asserts the same causes of action with the addition of two new claims.  (Dkt. No. 162.)  In place of its false advertising counterclaims (Claims 10 and 11), CREXi added intentional interference with contract and intentional interference with prospective economic advantage causes of action.  (*Id.*)  CoStar moves to dismiss CREXi's amended counterclaims.  (Dkt. No. 198.)  CoStar's motion is directed at all of CREXi's counterclaims, with the exception of CREXi's claim for trademark infringement and its unlawful competition claim predicated on CoStar's alleged trademark infringement, as the Court previously held that CREXi's allegations as to those claims plausibly stated a claim. (*See* Dkt. No. 146.)

## II.    LEGAL STANDARD

To survive a motion to dismiss, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* (citations and punctuation omitted). When considering motions to dismiss, courts accept all facts alleged in the complaint as true, construe the pleadings in the light most favorable to the nonmoving party, and draws all reasonable inferences in favor of the plaintiff. *Ass'n for Los Angeles Deputy Sheriffs v. Cty. of Los Angeles*, 648 F.3d 986, 991 (9th Cir. 2011).

### III.    DISCUSSION

**A.    Antitrust Claims**

CREXi reintroduces its eight antitrust claims against CoStar.  CREXi asserts six claims under Section 2 of the Sherman Act for monopolization and attempted monopolization in each of the three markets in which they compete; one claim under Section 1 of the Sherman Act; and one claim under California's Cartwright Act for CoStar's use of exclusionary contractual provisions.  (First Amended Counterclaims ("FACC") ¶¶ 265-349.)  All of CREXi's antitrust claims require CoStar to have engaged in concerted or independent anticompetitive conduct under Section 1 and Section 2 of the Sherman Act, respectively.  *See Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 989-90 (9th Cir. 2020) ("*Qualcomm*"); *Cty. Of Tuloumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (explaining that the analysis under the Cartwright Act mirrors the Sherman Act).  The Court will therefore conduct a single analysis of the alleged anticompetitive conduct in this case instead of a separate analysis for each statutory provision.  *Qualcomm*, 969 F.3d at 991.

The Court starts its analysis of CREXi's antitrust claims by evaluating the alleged conduct in light of the recognition in antitrust law that a business generally has the right to refuse to deal with its competitors.  The Court then evaluates CoStar's alleged market power, a required element for all of CREXi's antitrust claims, based on the allegations of CoStar's market dominance in the geographic

3

markets where its anticompetitive conduct occurred.

## 1. Alleged Anticompetitive Conduct

"As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ("Linkline"). Likewise, "the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (alteration in original) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). "[T]he U.S. Supreme Court has recognized that a market participant's right to refuse to deal with competitors generally serves procompetitive purposes, and that restricting that right can have anticompetitive effects." *Facebook, Inc. v. BrandTotal Ltd.*, No. 20-CV-07182-JCS, 2021 WL 3885981, at *7 (N.D. Cal. Aug. 31, 2021) (quoting *Trinko*, 540 U.S. at 407–08). "This is because the antitrust laws, including the Sherman Act, were enacted for the protection of competition, not competitors." *Qualcomm*, 969 F.3d at 993 (9th Cir. 2020) (quotation omitted).

CREXi alleges that CoStar engaged in anticompetitive conduct in the relevant markets of Commercial Real Estate ("CRE") listing services, CRE information services, and CRE auction services in the following ways: blocking other users from working with CREXi, utilizing exclusionary contractual terms to prevent brokers from using CRE services, falsely claiming ownership over brokers' CRE information and photographs, and infringing on CREXi's trademarked name. (FACC ¶¶ 39-135.) CREXi also alleges that these exclusionary practices have substantially foreclosed competition in the relevant markets. *Id.* at ¶¶ 136-139. The Court reviews CoStar's alleged conduct to determine whether it was anticompetitive or merely a business's legitimate refusal

1  to provide free aid and assistance to a competitor.

2        **a. CoStar Blocks Access to Webpages hosted by CoStar**

3      CREXi realleges that "CoStar imposes technological blocks" that "prevent

4  CREXi from accessing brokers' CRE listings on brokers' own websites," which

5  imposes a "restraint to interfere with economic relationships between brokers and

6  CREXi." (FACC ¶¶ 39-43.) CREXi alleges CoStar does this by integrating its

7  LoopNet search technology to display brokers' CRE listings on their publicly

8  available website by utilizing database functionality offered by a webtool called

9  LoopLink. (*Id.*) Therefore, when brokers utilize the LoopLink widget to show

10 their CRE listings, CoStar integrates this with its LoopNet search technology so

11 that the listings automatically get listed on LoopNet.com. CoStar's LoopNet.com

12 website contains CoStar's copyrighted images, data from the CoStar database, and

13 edits made by CoStar to "improve marketability" of brokers' listings. (*Id.*)

14 CREXi alleges CoStar's "intended purpose" for this is to "lock-in brokers to

15 exclusive relationships with CoStar, deprive brokers of the effective use of their

16 own CRE listings, and to prevent competition in the marketplace." (*Id.* at ¶ 49.)

17 CREXi further alleges that "many brokerages have become dependent on LoopNet

18 as a repository for their broker-owned listings" and if such information is not

19 available to competitors, "it is often unfeasible for any competitor to compete with

20 CoStar for those brokers because . . . the only original copies the brokers have of

21 their listings are on the broker's LoopLink-powered website." (*Id*. at ¶ 41.) Thus,

22 CREXi alleges that the practical effect of these technological measures is to "lock-

23 in" brokers into exclusive dealing relationships with CoStar and prevent

24 competition in the CRE marketplace. (*Id.* at ¶ 49.)

25     LoopLink allows brokers to link their websites to CoStar's LoopNet suite

26 and use its search function. LoopLink is operated and hosted by CoStar, and as

27 the Court found in its previous Order, CoStar is not obligated to provide CREXi

28 with access to its websites and database. The main addition to CREXi's

allegations is that rather than seeking to deal with or utilize CoStar's websites directly, CREXi demands access to websites that utilize CoStar's platforms—LoopLink and LoopNet—linked on brokers' public websites. Brokers are not obligated to utilize LoopLink, and if they do, they are still free to utilize CREXi's services as well. Brokers are still free to hire CREXi or share the same information to both CREXi and CoStar. In fact, CREXi's allegations confirm that over 500 existing brokers utilize *both* CoStar and CREXi's services. (*See* FACC ¶¶ 99-100, 108, 257.) If CoStar did not exist, CREXi would still need to perform the same actions it needs to engage in today to conduct business: go to the individual brokers and request listings for CREXi's platform. (*See* Order at 7) ("CoStar blocking CREXi from its own websites does not forbid brokers from hiring CREXi or even stop brokers from sharing the exact same information to both CREXi and CoStar—it only appears to stop CREXi from accessing broker information through CoStar's own websites.") Whether brokers have become dependent on LoopNet and thus choose not to maintain additional copies of listings apart from what is on LoopNet is not anticompetitive conduct by CoStar.

Thus, the use of innovative technology to produce a link to a repository of CRE listings hosted by CoStar and from which CREXi is blocked from accessing is not anticompetitive conduct.

### b. CoStar's Alleged *De Facto* Exclusivity Provisions

CREXi alleges that CoStar utilizes contractual provisions to create a "de facto" exclusivity agreement between CoStar and brokers that impacts "access and use of CoStar's publicly accessible websites, and brokers' own websites hosted by LoopLink." (FACC ¶¶ 55-69.) CREXi further alleges that CoStar "lures" brokers into using its services with promising assurances that brokers will maintain rights and ownership of their listing and photographs, but that ultimately prevents brokers from using or share information obtained through LoopNet and other services. (*Id.* at ¶¶ 52-60.) Put another way, CREXi alleges that CoStar asks

6

brokers to give the company their data and then turns around and claims that data as its own without allowing brokers to use or distribute that data. (*Id*. at ¶ 64.) CREXi identifies terms in CoStar's contracts that allegedly "prohibit or limit customers' ability to use or reproduce content posted on CoStar's platforms." (*Id*. at ¶¶ 56-61.) CREXi includes testimony of brokers who allegedly did not engage CREXi because of CoStar terms of agreement that "deter" brokers from sharing equivalent data with CoStar's competitors. (*Id*. at ¶¶ 60-68.)

When CoStar obtains images from brokers, it adds a watermark or some other information to the listing, and posts the image to its own LoopNet website. (*Id.* at ¶¶ 71, 76, 79.) Notably however, brokers still maintain the rights to their original images and can give those images or listings to CREXi or any other third-party listing service, so long as that they do not take the images or information directly from LoopNet or LoopLink. Thus, the practical effect of these contractual provisions is that the public and brokers are free to access listings through LoopNet, LoopLink, or the brokers' own websites, but cannot copy and reuse the modified images. While CREXi provides examples of brokers refusing to list CRE properties on CREXi's website out of fear of violating CoStar's contractual provisions, the terms of use only pertain to images that are modified and located on LoopNet, not the brokers' website separable from LoopLink, nor original images maintained by brokers. If CREXi wishes to do business with brokers, CREXi can advise brokers to use their own images, not the modified images listed on LoopNet or linked through LoopLink.

Accordingly, CoStar's contractual provisions prohibiting use of CoStar-modified images do not constitute anticompetitive conduct.

### c. CoStar's Alleged False Claims of Ownership

CREXi alleges that CoStar falsely claimed intellectual property ownership over customers' CRE information and photographs to stifle competition. To do this, CREXi alleges, CoStar "demanded that CREXi hire a vendor to install an

image filter" to "screen for CoStar's copyrighted images" on CREXi's website and "filter out such images." (*Id.* at ¶ 92.)  Thereafter, CREXi employed Getty Images ("Getty"), a third-party vendor that provides image recognition technology to filter CoStar's copyrighted photographs on CREXi's website.  CoStar "represented" that the Getty filter would flag "only CoStar's copyrighted images." (*Id.* at ¶ 93.)  The Getty filter ultimately identified a number of images—one out of every nine images flagged—over which CoStar does not have a copyright, including images submitted to CREXi by brokers. (*Id.* at ¶¶ 93-95.) Consequently, in the course of scanning CREXi's website and upon receiving notification of the flagged images, CREXi sent copyright notices to brokers informing them that CoStar claimed ownership over their images on CREXi's website, which CREXI alleges, disrupted its relationships with those brokers. (*Id.* at ¶¶ 96-109.)

As a preliminary point, CoStar contests CREXi's characterization that CoStar "demanded" CREXi engage Getty Images to screen for CoStar's copyrighted images.  CoStar contends CREXi was not obligated to employ this vendor, or any vendor for that matter.  CoStar also contends that the "false positive" flagging by the Getty filter cannot be attributed solely to CoStar, if at all. CREXi alleges that CoStar falsely assured CREXi that the filter would scan only for CoStar's copyrighted images and populated the filter repository with images it does not own.  (FACC at ¶¶ 92-93.)  CREXi further alleges it "engaged CoStar's *proposed* vendor" to implement on its website, "at CREXi's own expense". (*Id.* at ¶ 93) (emphasis added.)  CoStar argues it cannot be responsible for Getty Images producing inaccurate flagged results or for actions CREXi took as a result of Getty Images' "false-positive" flagging.  CoStar further argues that CREXi could have reviewed and disputed the flagged results prior to sending copyright notices to brokers and "disrupting" those relationships.

The false-positive flagging of images on CREXi's website by Getty Images

1    and the subsequent actions CREXi took as a result are not sufficient to constitute

2    anticompetitive conduct by CoStar.

3                    **d.  CoStar's Alleged Infringement of CREXi's Trademark**

4            CREXi alleges that CoStar engaged in anticompetitive conduct by

5    purchasing "CREXi" as a Google AdWord and explicitly infringed the CREXI®

6    mark in the header and text of CoStar's advertisements.  (FACC ¶ 128.)  For

7    example, a search for "crexi" on Google yielded an advertisement for

8    "Commercial Buildings For Sale – Crexi" at the top of the results page that was

9    actually purchased by CoStar and links to CoStar's Ten-X website.  (*Id.*)  CREXi

10   cites to two cases for support which the Court previously determined do not

11   support a finding of anticompetitive conduct by CoStar.  *See Church & Dwight*

12   *Co. v. Mayer Labs., Inc*., 2011 WL 1225912, at *16 (N.D. Cal. Apr. 1, 2011) and

13   *Dodge Data & Analytics LLC v. iSqFt, Inc*., 183 F. Supp. 3d 855, 868 (S.D. Ohio

14   2016).  Upon revisiting those cases, the Court's opinion remains the same.  As the

15   Court noted in its previous Order, those cases apply a different standard for

16   analyzing a claim for anticompetitive conduct.  The Court in *Church* cited to

17   extensive allegations establishing anticompetitive conduct and the foreclosure of

18   competition in a substantial share of the relevant market.  *Church & Dwight Co.*,

19   2011 WL 1225912 at *14.  Here, however, CREXi alleges a relatively limited

20   number of instances of trademark infringement in ads for a CoStar subsidiary.

21   (FACC ¶¶118-35.)  As for *Dodge,* there the Court applied the Sixth Circuit test for

22   determining whether a defendant possessed sufficient market power.  183 F. Supp.

23   3d  at 865 (citing *Richter Concrete Corp. v. Hilltop Concrete Corp*., 691 F.2d 818,

24   826 (6th Cir.1982).  Although the Court previously found that CREXi stated a

25   claim for trademark infringement, such conduct is not enough to constitute

26   anticompetitive conduct. Accordingly, CREXi's trademark infringement

27   allegations are insufficient to constitute anticompetitive conduct.

28

### 2. Allegations of Market Power

"Market power is the ability to raise price profitably by restricting output." *Ohio v. Am. Express Co*., 138 S. Ct. 2274, 2288 (2018) (emphasis removed) (quoting Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 5.01 (4th ed. 2017)). "A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'" *Qualcomm*, 969 F.3d at 992 (citing *Am. Express Co.,* 138 S. Ct. at 2285). Under Section 1 and Section 2 of the Sherman Act "the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market." *Newcal Indus., Inc. v. Ikon Off. Sol.,* 513 F.3d 1038, 1044, 1044 n.3 (9th Cir. 2008). "The relevant market must include both a geographic market and a product market." *Hicks v. PGA Tour, Inc*., 897 F.3d 1109, 1120 (9th Cir. 2018). Such allegations need not be pled with specificity. *Newcal Indus., Inc*., 513 F.3d at 1045. Although the "validity of the 'relevant market' is typically a factual element rather than a legal one," an antitrust complaint may be dismissed under Rule 12(b)(6) "if the complaint's 'relevant market' definition is facially unsustainable." *Id*. In addition, "failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1063 (9th Cir. 2001).

CREXi alleges the relevant product markets for its antitrust claims are "Internet CRE listing services, Internet CRE information services, and Internet CRE auction services," (FACC ¶ 140) and the relevant geographic markets are "Individual Metropolitan Statistical Areas ("MSAs"). (*Id.* at ¶ 158.) CREXi provided a list of 50 MSAs at issue. (*Id.* 165, Ex. B.) CoStar does not challenge CREXi's identification of the relevant product markets or the relevant geographic markets, but does challenge its dominance in those markets.

### a. Market Dominance

The Ninth Circuit has indicated that "[m]arket power may be demonstrated

through either of two types of proof." *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). The first type of proof is "direct evidence of the injurious exercise of market power." *Id.* That is "evidence of restricted output and supracompetitive prices." *Id.* "Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition." *Am. Express Co.*, 138 S. Ct. at 2284 (quotation and citation omitted). The second and "more common type of proof is circumstantial evidence pertaining to the structure of the market." *Rebel Oil Co.*, 51 F.3d at 1434. "To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Id.* (citing *Ryko Mfg. Co. v. Eden Serv.*, 823 F.2d 1215, 1232 (8th Cir.1987), *cert. denied*, 484 U.S. 1026 (1988).

In support of direct evidence of market dominance, CREXi alleges the following: (1) the FTC intervened to block a number of CoStar's anticompetitive acquisitions, including LoopNet and RentPath; (2) nearly 90% of all CRE activity occurs on a CoStar Network; and (3) CoStar drastically increased its prices for informational services and listing services following the acquisition of LoopNet. (*Id.* at ¶¶186-27, 21-212, 215.) However, CREXi does not make any allegations regarding restricted output. In *Rebel Oil* the Ninth Circuit defined "direct evidence" as "evidence of restricted output ***and*** supracompetitive prices." 51 F.3d at 1434 (emphasis added). Therefore, CREXi's allegations are insufficient to support direct evidence of CoStar's market dominance.

In support of circumstantial evidence of market dominance, CREXi alleges that CoStar holds greater than 90% market share in the internet CRE listing services market.[1] With respect to listing services, CREXi's allegations include

---

[1] CREXi does not allege facts regarding CoStar's estimated market shares with respect to CoStar's Internet CRE information services and Internet CRE auction services products.

internal market analysis of CoStar's market share in 50 MSAs and determined the following: in 12 MSAs, CoStar's market share is at least 90%; in 31 MSAs, it is at least 80%; in 38 MSAs, it is at least 70%; in 46 MSAs, it is at least 60%; and CoStar's market share exceeds 57% in all 50 MSAs. (FACC ¶¶ 220-23.) CREXi alleges that it determined these market shares using 2021 data on the dollar value of sale listings in relation to the total value of closed CRE sales transactions in each MSA. (*Id.*) However, CoStar is not in the business of selling property so the total value of closed CRE sales to the dollar value of properties in CoStar's listings does not represent CoStar's market share in the *listing services* market. Accordingly, CREXi's allegations do not plausibly demonstrate monopoly power in the relevant market—the CRE listing services market.

### b. Entry Barriers

The Ninth Circuit has defined entry barriers as "additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants," or "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427-28 (9th Cir.1993). "The main sources of entry barriers are: (1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preference; (4) capital market evaluations imposing higher capital costs on new entrants; and, in some situations, (5) economies of scale." *Rebel Oil*, 51 F.3d at 1439. "To justify a finding that a defendant has the power to control prices" sufficient to warrant judicial intervention, "entry barriers must be ... capable of constraining the normal operation of the market to the extent that the problem is unlikely to be self-correcting." *Id.* (citing *United States v. Syufy Enters.*, 903 F.2d

Instead, CREXi alleges that the markets for information and auction services are complementary to listing services and thus, market level monopoly power in CRE listing services translates to market-level monopoly power in CRE information and CRE auction services. (FACC ¶¶ 224-25.) The Court does not reach this issue given that CREXi's allegations of market power for the listing services market are insufficient to state a claim.

659, 663 (9th Cir.1990)).

CREXi alleges that competitors cannot increase output in the short run to bring CoStar's prices down due to "their inability to put any downward pressure on CoStar's inflated prices." (FACC ¶ 226.) CREXi also alleges the following barriers to entry: "sunk cost of developing CRE services and software, network effects that favor well-entrenched players, high switching costs, and other barriers created by CoStar's practices." *Id.* at ¶¶ 166-78. Having found the allegations insufficient to support CoStar's dominant share of the relevant markets, this cause of action does not survive.

Based on the foregoing deficiencies, Claims 1–8 in the Amended Counterclaim for antitrust violations under Section 1 and Section 2 of the Sherman Act and the Cartwright Act fail to state a claim.

**B. Intentional Interference with Contract and Prospective Economic Advantage (Claims 10-11)**

CREXi alleges two new claims in its amended counterclaims: intentional interference with contract and interference with prospective economic advantage. CoStar takes issue with CREXi's new claims and argues that it is outside the scope of the Court's Order granting leave to amend. Pursuant to Federal Rule of Civil Procedure 15, CREXi may bring new claims "only with the opposing party's written consent or the court's leave." Moreover, "where leave to amend is given to cure deficiencies in certain *specified claims*, courts have agreed that new claims alleged for the first time in the amended pleading should be dismissed or stricken." *DeLeon v. Wells Fargo Bank, N.A.*, 2010 WL 4285006, at *3 (N.D. Cal. 2010). In its Order, the Court identified CREXi's deficiencies as to each claim alleged in its Counterclaims and granted leave to amend as to those claims. Therefore, CREXI's new claims are not permitted. Nonetheless, the Court finds CREXi's new claims do not survive as a matter of law.

To prove intentional interference with contractual relations under California

law, CREXi must show: (1) that there was a valid contract between CREXi and third parties; (2) that CoStar knew of these contracts; (3) that CoStar took intentional acts designed to induce a breach or disruption of these contractual relationships; (4) that an actual breach or disruption of the contractual relationships occurred; and (5) that this conduct resulted in damage to CREXi. *United Nat. Maintenance, Inc. v. San Diego Convention Center, Inc*., 766 F.3d 1002, 1006 (9th Cir. 2014).  To prove intentional interference with prospective economic advantage, CREXi must demonstrate an economic relationship between CREXi and a third party, with a probability of future economic benefit to CREXi, in addition to the elements of CoStar's knowledge, CoStar's intentional acts, CoStar's actual disruption of economic relationships, and damage to CREXi. *O'Connor v. Uber Technologies, Inc.*, 58 F. Supp. 3d 989, 996 (N.D. Cal. 2014).

CREXi alleges that CoStar's conduct impeded, disrupted, and hampered CREXi's ability to provide services to its clients.  CREXi cites to the following conduct as disrupting its contractual and economic relationships with its customers: (1) blocking CREXi from brokers' websites hosted by LoopLink; (2) CoStar's alleged claims of copyright ownership over photos flagged by a third-party vendor employed by CREXi; and (3) CoStar's exclusionary contracts leading users to "balk" at continuing to use or invest in CREXi's services. (FACC ¶ 256-261.)  CREXi's arguments rest on its underlying claims of anticompetitive conduct. (*See id.* at ¶¶ 257-264.)  Moreover, CREXi's reliance on conduct of a third-party vendor cannot be attributed to CoStar for purposes of alleging that CoStar intentionally engaged in conduct that induced a breach or disruption in CREXi's relationship with its customers.  CoStar's conduct has only prevented its competitors including CREXi, from accessing CoStar's own website and services.  CREXi's fundamental issue that brokers do not want to spend time re-creating listings is not intentional conduct by CoStar.  Accordingly, CREXi's claims for tortious interference with contractual relations and prospective economic

advantage fail to state a claim.

### C. Unfair and Unlawful Competition Claims

CREXi alleges that CoStar engaged in unfair and unlawful competition under Cal. Bus. & Prof. Code § 17200 based on its underlying antitrust and tortious interference claims. (FCC ¶¶ 373-278.) CREXi alleges that CoStar engaged in unfair business practices by (1) leveraging LoopLink to force customer use of LoopNet and surreptitiously blocking competitors' access to brokers' own listings on brokers' own websites, to prevent brokers from working with competitors; (2) imposing exclusionary contractual restrictions to prevent brokers from using competitors' services; (3) falsely claiming intellectual property ownership over customers' CRE information and photographs to stifle competition; and (4) infringing CREXi's trademark to advertise CoStar's products and services and unfairly compete with CREXi. (*Id.* at ¶ 375.)

Having failed to allege sufficient facts to support the underlying antitrust and tortious interference claims, there can be no unfair competition under the UCL. "If the same conduct is alleged to be both an antitrust violation and an 'unfair' business act . . . for the same reason . . . the determination that the conduct is not an unreasonable restraint of trade necessarily implies that conduct is not 'unfair'." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1124 (9th Cir. 2018) (quoting *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001)). Accordingly, CREXi's unfair and unlawful competition claims fail to state a claim.

### D. Declaratory Relief

CREXi seeks a declaratory judgment that (i) finds that CREXi is not engaging in unlawful conduct by accessing CoStar's websites, (ii) prohibits CoStar from taking steps to block CREXi's access to its websites, and (iii) finds that CoStar has engaged in unlawful conduct by blocking CREXi's access to CoStar's websites. (FACC ¶ 386.) CREXi's claim for declaratory relief is based upon its antitrust violation claims, and therefore, its request for declaratory relief

fails.

## IV.  CONCLUSION

Accordingly, the Court **GRANTS** CoStar's Motion to Dismiss the First Amended Counterclaims with prejudice.  CREXi's ninth claim for trademark infringement and thirteenth claim for unlawful violations of the UCL predicated on CoStar's alleged trademark infringement, which are not the subject of CoStar's Motion or this Order, remain to be adjudicated.

**IT IS SO ORDERED.**

DATED:  FEBRUARY 23, 2023.

_____
CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

EXHIBIT C

1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10

11 | CoStar Group, Inc., *et al*., | Case No.:  CV 20-8819-CBM(ASx)

12 |      Plaintiffs, | **ORDER RE: COUNTERCLAIM**
**DEFENDANTS' 12(B)(6) MOTION**

13 | v. | **TO DISMISS COUNTERCLAIM**
**[82]**

14 | Commercial Real Estate Exchange Inc.

15 |     Defendant.

16      The matter before the Court is Plaintiffs and Counterclaim Defendants

17 CoStar Group, Inc. and CoStar Realty Information, Inc.'s (collectively "CoStar")

18 Motion to Dismiss the Counterclaim brought by Defendant and Counterclaim

19 Plaintiff Commercial Real Estate Exchange, Inc. ("CREXi").  (Dkt. 82.)  The

20 matter is fully briefed.

21         **I.    BACKGROUND**

22      CoStar provides commercial real estate ("CRE") services in three relevant

23 markets: CRE information, CRE listings, and CRE auction services.  (CC ¶ 1, dkt.

24 74.)  CREXi is a competitor attempting to build its own online CRE marketplace

25 and technology platform.  (*Id.* ¶ 2.)  CREXi alleges CoStar has 90% market share

26 in each of these three markets and engages in anticompetitive and other illegal

27 conduct in order to block and bankrupt competition.  This conduct includes

28 blocking CREXi from accessing any websites hosted by CoStar, altering

information and images on websites it hosts including by adding watermarks and its own logo, and a CoStar subsidiary including CREXi's trademarked name in the header of advertisements placed on Google. The Court has previously ruled on a motion to dismiss in the underlying case. (Dkt. 71.)

The Counterclaim was filed June 23, 2021, and alleges the following[1]: Claims 1–6 are for both monopolization and attempted monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, for each of the three (3) relevant markets where CREXi and CoStar compete; Claims 7–8 are brought under Section 1 of the Sherman Act, 15 U.S.C. § 1, and California's Cartwright Act, B&P § 16720, respectively, for CoStar's use of exclusionary contract provisions; Claims 9, 10, and 11 are brought under the Lanham Act for trademark infringement, 15 U.S.C. § 1114, false advertising, 15 U.S.C. § 1125(a)(1)(B), and California's False Advertising Law, B&P § 17500, respectively, due to CoStar's use of CREXi's trademark in certain Google ads; Claim 12 is brought under the "unfair" prong of California's Unfair Competition Law ("UCL") based on the anticompetitive conduct, B&P § 17200, and Claim 13 is brought under the unlawful prong of the UCL based on the antitrust, trademark, or false advertising claims; and Claim 14 is for declaratory relief.

## II.   STATEMENT OF THE LAW

Defendants move to dismiss the entire Counterclaim with prejudice for failure to state a claim pursuant to Fed. R. Civ. Proc. 12(b)(6). Rule 12(b)(6) allows a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. Proc. 12(b)(6). Dismissal of a complaint can be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). To survive a motion to dismiss, the complaint

---

[1] For readability of this Order the Court uses the word claims to refer to the causes of action within the Counterclaim.

"must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663, (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A formulaic recitation of the elements of a cause of action will not suffice. *Twombly*, 550 U.S. at 555. Labels and conclusions are insufficient to meet the plaintiff's obligation to provide the grounds of his or her entitlement to relief. *Id.* "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* On a motion to dismiss for failure to state a claim, courts accept as true all well-pleaded allegations of material fact and construes them in a light most favorable to the non-moving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031–32 (9th Cir. 2008). The court may only consider the allegations contained in the pleadings, exhibits attached to or referenced in the complaint, and matters properly subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).[2]

## III.    DISCUSSION

### A.    Antitrust Claims

CREXi brings a total of eight antitrust claims against CoStar. CREXi brings a total of six claims under Section 2 of the Sherman Act for both monopolization and attempted monopolization in each of the three markets in which they compete. (CC ¶¶ 28–46.) CREXi also brings one claim under Section 1 of the Sherman Act and another under California's Cartwright Act for CoStar's use of exclusionary contractual provisions. (CC ¶¶ 30 –316.) All of CREXi's antitrust claims require CoStar to have engaged in anticompetitive conduct; the only difference between the statutory requirements of the Sherman Act claims is that "Whereas § 1 of the Sherman Act targets *concerted* anticompetitive conduct, § 2 targets *independent*

---

[2] At the hearing both parties presented and discussed information beyond the allegations in the Counterclaim which the Court declines to consider for purposes of ruling on the instant Motion to Dismiss.

anticompetitive conduct." *Qualcomm*, 969 F.3d at 989–90 (emphasis in original); *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (explaining that the analysis under the Cartwright Act mirrors the Sherman Act). The Court will therefore conduct a single analysis of the alleged anticompetitive conduct in this case instead of a separate analysis for each statutory provision. *Qualcomm*, 969 F.3d at 991.

The Court starts its analysis of CREXi's antitrust claims by evaluating the alleged conduct in light of the recognition in antitrust law that a business generally has the right to refuse to deal with its competitors. The Court then evaluates CoStar's alleged market power, a required element for all of CREXi's antitrust claims, based the allegations of CoStar's market dominance in the geographic markets where its anticompetitive conduct occurred.

### 1. **Alleged Anticompetitive Conduct**

CREXi alleges that in each the relevant product markets (Internet CRE listing services, Internet CRE information services, and Internet CRE auction services) CoStar engaged in three types of anticompetitive conduct: imposing exclusionary contractual and technological measures, falsely claiming ownership over CRE information, and infringing CREXi's trademark.[3] (CC ¶¶ 109(i)-(iii).)

### a. **Refusal to Deal**

"As a general rule, businesses are free to choose the parties with whom they

---

[3] At least some of the alleged conduct could not plausibly impact all three of the relevant product and geographic markets. For example, the alleged trademark infringement is limited to a CoStar subsidiary's ads on Google for its own Internet CRE auction services, often for specific cities, that also used CREXi's mark. There are no plausible allegations connecting that trademark infringement with anticompetitive results in the other two product markets or any other geographic market. However, the Court does not need to address the relationship between each category of alleged anticompetitive conduct, product market, and hypothetical geographic market because each of these is a required element of CREXi's antitrust claims and each of them is based on deficient allegations.

will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ("*Linkline*").  Likewise, "the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (alteration in original) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)); *see also Trinko*, 540 U.S. at 411 ("there is no duty to aid competitors.").  "[T]he U.S. Supreme Court has recognized that a market participant's right to refuse to deal with competitors generally serves procompetitive purposes, and that restricting that right can have anticompetitive effects." *Facebook, Inc. v. BrandTotal Ltd.*, No. 20-CV-07182-JCS, 2021 WL 3885981, at *7 (N.D. Cal. Aug. 31, 2021) (quoting *Trinko*, 540 U.S. at 407–08).  "This is because the antitrust laws, including the Sherman Act, were enacted for the protection of competition, not competitors." *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) (quotation omitted) ("*Qualcomm*").

There are also certain "limited exceptions" to a business's right to refuse to deal with its competitors when antitrust laws will in fact require competitors to deal with each other, such as the Essential Facilities doctrine identified by the Ninth Circuit.  This doctrine "imposes liability where competitors are denied access to an input that is deemed essential, or critical, to competition." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) ("*Aerotec*").  This doctrine requires, among other things, that competitors be "unable reasonably or practically to duplicate the facility," and is limited to where control of a facility "carries with it the power to eliminate competition in the downstream market." *Id.* at 1185 (quoting *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 544 (9th Cir. 1991)).  CREXi expressly disclaims reliance on any exception to the refusal to deal doctrine because it argues CoStar is directly

liable under antitrust laws, but CREXi seeks to have CoStar's data treated as if it were an Essential Facility even though its current allegations do not satisfy the requirements of that doctrine. Moreover, the existence of such exceptions emphasizes how narrow and rare the circumstances are when antitrust laws will affirmatively require businesses to deal with their competitors such as through sharing access to data. The Court therefore reviews CoStar's alleged conduct to determine whether it was anticompetitive or merely a business's legitimate refusal to provide free aid and assistance to its competitor.

### b. **CoStars Blocks Competitors from Accessing CRE Listing Information on its Own Websites**

CREXi argues that CoStar imposes exclusionary contractual provisions and technological measures in order to "block competitors from accessing public CRE information" on CoStar's own website, the website of its subsidiary LoopNet, and the websites of independent brokers that are hosted by its subsidiary LoopLink.[4] (CC ¶¶ 109, 112, 116.)

CREXi repeatedly alleges CoStar has made the blocked CRE listing information available to the "public" for free and continually describes it as "publicly available" but CREXi fails to explain either of those terms and how they support its antitrust claims. (*E.g., id.* ¶¶ 31, 163 (alleging CoStar "has adopted and enforced anticompetitive contractual and other exclusionary measures to block competitors from accessing publicly available CRE listing information on

---

[4] For the purposes of analyzing the sufficiency of CREXi's antitrust counterclaims, the Court ignores any factual disputes and generally finds it unnecessary to distinguish which specific subsidiary's website contained the CRE information because it is undisputed that they were all ultimately hosted by CoStar. The Court recognizes, however, that there may be significant differences in what CoStar is permitted to do contractually or otherwise when the CRE information is located on an independent broker's website that is hosted by a CoStar subsidiary.

LoopNet, CoStar, and LoopLink-hosted broker websites.").)  But there is an inherent contradiction between the allegations that CoStar chose to make this information available to the public for free and the allegations that CREXi and competitors have been blocked from accessing information available to the public. (*Compare* CC ¶¶ 120–129 *with id.* ¶¶ 130–145.) This is because if CREXi and others have been blocked then, by definition, that information was never available to the public.  PUBLIC, Black's Law Dictionary (11th ed. 2019) ("Open or available for all to use, share, or enjoy.").  More accurately described, CoStar chose to make the Internet CRE listing information available for free to the anyone *except its direct competitors*.

CREXi argues that being blocked from CoStar's websites prevents brokers from making "public" listings available to competitors and is analogous to *Lorain Journal Co v. United States*, where the Supreme Court found that newspapers committed an antitrust violation when they prohibited advertisers from using radio.  42 U.S. 143, 152 (1951).  But the analogy fails because CoStar blocking CREXi from its own websites does not forbid brokers from hiring CREXi or even stop brokers from sharing the exact same information to both CREXi and CoStar—it only appears to stop CREXi from accessing broker information through CoStar's own websites.  The fundamental problem for CREXi is that "[o]nce brokers prepare listing information for a new property, they do not want to re-create it."  (CC ¶ 118.)  But this unwillingness by brokers cannot be described as anticompetitive conduct by CoStar.

In effect, CREXi seeks assistance in the form of free access to valuable information solely because CoStar chose to give that information to others for free.  But the antitrust laws do not compel CoStar to provide such assistance to a competitor.  CREXi argues this is not assistance under the refusal to deal doctrine because it instead merely seeks to stop CoStar's affirmative steps of imposing a vertical input restraint by "chok[ing] off competitors' access to public CRE listing

information that CoStar does not own." (Opp'n at 8 (emphasis omitted)).  But as explained above, this information was not "public," the fact that CoStar does not own it only highlights that CREXi has not been denied access to anything it cannot obtain it elsewhere, and it is legally irrelevant because "mandating access . . . shares the same concerns as mandating dealing with a competitor."  *See Aerotec*, 836 F.3d at 1185.  Therefore, as a matter of law, the information CREXi seeks from CoStar (for free no less) constitutes a form of assistance under the antitrust laws that CoStar is not obligated to provide.

Accordingly, it is not anticompetitive conduct for Costar to block its competitors from accessing CRE listing information hosted on its own websites.

### c. **CoStar's Claims of Ownership over CRE Information and Photographs on its Own Websites**

CREXi next argues that even though CoStar's contracts with brokers do not contain an exclusivity clause, CoStar has established a de facto exclusivity clause that raises costs and creates a barrier to entry for competitors through its claims of ownership over CRE information and photographs, including by altering information and adding watermarks and logos onto some photos it hosts. (CC ¶ 171-189.)  This exclusivity clause allegedly constitutes anticompetitive conduct because it raises the costs for CoStar's rivals and creates a barrier to their entry.  However, these allegations are insufficient because they do not show how the "de facto" exclusivity clause "substantially foreclosed dealing with a competitor for the same good or service"  because brokers expressly retain the rights to the original information and photographs they provided to CoStar.  *Aerotec*, 836 F.3d at 1182.  This alleged de facto exclusivity clause therefore cannot increase or otherwise impact CREXi's costs when it obtains information directly from the brokers or any other source besides CoStar's websites.  Further, CoStar adding watermarks or logos to the versions hosted on its websites only increases CREXi's costs because it makes copying CoStar less financially appealing, presumably

8

because CREXi is unwilling to host pictures with a competitor's logo or watermark. (CC ¶¶ 114-16.) It is not anticompetitive for CoStar to seek to limit the amount it in effect subsidizes its competitors.

As explained above, CoStar is under no obligation to provide information or photographs to CREXi at all, so its decision in some cases to add watermarks or logos to the information to hosts is not anticompetitive conduct.

### d. **CoStar Infringes CREXi's Trademark**

CREXi finally argues that CoStar engaged in anticompetitive conduct by blatantly infringing on its trademark when it purchased CREXi as a Google AdWord as well as when it included CREXi in the header to Google ads for CoStar's Ten-X product. (CC ¶¶ 190-206.) CREXi cites to two cases to argue that trademark infringement in combination with other exclusionary conduct may constitute anticompetitive conduct under Section 2 of the Sherman Act. (Opp'n at 13 (citing *Church & Dwight Co. v. Mayer Labs.*, Inc., 2011 WL 1225912, at *16 (N.D. Cal. Apr. 1, 2011) and *Dodge Data & Analytics LLC v. iSqFt, Inc.*, 183 F. Supp. 3d 855, 868 (S.D. Ohio 2016)).) But neither case reaches that conclusion, and such a holding is contrary to the actual standards applied by those courts. *Church* required the trademark infringement to "establish substantial foreclosure from competition," 2011 WL 1225912, at *16, and *Dodge Data* required "the conduct be designed to have an anticompetitive effect on the relevant market," 183 F. Supp. 3d at 868. CREXi does not reference either of these holdings, and under either standard the Counterclaim's allegations regarding a relatively limited number of instances of trademark infringement in ads for a CoStar subsidiary are insufficient.

Accordingly, CoStar's alleged infringement of CREXi's trademark does not constitute anticompetitive conduct.

### 2. **Allegations of Market Power**

"Market power is the ability to raise price profitably by restricting output."

9

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018) (emphasis removed) (quoting Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 5.01 (4th ed. 2017)). "A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'" *Qualcomm*, 969 F.3d at 992 (citing *Am. Express Co.*, 138 S. Ct. at 2285). Under Section 1 and Section 2 of the Sherman Act "the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044, 1044 n.3 (9th Cir. 2008). "The relevant market must include both a geographic market and a product market." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018). Such allegations need not be pled with specificity. *Newcal Indus.*, Inc., 513 F.3d at 1045. Although the "validity of the 'relevant market' is typically a factual element rather than a legal one," an antitrust complaint may be dismissed under Rule 12(b)(6) "if the complaint's 'relevant market' definition is facially unsustainable." *Id.* In addition, "failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1063 (9th Cir. 2001).

CREXi alleges the relevant product markets for its antitrust claims are "Internet CRE listing services, Internet CRE information services, and Internet CRE action services," (CC ¶ 28) and the relevant geographic markets are "individual metropolitan areas." (*Id.* ¶ 47.) In order to establish CoStar's market power, CREXi alleges on information and belief for each product market that CoStar's current share is over either 90% or 95% and that "CoStar is dominant in an overwhelming majority of metropolitan areas." (*Id.* ¶¶ 102–104.) CoStar does not challenge CREXi's identification of the relevant product markets but does challenge its allegations regarding the relevant geographic market and its dominance in that market.

a. **Geographic Market of the Antitrust Violations**

"A geographic market is an area of effective competition where buyers can turn for alternate sources of supply." *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991) (cleaned up). A geographic market must "'correspond to the commercial realities' of the industry and be economically significant." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962) ("although the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area.") (citation omitted). In other words, "a market is the group of sellers or producers who have the actual or potential ability to deprive each other of significant levels of business." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir.1995) (quoting *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir.1989)) (internal quotation marks omitted).

CoStar argues that the allegations of the geographic markets for CREXi's antitrust claims are insufficient because they do not identify a single specific location, provide a definition of what constitutes "individual metropolitan areas," or explain why the claim is limited to those metropolitan areas, and that these deficiencies also prevent it from defending itself. (Mot. at 15; Reply at 6 (quoting *Orchard Supply Hardware LLC v. Home Depo USA, Inc.*, 939 F. Supp. 2d 1002, 1010 (N.D. Cal. 2013)).) While CREXi correctly notes that the factual scope of the geographic market cannot be resolved on a motion to dismiss, an antitrust complaint may be dismissed at the 12(b)(6) stage if the allegations of market power are "facially unsustainable," *Newcal Indus., Inc.*, 513 F.3d at 1044, or "fail[] to identify a relevant market," *Tanaka*, 252 F.3d 1059, 1063. "Individual metropolitan areas" is insufficient under either standard. CREXi's three-word allegation is essentially a placeholder that contains virtually no factual details and makes it impossible to know whether any location is part of this lawsuit or not. *Flaa v. Hollywood Foreign Press Ass'n*, No. 2:20-CV-06974-SB (Ex), 2021 WL

1399297, at *6 (C.D. Cal. Mar. 23, 2021) (holding that "vague, confusing, or economically nonsensical market allegations" may be challenged at the pleading stage). None of the cases CREXi cites contain allegations of a geographic market as undefined as "individual metropolitan areas," and this description fails to provide CoStar with notice of the markets being targeted or the opportunity to defend itself.

CREXi therefore fails to sufficiently allege the geographic market for its antitrust claims.

### b. **Market Dominance**

Along with a relevant market definition, a plaintiff must plead that the defendant has power within that market. *Newcal Indus., Inc.*, 513 F.3d at 1052. Market power may be demonstrated through either of two types of proof: (1) "direct evidence of the injurious exercise of market power," i.e., "evidence of restricted output and supracompetitive prices;" or (2) more commonly, "circumstantial evidence pertaining to the structure of the market." *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). "To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Id.*

"Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition." *Am. Express Co.*, 138 S. Ct. at 2284 (quotation and citation omitted). Market power must ordinarily be assessed in the context of a properly defined relevant market, *id.* at 2284–2285, but here the allegations CREXI identifies as direct evidence of CoStar's market power are largely conclusory, anecdotal, implausible, or legally insufficient to establish detrimental effects to competition such as CoStar's ability to "control prices or exclude competition." (Opp'n at 16–17 (quoting *Cost Mgmt. Servs.*, 99 F.3d at

950).)  For the reasons discussed above, the Court is unable to evaluate the plausibility of CREXi's allegations that CoStar's current share of each product market is over 90% or 95% in the absence of a properly defined geographic market.  Finally, CREXi does not allege facts demonstrating that CoStar's competitors "lack the capacity to increase their output in the short run."  *Rebel Oil Co., Inc.*, 51 F.3d at 1434.  The Counterclaim therefore fails to allege CoStar's market power in the relevant markets.

Based on the foregoing deficiencies, Claims 1–8 in the Counterclaim for antitrust violations under Section 1 and Section 2 of the Sherman Act and the Cartwright Act are dismissed with leave to amend.

## B.    Trademark Infringement

CREXi's ninth counterclaim alleges that CoStar committed trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114.  "To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, a party must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion."  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011) (citation and quotation omitted).  CoStar argues that CREXi has not plausibly alleged that its use of CREXi trademark in its Google AdWord ads created a likelihood of confusion among the sophisticated consumers bidding on commercial real estate, and its alleged infringement would not have resulted in a diverted sale and would have only impacted a consumer's "initial interest."  The Court declines to consider these arguments on a motion to dismiss.

The Court rejects as premature CoStar's invitation at this stage to focus only on two of the eight factors discussed in *Sleekcraft*, *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979), and conclude its purchase and use of CREXi's mark in ads for Ten-X could not create a likelihood of confusion as a matter of law.  CoStar may ultimately prove to be correct on both points, but

drawing all factual inferences in CREXi's favor, as the Court must on a motion to dismiss, the Counterclaim alleges sufficient facts to state a claim for trademark infringement under the Lanham Act.

CoStar also argues that "initial interest confusion" provides no basis for relief under the Lanham Act "where the confusion is remedied prior to sale," citing to an opinion from the Southern District of Florida. *Blue Water Innovations, LLC v. Fettig*, 2019 WL 1904589, at *3 (S.D. Fla. Mar. 8, 2019). But the preceding sentence of the opinion notes that the Eleventh Circuit has not expressly decided the issue. *Id.* (quoting *Brain Pharma, LLC v. Woodbolt Distribution, LLC*, No. 12-60141-CIV, 2012 WL 12838277, at *6 (S.D. Fla. May 1, 2012)) (discussing *N. Am. Medical Corp. v. Axiom Worldwide Inc.*, 522 F.3d 1211, 1222 (11the Cir. 2012))).  It is well-settled in the Ninth Circuit that even though initial interest confusion is "dispelled before an actual sale occurs, initial interest confusion impermissibly capitalizes on the goodwill associated with a mark and is therefore actionable trademark infringement." *Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1025 (9th Cir. 2004).

Accordingly, CREXi alleges sufficient facts to state a claim for trademark infringement under the Lanham Act.

**C.    False Advertising**

CREXi's tenth claim is for false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and its eleventh claim is for false advertising under California's False Advertising Law, Business and Profession Code § 17500.  The parties agree that these claims are "substantially congruent" and can be analyzed together.  Establishing a false statement in violation of the Lanham Act requires proving:

> (1) a false statement of fact by the defendant in a
> commercial advertisement about its own or another's
> product; (2) the statement actually deceived or has the

tendency to deceive a substantial segment of its
audience; (3) the deception is material, in that it is likely
to influence the purchasing decision; (4) the defendant
caused its false statement to enter interstate commerce;
and (5) the plaintiff has been or is likely to be injured as
a result of the false statement, either by direct diversion
of sales from itself to defendant or by lessening of the
goodwill associated with its products.

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th Cir. 2014). CoStar seeks dismissal for CREXi's failure to satisfy the first three elements listed above: false statement, deception, and materiality.

CREXi's false advertising claims are limited to the same Ten-X ads at issue in its claim for trademark infringement. The Counterclaim alleges that CoStar's use of CREXi's mark "constitutes false advertisements that misrepresent the nature, characteristics, and qualities of CoStar's products and services." (CC ¶¶ 201–204, 326, 331.) Although CREXi provides no supporting factual details for the Court to review, the Counterclaim does contain screenshots of ads which the Court has reviewed to determine if CREXi has stated claims for false advertising. (*Id.* ¶¶ 200, 202.)

### 1. **False Statement**

To satisfy the first element an actionable statement must be "a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1121 (9th Cir. 2021) (quotation omitted). CREXi alleges that CoStar's ads are false because they use CREXi's mark, but in considering the ads both with and without the offending word, CREXi does not explain how the inclusion of the word "CREXi" in the ads "misrepresents the nature, characteristics, qualities," of CoStar's products and services, as required to state a claim for false advertising

under the Lanham Act. 15 U.S.C. § 1125(a)(1)(B). CREXi does not, for example, argue the ads were ambiguous or otherwise implied a false statement. *Prager Univ. v. Google LLC*, 951 F.3d 991, 1000 (9th Cir. 2020) ("Although a false advertising claim may be based on implied statements, those statements must be both specific and communicated as to deceive a significant portion of the recipients."). CREXi also cites to *U-Haul Int'l, Inc. v. Jartran, Inc.*, but the alleged ads do not contain any comparative claims (deliberately false or otherwise) about CREXi or its products. 793 F.2d 1034, 1040 (9th Cir. 1986). Confusingly, CREXi instead argues that the inclusion of its name renders the ads subject to the "literal falsity" doctrine. (Mot. at 22–23.) As explained by Judge Posner in *Southland Sod Farms v. Stover Seed Co.*, 586 F.3d 500, 513 (7th Cir. 2009) ("*Southland*") the "literal falsity" doctrine creates a presumption of deception for a "patently false statement that means what it says to any linguistically competent person." Here, just as in *Southland*, merely stating a competitor's name cannot render an ad "literally false" because, *inter alia*, "there is no statement in the ordinary sense, because there is no verb." *Id.* (reminding plaintiffs they cannot "just intone 'literal falsity' and by doing so prove a violation of the Lanham Act.").

### 2. **Likely to Deceive**

On the second element of deception for a false advertising claim under the Lanham Act, CoStar argues that its ads could not have deceived or had a tendency to deceive a substantial segment of their audience. However, in analyzing CREXi's claim for trademark infringement, the Court has already concluded that, at least for the purposes of the Motion to Dismiss, the Counterclaim sufficiently alleges that CoStar's use of CREXi's mark is likely to cause confusion or deceive.

### 3. **Materiality**

However, not all deceptions are actionable as false advertisements, and CoStar's use of CREXi's mark was not material because it did not influence the

purchasing decision of any consumer for two distinct reasons.  First, CREXi's argues that the use of its mark created a false belief that CoStar and CREXi were affiliated, but the Counterclaim's allegations are entirely conclusory and insufficient to plausibly establish an impact to any consumer's decision on which website to use to buy or sell commercial real estate.  (*See* CC ¶ 326–27.)  Second, in order for a deception to be material a consumer necessarily must have been exposed to it, and CREXi also fails to allege facts establishing that consumers of commercial real estate were ever even exposed to these ads.  The Ninth Circuit has held that false statements in a video jacket were immaterial and could not influence a purchasing decision when the video was sold to consumers over the phone who never saw it.  *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003), *overruled on other grounds by Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) (en banc).  Similarly, the Counterclaim simply provides no factual allegations from which the Court can conclude that consumers making decisions regarding buying or selling commercial real estate online could have been exposed to CoStar's ads.  (CC ¶ 204.)

Accordingly, CREXi fails to plead sufficient facts to state its tenth claim for false advertising under the Lanham Act and eleventh claim for false advertising under California's False Advertising Law and the Court dismisses them with leave to amend.

**D.    UCL Claims**

The Counterclaim alleges two distinct UCL claims. The Counterclaim's twelfth claim is for violations of the UCL under the unfair prong, while its thirteenth claim is for violations under the unlawful prong.  The UCL claim based on the unlawful prong states a claim predicated on trademark infringement, as discussed above.

CREXi argues that CoStar's practices also constitute unfair competition

under California law, relying heavily on the Ninth Circuit's recent opinion in *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1194 (9th Cir. 2022) ("*hiQ*"). But the facts and claims at issue in *hiQ* were very different from those presented by the Counterclaim. *HiQ* involved a data analytics company scraping data from professional profiles available on LinkedIn to create "people analytics" which it sold to business clients. *Id.* at 1187. LinkedIn attempted to electronically block it from accessing its website and data, and hiQ obtained a preliminary injunction based on its claim under California law for intentional interference with contractual relations because being blocked from LinkedIn's data would prevent it from fulfilling its existing contracts with third parties and put it out of business. Significantly, CREXi does not bring a claim for tortious interference with contractual relations or even allege any such contracts exist, and the Ninth Circuit expressly declined to reach hiQ's UCL claim. *Id.* at 1194. The Ninth Circuit's comment that blocking hiQ from accessing otherwise public data on LinkedIn's servers "may well be considered unfair competition under California law" was expressly based on the fact that blocking hiQ would result in the "complete exclusion of the original innovator in aggregating and analyzing the public information." *Id.* at 1193–94. But CREXi is not the "original innovator" in aggregating and analyzing the public information on CoStar's websites, nor has CREXi alleged that being blocked from scraping has completely excluded it from accessing public information on the relevant markets and therefore put it out of business. CREXi in fact alleges the opposite – it was founded in 2015 (almost thirty years after CoStar) by a group of seasoned CRE professionals who were "astonished by how the CRE industry lagged behind other industries moving into the digital age." (CC ¶¶ 18, 21.) CREXi argues that *hiQ* stands for the proposition that a private website cannot have a property right in information that is public or otherwise owned by the brokers who submitted it. But *hiQ* does not lend itself to such a broad reading that is entirely divorced from the contractual

relationships at issue and history between the parties.  More importantly, this argument does not appear to help CREXi in establishing a violation of California's Unfair Competition Law because it only highlights that CoStar cannot stop CREXi from obtaining CRE information for itself from other sources such as public records or the brokers themselves, unlike in *hiQ* where LinkedIn was the exclusive source of data.

CREXi therefore fails to plead sufficient facts to establish its thirteenth claim based on violations for the unfair prong of the UCL and the Court dismisses this claim with leave to amend.

**E.  Declaratory Relief**

The Court finds the allegations in the Counterclaim and the surviving claims are sufficient for CREXi to state a request for declaratory relief at this stage.

## IV.  CONCLUSION

Accordingly, the Court **DENIES** Costar's Motion to Dismiss the Counterclaim as to the ninth claim for trademark infringement, thirteenth claim for unlawful violations of the UCL, and the fourteenth claim for declaratory judgment, and **GRANTS** the Motion to Dismiss as to all other claims with leave to amend to correct the deficiencies identified in this Order.  Any amended complaint shall be filed **no later than July 12, 2022**.


**IT IS SO ORDERED.**


DATED:  June 17, 2022.

_____
CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE