No. 23-55662

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

COSTAR GROUP, INC.; COSTAR
REALTY INFORMATION, INC.,
*Plaintiffs-counter-defendants-Appellees,*

v.

COMMERCIAL REAL ESTATE EXCHANGE,
INC.,
*Defendant-counter-claimant-Appellant.*

On Appeal from the United States District Court
for the Central District of California,
No. 2:20-cv-08819 (Hon. Consuelo B. Marshall)

# BRIEF FOR AMICUS CURIAE FEDERAL TRADE COMMISSION
# IN SUPPORT OF NEITHER PARTY

*Of Counsel*:

GEOFFREY M. GREEN
PATRICIA M. MCDERMOTT
KARNA ADAM
KATHLEEN CLAIR
ELIZABETH GILLEN
AUSTIN R. HEYROTH

FEDERAL TRADE COMMISSION
Washington, D.C. 20580

ANISHA S. DASGUPTA
*General Counsel*

MARIEL GOETZ
*Acting Deputy General Counsel
for Litigation*

BRADLEY DAX GROSSMAN
*Attorney*
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-2994
bgrossman@ftc.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ......................................................................................... 1

INTEREST OF THE FEDERAL TRADE COMMISSION .................................... 2

BACKGROUND ........................................................................................... 3

SUMMARY OF ARGUMENT ......................................................................... 6

ARGUMENT ............................................................................................... 8

I.   The District Court Misclassified The Challenged Conduct As A
     Unilateral Refusal To Deal ................................................................. 10

     A.   The Sherman Act Prohibits Monopolists From Imposing
          Anticompetitive Restraints On Customers' Dealings With Rivals ........... 10

     B.   The District Court Failed To Analyze The Practical Effects Of
          CoStar's Exclusionary Conduct As The Sherman Act Requires .............. 13

     C.   The Unilateral-Refusal-To-Deal Doctrine Is Irrelevant To This Case ....... 14

II.  The District Court Improperly Absolved CoStar From Liability Based
     On Language In Its Contracts, While Overlooking CoStar's Alleged
     Misconduct In Implementing And Enforcing Those Contracts ...................... 17

     A.   CREXi Alleges That CoStar's Contracts *And* Its Conduct Were
          Exclusionary ................................................................................. 18

     B.   The District Court Improperly Weighed Competing Factual
          Inferences ................................................................................... 20

III. The District Court Erred In Rejecting CREXi's Monopoly Power
     Allegations .................................................................................... 22

     A.   CREXi Established Monopoly Power With Well-Pleaded
          Allegations That CoStar Controlled Prices And Excluded
          Competition ................................................................................. 23

          1.   CoStar controlled prices. ......................................................... 24

          2.   CoStar excluded competition. ................................................... 25

B.  The District Court Was Wrong To Dismiss CREXi's Monopoly
    Power Claim For A Supposed Lack Of Separate Output Allegations .......26

    1.  A plaintiff need not show restricted output in addition to
        supracompetitive prices and excluded competition...........................27

    2.  The district court improperly disregarded CREXi's restricted
        output allegations...............................................................30

CONCLUSION .................................................................................31

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) ...............................................................19

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1984)............................................................... 6, 10, 15

*Calif. Dental Ass'n v. FTC*,
526 U.S. 756 (1999)..................................................................... 28, 29

*Cascade Health Solutions v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) ..............................................................9

*Chase Mfg., Inc. v. Johns Manville Corp.*,
84 F.4th 1157 (10th Cir. 2023) ................................ 9, 12, 13, 17, 21

*Chung Le v. Zuffa, LLC*,
No. 2:15-cv-01045-RFB-BNW, 2024 WL 195994 (D. Nev. Jan. 18,
2024) .............................................................................................28

*Cost Mgmt. Servs., Inc. v. Washington Natural Gas Co.*,
99 F.3d 937 (9th Cir. 1996) ...............................................................25

*Daniels-Hall v. Nat'l Educ. Ass'n*,
629 F.3d 992 (9th Cir. 2010) ..................................................... 14, 21

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)..................................................................... 16, 23

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ................................ 8, 22, 23, 24, 25, 27

*Forsyth v. Humana, Inc.*,
114 F.3d 1467 (9th Cir. 1997) ..........................................................24

*FTC v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986)............................................................................3

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ...............................................................8

*Greyhound Computer Corp., Inc. v. IBM Corp.*,
559 F.2d 488 (9th Cir. 1977) ..................................................... 25, 29

*In re ATM Fee Antitrust Litig.*,
  No. C 04-2676 CRB, 2010 WL 2557519 (N.D. Cal. Jun. 21, 2010) ...............30

*In re CoStar Group, Inc., Lonestar Acquisition Sub, Inc. and LoopNet, Inc.,*
  Docket No. 4368 (FTC Aug. 29, 2012) ..............................................................3

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
  933 F.3d 1136 (9th Cir. 2019) .........................................................................9

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ..........................................................................22

*Lacey v. Maricopa Cnty.*,
  693 F.3d 896 (9th Cir. 2012) ..........................................................................24

*Lorain J. Co. v. United States*,
  342 U.S. 143 (1951)....................................................... 1, 7, 9, 11, 13

*McWane, Inc. v. FTC*,
  783 F.3d 814 (11th Cir. 2015) ....................................... 12, 13, 18, 20

*MetroNet Servs. Corp. v. Qwest Corp.*,
  383 F.3d 1124 (9th Cir. 2004) ........................................................................15

*Minnesota Made Hockey Inc. v. Minnesota Hockey Inc.*,
  789 F. Supp. 2d 1133 (D. Minn. 2011)..................................... 25, 26

*NCAA v. Bd. of Regents*,
  468 U.S. 85 (1984)..........................................................................................24

*New York v. Facebook, Inc.*,
  549 F. Supp. 3d 6 (D.D.C. 2021).....................................................................16

*New York v. Meta Platforms, Inc.*,
  66 F.4th 288 (D.C. Cir. 2023)..........................................................................16

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) ............................................. 7, 9, 16

*O'Bannon v. NCAA*,
  802 F.3d 1049 (9th Cir. 2015) .........................................................................28

*Ohio v. Am. Exp. Co.*,
  138 S. Ct. 2274 (2018)....................................................... 8, 21, 27

iv

*Otter Tail Power Co. v. United States*,
410 U.S. 366 (1973) .................................................................... 10, 15

*Pac. Bell Tel. Co. v. linkLine Communications, Inc.*,
555 U.S. 438 (2009) .................................................................... 10, 15

*Produce Pay, Inc. v. Izguerra Produce, Inc.*,
39 F.4th 1158 (9th Cir. 2022) ............................................................14

*Realcomp II, Ltd. v. FTC*,
635 F.3d 815 (6th Cir. 2011) ...............................................................3

*Rebel Oil Co. v. Atlantic Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .................................................. 27, 28, 29

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) .............................................................22

*Tampa Elec. Co. v. Nashville Coal Co.*,
365 U.S. 320 (1961) ...................................................................... 13, 18

*Team Schierl Cos. v. Aspirus, Inc.*,
No. 22-CV-580-JDP, 2023 WL 6847433 (W.D. Wis. Oct. 17, 2023) .............19

*United States v. Am. Tobacco Co.*,
221 U.S. 106 (1911) ........................................................................20

*United States v. AMR Corp.*,
335 F.3d 1109 (10th Cir. 2003) ..........................................................29

*United States v. Dentsply Int'l, Inc.*,
399 F.3d 181 (3d Cir. 2005) ........................................................... 11, 13

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966) ................................................................ 7, 22, 25, 29

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ....................................................... 24, 27, 29

*United States v. Syufy Enters.*,
903 F.2d 659 (9th Cir. 1990) ..............................................................24

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko*,
540 U.S. 398 (2004) .........................................................................15

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ........................................................ 17, 18

## **<u>Statutes</u>**

15 U.S.C. § 1 ..........................................................................................1, 5

15 U.S.C. § 2 ..........................................................................................1, 5

15 U.S.C. § 41 ...........................................................................................2

**INTRODUCTION**

In this antitrust case, Commercial Real Estate Exchange (CREXi) alleges

that CoStar, a monopolist provider of commercial real estate (CRE) listing,

information, and auction platforms, entrenched its market dominance by forcing

brokers not to do business with CREXi and other would-be rivals of CoStar.

According to CREXi, CoStar imposed *de facto* exclusionary contracts and

technological barriers that prevented brokers from sharing their listings and

otherwise working with CoStar's rivals. CREXi alleges that these practices

violated Sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1 & 2. The district

court dismissed the antitrust counts for failure to state a claim.

The Federal Trade Commission is concerned that the district court

committed three fundamental legal errors that, unless corrected, could shield

harmful monopolistic conduct from antitrust review.

*First*, the district court deemed CoStar's conduct lawful by relying on the

principle that a business may unilaterally refuse to deal with its rivals. But that

principle has no bearing when, as here, a monopolist allegedly forces its *customers*

not to transact with those rivals. *See, e.g.*, *Lorain J. Co. v. United States*, 342 U.S.

143, 152-53 (1951). Such conduct raises serious anticompetitive concerns if it

helps a monopolist secure or maintain its dominant position. But the district court

failed to engage in any case-specific analysis of the challenged conduct's exclusionary effects.

*Second*, the district court contravened motion-to-dismiss standards by elevating CoStar's version of the facts over CREXi's. The court failed to credit CREXi's allegations that CoStar, in practice, blocked brokers from sharing photographs, listings, and other information with CREXi and threatened brokers who did so. The court was required to accept those well-pleaded allegations as true and grant all reasonable inferences in CREXi's favor.

*Third*, the district court erred in declaring CREXi's allegations of monopoly power insufficient. CREXi met its pleading burden by alleging that CoStar raised prices to supracompetitive levels, acting without regard to the conduct of other market participants, while also excluding competition. This suffices under established precedent.

## INTEREST OF THE FEDERAL TRADE COMMISSION

The Federal Trade Commission is an independent agency charged with promoting fair competition. *See* 15 U.S.C. §§ 41-58. The FTC has developed over 100 years' expertise investigating and litigating anticompetitive mergers and conduct cases. The FTC's enforcement responsibilities cover a wide range of industries and encompass all violations of the Sherman Act as well as other unfair and anticompetitive practices. *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447,

454 (1986). The FTC has investigated or challenged a range of mergers and anticompetitive conduct involving the real estate business and CRE technology platforms, including the merger between CoStar and LoopNet.[1]

Because the FTC has a strong interest in ensuring the proper application of the antitrust laws, the FTC regularly submits amicus briefs in private antitrust cases. The FTC files this brief in support of neither party, pursuant to Federal Rule of Appellate Procedure 29(a)(2). Although the FTC takes no position on the merits of either party's claims or factual allegations, we are concerned that the district court's legal errors, if uncorrected, could significantly impair both public and private antitrust enforcement of meritorious cases against monopolists of all stripes.

## BACKGROUND

CRE brokers depend on third-party information platforms to publicize and find available properties, to conduct research for assessing potential transactions, and to auction properties. First Amended Counterclaims (FACC) ¶¶ 141-144, 148-

---

[1] *See, e.g.*, Compl., *In re CoStar Group, Inc., Lonestar Acquisition Sub, Inc. and LoopNet, Inc.,* Docket No. 4368 (FTC Aug. 29, 2012); *Realcomp II, Ltd. v. FTC*, 635 F.3d 815 (6th Cir. 2011) (upholding FTC administrative order against real estate association that unlawfully restrained the sharing of certain types of residential listings to the public).

150, 153-154, 171.[2] According to CREXi, CoStar is the dominant provider of technology platform services for the CRE industry. FACC ¶¶ 1, 3, 21, 360.[3] CoStar offers CRE brokers a platform called LoopNet to share and access listings, and a tool called LoopLink to display the brokers' listings on their individual websites. FACC ¶¶ 3-4, 39-41. CoStar is also a leading provider of CRE information services to help customers research and evaluate properties. FACC ¶¶ 39-41. Finally, CoStar operates a platform that facilitates online auctions of commercial properties. FACC ¶¶ 3, 153-54. CREXi is a rival to CoStar in each of these services and an upstart provider of CRE technology platforms. FACC ¶ 2, 15, 18.

CREXi alleges that CoStar holds monopoly power in the markets for CRE listing, information, and auction services, as evidenced by its dramatic price increases without regard to prices charged by rivals offering comparable or superior products. FACC ¶¶ 208-27. These markets all feature significant barriers to entry. FACC ¶¶ 166-172.

---

[2] The FACC appear in partially redacted form at 2-ER-075-278 and under seal in unredacted form at 4-ER-557-697.

[3] Consistent with the legal standards for resolving motions to dismiss, this brief assumes the truth of all facts alleged in the counterclaims. As the counterclaims disclose, the FTC is currently investigating some of the alleged conduct at issue in this case. *See* FACC ¶¶ 31-33. This brief is based solely on the complaint allegations and not any information the FTC may have learned in this or any other matter. The existence of the investigation should not be construed as a determination that CREXi's factual allegations are true or that any violation of law has occurred or is occurring.

CoStar allegedly wields its monopoly power to block customers from doing business with CREXi and other CoStar rivals. *E.g.*, FACC ¶¶ 44-47, 64-69. For instance, CoStar imposes contractual terms upon its CRE broker customers that, in practice, bar brokers from sharing their "own listing information … with CoStar's competitors" on threat of losing access to CoStar's services. FACC ¶¶ 6, 55-58, 60-63. Relatedly, CREXi alleges that CoStar employs technological blocks that impede customers from sharing their listings with CoStar's competitors via the brokers' public websites if the brokers use CoStar's LoopLink tool to publish those listings on their websites. FACC ¶¶ 4-5, 39-43.

CREXi alleges that, through this conduct, CoStar impairs competition and preserves its monopoly power, FACC ¶¶ 44-47, 64-69, 227, violating Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2. The district court dismissed CREXi's amended counterclaims in relevant part, holding that they failed to allege a plausible antitrust violation. 1-ER-22.

Specifically, the district court deemed CREXi's allegations of monopoly power insufficient. 1-ER-20-22. According to the court, CREXi failed to establish "direct evidence of CoStar's market dominance": although CREXi alleged that CoStar charged supracompetitive prices, the court concluded that CREXi did not also allege that CoStar "restricted output," which the court believed was required. 1-ER-20.

The district court also held that CREXi's allegations failed to establish that CoStar engaged in anticompetitive conduct. Although the counterclaims challenged restrictions that CoStar placed on its *customers*, the court relied on the principle that "a business generally has the right to refuse to deal with its *competitors*." 1-ER-12 (emphasis added). In the court's view, CoStar's restrictions were part of a "legitimate refusal to provide free aid and assistance to a competitor." 1-ER-13-14. The court found that CoStar's written contracts did not expressly forbid brokers from sharing their listing information with CoStar's rivals, "so long as [ ] they do not take the images or information directly from LoopNet or LoopLink." 1-ER-16.

## SUMMARY OF ARGUMENT

The district court's dismissal rested on three critical errors that, if widely adopted, could make it prohibitively difficult to plead a case of unlawful monopolization, harming competition and the public.

1.      The court incorrectly treated CoStar's alleged misconduct as a "legitimate refusal" to deal essentially immune from antitrust review. Although the Supreme Court has applied heightened liability standards to a firm's *unilateral* refusal to deal with rivals, *see, e.g.*, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608, 610-11 (1984), that doctrine does not apply when a monopolist "limit[s] the abilities of *third parties* to deal with rivals." *Novell, Inc. v.*

6

*Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (Gorsuch, J.) (emphasis added). Because CoStar allegedly blocked its *customers* from dealing with rivals, the court was required to undertake a fact-based inquiry as exemplified by *Lorain Journal*, 342 U.S. at 152-53.

2.      The court went beyond its proper role at this stage by finding as fact that CoStar's contracts do not prevent customers from sharing their images and listings with other platforms. The court was required to credit CREXi's well-pleaded allegations that (1) CoStar intended its contracts to deter brokers from sharing their own images and listings with CoStar's rivals, (2) customers understood the contracts that way, (3) CoStar threatened to sue brokers who shared information with rivals, and (4) brokers actually refrained from working with rivals *because of* these provisions. FACC ¶¶ 6, 29, 50, 60-68, 112-114. Because CoStar's contracts allegedly prevented brokers from working with CoStar's rivals in practice, the express terms of those contracts were not dispositive. Antitrust liability turns on the practical effects of CoStar's conduct as a whole, not isolated language within its contracts.

3.      The court improperly rejected CREXi's allegations of monopoly power, which is the "power to control prices or exclude competition." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (citation omitted). CREXi's allegations, taken as true, directly showed that CoStar *both* controlled prices and

excluded competition. The court erred when faulting CREXi for failing to make separate allegations regarding output.

## ARGUMENT

In dismissing CREXi's antitrust counterclaims, the district court misapplied core Sherman Act principles and the legal standards for resolving motions to dismiss. These errors, if repeated by other courts, could imperil effective antitrust enforcement.

Section 2 of the Sherman Act forbids monopolization, which requires a showing that the defendant (1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power through anticompetitive, predatory, or exclusionary conduct. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023), *cert. denied*, 2024 WL 156474 (Jan. 16, 2024). Section 1 of the Sherman Act forbids agreements that unreasonably restrain trade. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 988-89 (9th Cir. 2020). "Restraints that are not unreasonable *per se* are judged under the 'rule of reason.'" *Id.* at 989 (quoting *Ohio v. Am. Exp. Co.*, 138 S. Ct. 2274, 2284 (2018)).

The rule of reason generally applies when determining whether conduct is anticompetitive under Sections 1 and 2. *Epic*, 67 F.4th at 974. The court must "examine the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed, to determine the effect on competition in the relevant

product market." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1150 (9th Cir. 2019) (emphasis added). "Anticompetitive conduct is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008).

Courts bypass the typical analysis of anticompetitive effects and apply a different liability standard in the "narrow situation[]" where a plaintiff challenges a monopolist's *unilateral* refusal to deal directly with its rivals. *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1173 (10th Cir. 2023) (citing *Aspen Skiing*, 472 U.S. at 610-11). By contrast, courts undertake a fact-intensive analysis of effects when the conduct "involves some assay by the monopolist into the marketplace," by, for example, "limit[ing] the abilities of third parties to deal with rivals." *Novell*, 731 F.3d at 1072. A monopolist thus may violate the Sherman Act by "forcing" its customers "to boycott a compet[itor]" as a condition of doing business. *Lorain J.,* 342 U.S. at 152-53.

In this case, the district court committed three key errors when dismissing CREXi's antitrust counterclaims: the court (1) incorrectly applied the unilateral-refusal-to-deal-with-rivals framework to CoStar's alleged restrictions on its customers; (2) erroneously absolved CoStar from liability by overlooking CREXi's factual allegations concerning the practical effects of CoStar's conduct; and (3)

improperly rejected CREXi's monopoly power allegations concerning CoStar's control of prices and successful efforts to exclude competitors.

## I. The District Court Misclassified The Challenged Conduct As A Unilateral Refusal To Deal

The district court applied an incorrect framework by declaring CoStar's conduct a "legitimate refusal to provide free aid and assistance to a competitor," and thus exempting it from scrutiny into whether that conduct actually harmed competition. 1-ER-13-14. This ruling was error. The refusal-to-deal framework applies only to a firm's "purely unilateral" refusal to deal with rivals, *Pac. Bell Tel. Co. v. linkLine Communications, Inc.*, 555 U.S. 438, 448 (2009) (*linkLine*), which CoStar's alleged violations were not.[4] Because CoStar allegedly placed restraints *on its customers* that prevented them from working with CoStar's rivals, the court was required to analyze the restraints' potential anticompetitive effects.

### A. The Sherman Act Prohibits Monopolists From Imposing Anticompetitive Restraints On Customers' Dealings With Rivals

Bedrock antitrust precedents establish that a monopolist can violate the Sherman Act by imposing conditions that have the effect of preventing third

---

[4] Although unilateral refusals to deal sometimes can violate the antitrust laws (*see Aspen Skiing*, 472 U.S. at 608, 610-11; *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377-78 (1973)), the district court did not acknowledge those precedents or analyze how they would apply to CoStar's conduct.

parties from doing business with the monopolist's would-be rivals. The district court cited none of these rulings, which are essential to resolving this appeal.

The Supreme Court made this principle clear in *Lorain Journal*, where a newspaper with a monopoly on local news coverage "refused to accept local advertisement[s]" from companies that advertised or were about to advertise with a radio station that had recently started to compete for advertisers. 342 U.S. at 146-50. Many customers exclusively advertised with the newspaper because they "could not afford to discontinue their newspaper advertising in order to use the radio" station. *Id*. at 153. The Supreme Court ruled that the newspaper's "attempt to regain its monopoly [on local advertisements] ... by forcing advertisers to boycott a competing radio station violated § 2." *Id.* at 152.

Similar decisions abound in the circuit courts. For instance, in *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005), a dominant false teeth supplier "required agreement" by its "dealers not to handle competitors' teeth" on pain of losing access to the monopolist's products. *Id.* at 190. The dominant supplier coerced several customers into not dealing with the supplier's rivals, and it terminated or threatened to terminate customers who nonetheless tried to work with a rival. *Id*. These actions were anticompetitive, as they "effectively choked off the market for artificial teeth, leaving only a small sliver for competitors." *Id.* at 196.

Similarly, in *McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015), a monopolist pipe fittings supplier employed an exclusivity policy that temporarily blocked sales to customers who had purchased from the supplier's rivals. *Id.* at 820-21. Several customers stopped working with rivals "in order to avoid the devastating result of being cut off" from the monopolist's products. *Id.* The Eleventh Circuit upheld the Commission's finding that the exclusivity policy harmed competition by "stunt[ing] the growth of" the monopolist's "only rival in the … market—and prevent[ing] it from emerging as an effective competitor who could challenge [the monopolist's] supracompetitive prices." *Id.* at 839.

Most recently, in *Chase Manufacturing*, a dominant thermal insulation supplier told customers to "stop doing business with [an upstart rival] or lose access to [the monopolist's] enormous thermal-insulation inventory." 84 F.4th at 1171-72. The monopolist's coercion was successful, and multiple customers "dropped competing product lines [from the rival] because they could not survive without access to the dominant manufacturer." *Id.* at 1174. The district court dismissed after applying the heightened standards for refusals to deal with rivals. *Id.* at 1173. The Tenth Circuit reversed, holding that the plaintiff was entitled to prove at trial that the monopolist's "concentrated market position, supracompetitive prices, and several threats … deprived the market of access to [the rival's] less expensive, superior" product. *Id.* at 1177.

The core teaching of these cases is that when a monopolist allegedly prevents its customers from assisting or dealing with the monopolist's potential rivals, the court must examine "the reality of the [relevant] market and the practical effect of [the monopolist's] conduct." *Id.* at 1173. If the effect is anticompetitive, the conduct violates the antitrust laws.

### B. The District Court Failed To Analyze The Practical Effects Of CoStar's Exclusionary Conduct As The Sherman Act Requires

The allegations in this case closely resemble the facts of *Lorain Journal*, *Dentsply*, *McWane*, and *Chase Manufacturing*. As the district court recognized, CoStar alleges that CREXi "impos[es] exclusionary contractual restrictions to prevent brokers from using competitors' services." 1-ER-15-16, 24 (citing FACC ¶¶ 55-69). Nonetheless, the court failed to undertake any case-specific analysis of market realities and practical effects of the exclusionary restrictions as the law requires. *See Chase Mfg.*, 84 F.4th at 1173; *McWane*, 783 F.3d at 834-40 (discussing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326-29 (1961)).

CREXi's well-pleaded allegations describe the harmful practical effects of CoStar's scheme. In practice and coupled with its conduct, CoStar's exclusionary contracts bar users of CoStar's services from sharing information with CoStar's competitors, including the customers' own listings, and impede customers from working with rival CRE platforms—all on threat of losing access to CoStar's must-have services. FACC ¶¶ 6, 55-58, 60-69; *see also* FACC ¶¶ 4-5, 39-43 (describing

CoStar's technological blocks and their consequences). CREXi alleges that "brokers, buyers, and competition would benefit from brokers being able to widely publicize their CRE listings on different platforms." FACC ¶ 69. CoStar's conduct was anticompetitive because it "squelch[ed] meaningful competition between different platforms, resulting in inflated prices, suppressed output, and smothered innovation." FACC ¶ 69; *see also* FACC ¶ 49.

At the motion-to-dismiss stage, the district court was required to accept CREXi's factual allegations as true and draw reasonable inferences in CREXi's favor concerning the anticompetitive effects. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).[5] Instead, the court did the opposite: it counterfactually treated CoStar's alleged violations as a unilateral refusal to deal, sidestepping the required analysis of anticompetitive effects. *See* 1-ER-12-16. In the process, the district court contravened motion-to-dismiss precedent by adopting a "characterization" of CoStar's conduct "at odds with [CREXi's] allegations." *See Produce Pay, Inc. v. Izguerra Produce, Inc.*, 39 F.4th 1158, 1162 (9th Cir. 2022).

## C. The Unilateral-Refusal-To-Deal Doctrine Is Irrelevant To This Case

The unilateral-refusal-to-deal-with-rivals framework does not fit the facts of this case. The Supreme Court has applied this standard in two related-but-narrow

---

[5] Of course, CoStar remains free to argue at trial or in a summary judgment motion that CREXi's allegations are unsupported by the evidence, that its actions did not produce anticompetitive effects, or that they were procompetitive on balance.

situations: first, where a defendant refuses to sell a requested product or service directly to a rival,[6] and second, where a defendant agrees to deal directly with rivals but fails to offer "terms and conditions that the rivals find commercially advantageous."[7] Neither situation exists here. Indeed, CREXi expressly disavows any claim that CoStar should be required to grant CREXi "access to CoStar-owned data" or to allow CREXi to use "CoStar's websites to populate CREXi with listings." *E.g.*, FACC ¶ 12. Rather, CREXi seeks to deal with third-party brokers and is blocked by the contractual and technological barriers that CoStar imposes *on brokers*. FACC ¶ 12.

Moreover, the policy concerns behind the unilateral-refusal-to-deal-with-rivals framework have no salience here. Courts recognize that "compelling negotiation between *competitors*" poses unique risks that could facilitate horizontal collusion and require courts to dictate the "proper price, quantity, and other terms of dealing" between rivals. *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1131 (9th Cir. 2004) (emphasis added) (quoting *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004)). In response to this

---

[6] *See Aspen Skiing*, 472 U.S. at 608-11 (refusal to sell ski lift tickets to a competitor to be used in a joint ticket offering); *Otter Tail*, 410 U.S. at 371 (electric utility company's refusal to sell wholesale power to municipal distribution systems).

[7] *See linkLine*, 555 U.S. at 450-51 (rival challenged an existing deal with the defendant that charged high wholesale prices to the rival in the face of low retail prices).

policy problem, the refusal-to-deal-with-rivals framework is "underinclusive" and deliberately errs toward generating "false negatives," *i.e.*, finding no liability even in the face of otherwise compelling evidence of anticompetitive harm. *Novell*, 731 F.3d at 1075 (cleaned up). But CREXi does not seek an order requiring CoStar to do business with CREXi, only to end the exclusionary barriers imposed on third-party brokers.

Expanding the unilateral-refusal-to-deal-with-rivals doctrine beyond its proper boundaries is unwarranted. In antitrust cases, the Supreme Court generally disfavors "[l]egal presumptions that rest on formal distinctions," instead "prefer[ring] to resolve antitrust claims on a case-by-case basis, focusing on the particular facts disclosed by the record." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466-67 (1992) (cleaned up, emphasis added). Accordingly, courts may not apply the unilateral-refusal-to-deal-with-rivals framework when, as here, the plaintiff seeks to remedy harm caused by a monopolist's "interfere[nce] with the relationship between rivals and *third parties*." *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 32 (D.D.C. 2021), *aff'd sub nom. New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023) (emphasis added); *see also Novell*, 731 F.3d at 1072. That is why, in *Chase Manufacturing*, the Tenth Circuit overturned a district court's decision to "borrow[] a standard from refusal-to-deal-with-rivals caselaw" to absolve a

monopolist from liability for restricting customers' ability to work with the monopolist's rivals. 84 F.4th at 1173. The district court committed the same analytical error here; this Court should correct it.

## II. The District Court Improperly Absolved CoStar From Liability Based On Language In Its Contracts, While Overlooking CoStar's Alleged Misconduct In Implementing And Enforcing Those Contracts

The district court committed a second critical error by exculpating CoStar based on its siloed interpretation of the contract terms. In the process, the court overlooked allegations that CoStar deployed those contracts to threaten customers and deter them from sharing any information with CoStar's rivals, and that customers understood the contracts to have that effect, modifying their behavior accordingly. In analyzing exclusionary contracts under Section 2, the court must "look past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement in the real world." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) (cleaned up). The district court neglected this essential task.

Instead, the district court simply held that "CoStar's *contractual provisions* prohibiting use of CoStar-modified images do not constitute anticompetitive conduct," because the court improperly assumed that the contracts allowed brokers to share "their own images" with rival platforms. 1-ER-16 (emphasis added). But CREXi's allegations refute that assumption. CREXi alleges that, in practice,

17

CoStar "threaten[ed]" brokers who "simply … shar[ed] the brokers' own listing information and photographs with CoStar's competitors." FACC ¶ 62 (emphasis added). Even when brokers considered CoStar's breach-of-contract claims to be "frivolous," they *still* avoided working with CREXi out of fear of "costly litigation" and losing access to CoStar's services. FACC ¶ 66; *see also* FACC ¶ 6.

CREXi's allegations, taken as true, create a plausible inference that CoStar's conduct had the real-world effect of thwarting customers from sharing information with rival platforms. The district court prematurely resolved factual issues in finding otherwise.

## A. CREXi Alleges That CoStar's Contracts *And* Its Conduct Were Exclusionary

Under the Sherman Act, the district court was required to evaluate CoStar's *conduct*, not just its contracts. When a monopolist imposes restrictions that have the "practical effect" of tying up customers, it can harm competition. *Tampa Elec.*, 365 U.S. at 326-27. Accordingly, "[a]n express exclusivity requirement … is not necessary" if the evidence shows that the real-world effect of the monopolist's conduct is anticompetitive. *ZF Meritor*, 696 F.3d at 270; *accord McWane*, 783 F.3d at 834-35 (when a defendant's exclusionary "program" harms competition, a "conventional exclusive dealing contract" is not required to establish liability). Rather, a plaintiff can show that the defendant used "extra-contractual conditions" to "coerce buyers into purchasing a substantial amount of their needs from the

seller." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182-83 (9th Cir. 2016). "What matters are the actual restraints the defendant imposes on the market, not words on a page." *Team Schierl Cos. v. Aspirus, Inc.*, No. 22-CV-580-JDP, 2023 WL 6847433, at *10 (W.D. Wis. Oct. 17, 2023) ("A rule that looked only at the express terms of the contract could be too easily evaded.").

The counterclaims allege that the relevant contract terms amount to "agreement[s] to not support, or even share equivalent data with, CoStar's competitors," and create a "chilling effect on brokers' willingness to work with competitors." FACC ¶ 60. CREXi alleges that CoStar "declares that listings posted by brokers on the LoopNet website are 'proprietary to LoopNet' and forbids brokers from providing those same listings to CoStar's competitors." FACC ¶¶ 6, 50, 61. Even if a broker simply shares its "own listings" with a CoStar rival, CoStar nonetheless "threatens brokers that they are in 'prima facie breach' of contract." FACC ¶¶ 6, 50, 61-63.

The counterclaims also include concrete examples showing that brokers "widely understood" CoStar's threats as "foreclosing their ability to work with competing platforms." FACC ¶¶ 64-69; *see Aerotec*, 836 F.3d at 1183 (recognizing that other circuit courts have held that plaintiffs can establish *de facto* exclusive dealing through "evidence that buyers understood offers as conditional on the buyer forgoing purchases from competitor manufacturers"). Some brokers saw

CoStar's legal threats as specious, but refused to work with CREXi anyway out of fear of being sued or losing access to CoStar's industry-essential services. FACC ¶¶ 64, 66. This outcome was "inten[tional]," as CoStar sought "to prevent brokers from using competitors' services." FACC ¶ 6. The real-world effect has been to "chok[e] off the supply of brokers and CRE listings to potential competitors," thereby enabling "CoStar to charge supracompetitive prices." FACC ¶ 6.

These nonconclusory allegations establish precisely the type of "market realities" that make out a case of exclusionary conduct, if supported by evidence. *See McWane*, 783 F.3d at 833-35. Although the district court alluded to some of these allegations, it ruled only that CoStar's "*contractual provisions*" were not anticompetitive. 1-ER-16 (emphasis added). But even if a contract were legal in isolation, it may still be a tool for illegal monopolization. *Cf. United States v. Am. Tobacco Co.*, 221 U.S. 106, 182-83 (1911). The court neglected to ask the proper Sherman Act question: Was CoStar's *conduct* in implementing and enforcing its contracts anticompetitive? Because CREXi's allegations create a reasonable inference that the answer is yes, the district court's failure to credit those allegations was erroneous.

## B. The District Court Improperly Weighed Competing Factual Inferences

In addition to misapplying the Sherman Act, the district court contravened basic pleading standards by granting dispositive weight to CoStar's disputed view

of the contracts and their effects. Under Rule 12(b)(6), the court was required to take CREXi's factual allegations as true and construe them in the light most favorable to CREXi. *E.g.*, *Daniels-Hall*, 629 F.3d at 998. Instead, the court improperly credited CoStar's version of the facts over CREXi's well-pleaded allegations.

CoStar defended itself below by arguing that its contracts allowed brokers to share their original images and listings with CREXi. *See* CoStar's Mot. to Dismiss CREXi's FACC, D. Ct. ECF 198, at 24-26. But CREXi alleges the opposite: While parts of CoStar's contracts *say* that customers are free to share listing information with other platforms, those "promises [were] illusory and contradicted by CoStar's actions as well as other CoStar contractual terms." FACC ¶ 52. In CREXi's telling, apart from what the contracts may have stated, CoStar threatened brokers who shared even their *original* photos and listings with CoStar's rivals, which chilled brokers from dealings with CREXi. *See supra* pp. 19-20; FACC ¶¶ 107-08, 111.

Resolving a fact-specific dispute over the competitive effects of an alleged exclusivity scheme is inappropriate on a motion to dismiss. *See Am. Express*, 138 S. Ct. at 2284 (determining a restraint's "actual effect on competition" requires a "fact-specific assessment") (cleaned up); *accord Chase Mfg.*, 84 F.4th at 1176. But the district court chose a different—and improper—path: it proclaimed as fact that brokers dealing with CoStar "still maintain the rights to their original images"

under the language of the contracts, so brokers "can give those images or listings to CREXi or any other third-party listing service." 1-ER-16. The court thus implicitly rejected CREXi's allegation that brokers were not free to share such information in practice.

That ruling amounts to a premature weighing of facts that this Court's precedents condemn. Although CoStar may press its theories about the restraints' practical effects after discovery, the district court had no basis to "accept … as uncontroverted and true" a defendant's "own version of the facts at the pleading stage." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). Doing so would make it "near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief." *Id.*[8]

## III. The District Court Erred In Rejecting CREXi's Monopoly Power Allegations

Finally, the district court was wrong to dismiss CREXi's allegations that CoStar was a monopolist in the relevant markets. *See* 1-ER-18-22. Monopoly power is "the power to control prices or exclude competition." *Grinnell*, 384 U.S. at 571 (citation omitted); *accord Epic*, 67 F.4th at 998. Here, CREXi

---

[8] As the Fourth Circuit has observed, "post-*Twombly* appellate courts have often been called upon to correct district courts that mistakenly engaged in [a] premature weighing exercise in antitrust cases" by crediting the defendant's version of the facts in response to a motion to dismiss. *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 425 (4th Cir. 2015) (collecting cases).

unambiguously met its pleading burden by alleging facts directly establishing that

CoStar both controlled prices *and* excluded competition.[9]

The district court incorrectly faulted CREXi for not making "any allegations

regarding restricted output." 1-ER-20. Separate allegations regarding output were

unnecessary here, as CREXi's counterclaims directly established anticompetitive

effects in the form of sustained supracompetitive prices and excluded competition.

But in any event, CREXi *did* make allegations regarding restricted output, which

the district court simply overlooked. *See* FACC ¶¶ 69, 177, 226.

### A. CREXi Established Monopoly Power With Well-Pleaded Allegations That CoStar Controlled Prices And Excluded Competition

CREXi pleaded facts identifying the relevant product and geographic

markets; CoStar does not challenge the sufficiency of these allegations. 1-ER-19.

Further, CREXi pleaded facts that, taken as true, directly show CoStar's monopoly

power within those markets.[10] "There is universal agreement that monopoly power

---

[9] While Section 2 of the Sherman Act requires a showing of "monopoly power," Section 1 requires "market power." *Epic*, 67 F.4th at 982-83, 998. The two concepts differ in "degree": monopoly power requires "something greater" than market power. *Id.* at 998 (quoting *Eastman Kodak*, 504 U.S. at 481). While CREXi raises both Section 1 and Section 2 claims, we focus on monopoly power here because CREXi has readily satisfied the pleading requirements for market power *and* for monopoly power.

[10] A plaintiff can establish monopoly power through either direct or indirect evidence. *Epic*, 67 F.4th at 998. This brief addresses only the direct evidence alleged in CREXi's counterclaims.

is the power to exclude competition *or* control prices." *United States v. Syufy Enters.*, 903 F.2d 659, 664 (9th Cir. 1990) (emphasis added). CREXi alleges in painstaking detail that CoStar in fact did *both*.

### 1. CoStar controlled prices.

A monopolist is a firm that "can profitably raise prices substantially above the competitive level." *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (en banc). In particular, setting prices "without considering rivals' prices" is "something a firm without a monopoly would [be] unable to do." *Id.* at 57-58. Here, CREXi alleges just that: CoStar charged supracompetitive prices undisciplined by the actions of its competitors for an extended period of time. This is the quintessential monopoly-power showing.[11]

Specifically, CREXi alleges that CoStar's prices are not materially affected by the prices of rivals with "product features comparable or superior to those of CoStar." FACC ¶ 226. Thus, CoStar was able to increase its prices after acquiring

---

[11] "A supracompetitive price is simply a price above competitive levels." *Epic*, 67 F.4th at 984 (cleaned up). Of course, a firm "routinely charg[ing] higher prices" than certain competitors is not by itself evidence of monopoly power. *See Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997), *overruled in part on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012). The inquiry is not whether prices are "high" in some abstract sense, but instead whether prices are above the level that would exist in a competitive marketplace. *See, e.g.*, *NCAA v. Bd. of Regents*, 468 U.S. 85, 109 n.38 (1984). Here, CREXi sufficiently alleges the relevant markets and alleges evidence of supracompetitive pricing beyond just CoStar's high prices.

LoopNet by 300 to 500 percent. 1-ER-20; FACC ¶ 215. Then, after another rival

exited the market, CoStar subjected the market to another 80 percent price

increase. FACC ¶¶ 197, 217. Indeed, CoStar raised prices "every time" it acquired

a competitor. FACC ¶ 218. Those prices have been "substantially above

competitive levels" for years. FACC ¶¶ 226-27. CoStar's customers reported that

they were forced to accept CoStar's price increases because (in their own words)

"no website can really compete." FACC ¶¶ 213-14.

This Court long has recognized that a firm's "ability to manage its prices

with little regard to competition" "support[s] an inference of market dominance."

*Greyhound Computer Corp., Inc. v. IBM Corp.*, 559 F.2d 488, 497 (9th Cir. 1977).

That is precisely what CREXi's allegations show here. CoStar's ability to charge

prices above the competitive level is the hallmark of monopoly power.

### 2. CoStar excluded competition.

A plaintiff also can directly show monopoly power through well-pleaded

allegations that the defendant excluded competition. *See Epic*, 67 F.4th at 998;

*Cost Mgmt. Servs., Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 950-51 (9th

Cir. 1996) (citing *Grinnell*, 384 U.S. at 571). For example, in *Minnesota Made*

*Hockey Inc. v. Minnesota Hockey Inc.*, 789 F. Supp. 2d 1133 (D. Minn. 2011), the

court credited the plaintiffs' monopoly-power allegations where a dominant youth

hockey league issued a rule that barred players from also competing in rival

leagues. *Id.* at 1145. Because this rule led numerous parents to withdraw their children from other leagues, demonstrating the power to exclude competition, the complaint successfully pleaded the defendant's monopoly power. *Id.*

Likewise, the district court here should have credited CREXi's allegation that CoStar's contracts, threats, and technological blocks excluded competition from rival platforms, thereby establishing monopoly power. As described above, CREXi alleges that CoStar's contractual terms have prevented numerous broker customers from working with and using rival CRE platforms (FACC ¶¶ 64-69, 136-139, Ex. A), and that CoStar's technology blocks have prevented brokers from sharing their own CRE listings from their own websites with CoStar's rivals (FACC ¶¶ 44-47, 136-39, Ex. A). The effect of these restrictions is that rival platforms have been unable to provide "meaningful competition" in the relevant markets. FACC ¶ 69. The counterclaims give numerous examples of individual brokers who were directly thwarted from using rival platforms because of CoStar's alleged exclusionary practices. FACC ¶¶ 44-47, 64-69, 136-139, Ex. A.

## B. The District Court Was Wrong To Dismiss CREXi's Monopoly Power Claim For A Supposed Lack Of Separate Output Allegations

The district court dismissed CREXi's direct allegations of monopoly power with a terse assertion that "CREXi does not make any allegations regarding restricted output." 1-ER-20. The court exclusively relied on this Court's prior observation that "[i]f the plaintiff puts forth evidence of restricted output and

supracompetitive prices, that is direct proof of injury to competition which a competitor with market power may inflict." *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). The district court's ruling was in error, both because no separate output allegations were required, and because CREXi *did* allege restricted output.

### 1. A plaintiff need not show restricted output in addition to supracompetitive prices and excluded competition.

A defendant may show monopoly power through direct evidence of the "actual exercise" of such power, *Rebel Oil*, 51 F.3d at 1434, or other conduct that is "difficult to explain unless" the defendant is a monopolist, including either supracompetitive pricing or excluding competition, *Microsoft*, 253 F.3d at 57-58. Although *Rebel Oil* observed that a firm may prove monopoly power directly with "evidence of restricted output and supracompetitive prices," *Rebel Oil*, 51 F.3d at 1434, it did not suggest that this was the *only* form of direct proof available. The district court was wrong to construe *Rebel Oil* in this manner.

Since *Rebel Oil*, the Supreme Court and this Court have repeatedly clarified that a plaintiff can directly prove injury to competition with evidence of "reduced output, increased prices, *or* decreased quality in the relevant market." *E.g.*, *Am. Express*, 138 S. Ct. at 2284 (emphasis added). As this Court has stressed, "showing a reduction in output is one form of direct evidence, but it 'is not the only measure.'" *Epic*, 67 F.4th at 983 (quoting *O'Bannon v. NCAA*, 802 F.3d 1049,

1070 (9th Cir. 2015)). Thus, in *O'Bannon*, the Court "quickly" rejected the argument that plaintiffs needed to show decreased output in addition to increased prices, since "raising price, reducing output, and dividing markets have the same anticompetitive effects." 802 F.3d at 1070-71 (quoting *Calif. Dental Ass'n v. FTC*, 526 U.S. 756, 777 (1999)).[12] Notably, earlier this month a district court in this Circuit recognized that *Epic* and *O'Bannon* are "controlling in-circuit prec[ed]ent" on this point. *See Chung Le v. Zuffa, LLC,* No. 2:15-cv-01045-RFB-BNW, 2024 WL 195994, at *5 & n.7 (D. Nev. Jan. 18, 2024) (emphasizing that "*either* reduced purchases or reduced prices may be relied upon as direct evidence" of monopsony power). Here, *either* pricing *or* output allegations are sufficient to allege direct evidence of monopoly power.

Indeed, as *Rebel Oil* itself recognized, the monopoly-power inquiry asks whether the defendant is able "unilaterally to raise prices above competitive levels." 51 F.3d at 1434. As discussed on pp. 24-25, CREXi's allegations establish that CoStar repeatedly imposed dramatic and supracompetitive price increases unchecked by rivals with comparable or superior products. Because CREXi's

---

[12] The discussions about direct evidence in *Epic* and *O'Bannon* take place in the context of assessing direct evidence of anticompetitive effects, as does the passage in *Rebel Oil* on which the district court relied in insisting that CREXi must make separate pleadings regarding output. *See* 51 F.3d at 1434 (noting that "direct evidence of the injurious exercise of market power"— *i.e.*, anticompetitive *effects*—sufficed to show direct evidence of monopoly *power*) (citation omitted).

alleged "evidence indicates that [CoStar] has … profitably" raised prices above the competitive level in the relevant markets without regard to the actions of rivals, "the existence of monopoly power is clear." *Microsoft*, 253 F.3d at 51 (*citing Rebel Oil*, 51 F.3d at 1434); *accord Greyhound*, 559 F.2d at 497. CREXi also separately alleges that CoStar in fact excluded competition—an independent pathway by which it sufficiently pleaded monopoly power. *See Grinnell*, 384 U.S. at 571.

Given the totality of allegations establishing that CoStar met the definitions of monopoly power, the district court's focus on output was unfounded. It would be superfluous to require allegations of reduced output when a plaintiff has already proffered well-pleaded allegations of control over prices and exclusion of competition. "If firms raise price, the market's demand for their product will fall, so the amount supplied will fall too—in other words, output will be restricted." *Calif. Dental*, 526 U.S. at 777 (cleaned up). *See also United States v. AMR Corp.*, 335 F.3d 1109, 1115 n.6 (10th Cir. 2003) ("prices and productive output are two sides of the same coin") (cleaned up). Accordingly, at the motion-to-dismiss stage, an allegation of sustained supracompetitive pricing *itself* creates a plausible inference of reduced output. As Judge Breyer of the Northern District of California has explained, "because price and output are inversely correlated," when a monopolist charges supracompetitive prices for an extended period, this "implies that marketwide output … has been lower than it would have been" if the

monopolist had charged a competitive price. *In re ATM Fee Antitrust Litig.*, No. C 04-2676 CRB, 2010 WL 2557519, at *10-11 (N.D. Cal. Jun. 21, 2010) (denying motion to dismiss in relevant part).

## 2. The district court improperly disregarded CREXi's restricted output allegations

Even assuming arguendo that allegations of reduced output were necessary here, CREXi did just that. CREXi made well-pleaded allegations of reduced output, which the district court failed to acknowledge or credit. CREXi alleges that "CoStar's *de facto* contractual exclusivity squelches meaningful competition between different platforms, resulting in … suppressed output." FACC ¶ 69. CoStar exploited its "dominant market position and barriers to entry" to prevent rivals from "increasing their output" by adding "brokers and listings" to their platforms. FACC ¶ 177. CoStar "purposely designed" its restraints so that competitors "cannot increase output in the short run to bring CoStar's prices down." FACC ¶ 226.

In any event, CREXi's allegations regarding supracompetitive pricing and exclusion of competition were themselves sufficient to show monopoly power. The district court's improper output requirement, if widely adopted, could obscure—rather than illuminate—courts' inquiries into monopoly power and anticompetitive conduct.

## CONCLUSION

This Court should correct the three fundamental errors that led the district court to dismiss CREXi's counterclaims: (1) its inappropriate application of a unilateral-refusal-to-deal-with-rivals framework; (2) its failure to consider CREXi's allegations of exclusionary conduct beyond the literal terms of CoStar's contracts; and (3) its rejection of CREXi's allegations providing direct evidence of monopoly power.

Respectfully submitted,

ANISHA S. DASGUPTA
   *General Counsel*

MARIEL GOETZ
   *Acting Deputy General*
   *Counsel for Litigation*

January 26, 2024

*/s/ Bradley Grossman*
BRADLEY DAX GROSSMAN
   *Attorney*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
bgrossman@ftc.gov
202-326-2994

Of Counsel:
GEOFFREY M. GREEN
PATRICIA M. MCDERMOTT
KARNA ADAM
KATHLEEN CLAIR
ELIZABETH GILLEN
AUSTIN R. HEYROTH

FEDERAL TRADE COMMISSION
Washington, D.C. 20580

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-55662

I am the attorney or self-represented party.

**This brief contains 6,979 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Bradley Grossman*          **Date** January 26, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*