No. 23-55662

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 for the 𝔑𝔦𝔫𝔱𝔥 𝔠𝔦𝔯𝔠𝔲𝔦𝔱

——————————

CoStar Group, Inc.; CoStar Realty Information, Inc.,
*Plaintiffs-Counter Defendants-Appellees,*

v.

Commercial Real Estate Exchange, Inc.,
*Defendant-Counter Claimant-Appellant.*

——————————

On Appeal from the U.S. District Court
for the Central District of California (Los Angeles)
No. 2:20-cv-08819-CBM-AS, Hon. Consuelo B. Marshall

——————————

**BRIEF OF *AMICI CURIAE* FORMER ANTITRUST OFFICIALS
AND ANTITRUST SCHOLARS IN SUPPORT OF PLAINTIFFS-
COUNTER DEFENDANTS-APPELLEES**

——————————

Cody L. Reaves
*Counsel of Record*
Benjamin M. Mundel
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
Tel: (202) 736-8000
cody.reaves@sidley.com

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................ii

Interest of *Amici Curiae* ..............................................................1

Introduction and Summary of Argument ..................................4

ARGUMENT ...................................................................................8

    I.   Courts Properly Analyze Whether Alleged Misconduct Is Anticompetitive In Light Of The Bedrock Principle That A Business Has No Duty To Aid Its Competitors. .............................8

    II.  The De Facto Exclusive Dealing Theory Cannot Be Used To Transform Non-Exclusive Contract Provisions Into Exclusivity Provisions. ..................................................................13

        A.   The De Facto Exclusive Dealing Theory Lacks Any Doctrinal Foundation. ............................................................13

        B.   This Court's Cases, Historical Context, and Administrability Concerns Counsel Strongly Against Recognizing The De Facto Dealing Theory. ...........................................................20

    III. Allegations Of High Prices, Standing Alone, Do Not Provide Direct Evidence Of Market Power Or Monopoly Power. ..........................26

CONCLUSION ...............................................................................33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) ..................................................... *passim*

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010) ................................................................ 24

*Apartments Nationwide, Inc. v. Harmon Publ'g Co.*,
78 F.3d 584 (6th Cir. 1996) ..................................................................... 4

*In re ATM Fee Antitrust Litig.*,
No. C 04-2676 CRB, 2010 WL 2557519 (N.D. Cal. June 21, 2010) .................................................................................................. 32

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979) ................................................................. 27

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) .......................................................... 7, 27

*Brown Shoe Co. v United States*,
370 U.S. 294 (1962) ................................................................................ 8

*Cascade Health Sols. v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) ................................................................. 9

*Chase Mfg., Inc. v. Johns Manville Corp.*,
84 F.4th 1157 (10th Cir. 2023) ..................................................... 11, 12

*Chase Mfg., Inc. v. Johns Manville Corp.*,
601 F. Supp. 3d 911 (D. Colo. 2022) ............................................ 11, 12

*Chung Le v. Zuffa, LLC,*
  No. 2:15-cv-01045-RFB-BNW, 2024 WL 195994 (D. Nev.
  Jan. 18, 2024) .................................................................................. 32

*Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.,*
  611 F.3d 495 (9th Cir. 2010) ...................................................... 7, 27

*Concord Boat Corp. v. Brunswick Corp.,*
  207 F.3d 1039 (8th Cir. 2000) ......................................................... 15

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
  504 U.S. 451 (1992) .......................................................................... 23

*Epic Games, Inc. v. Apple, Inc.,*
  67 F. 4th 946 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681
  (2024) ...................................................................................... 30, 31

*FTC v. Qualcomm Inc.,*
  969 F.3d 974 (9th Cir. 2020) ............................................. 5, 9, 10, 21

*Food Mktg. Inst. v. Argus Leader Media,*
  139 S. Ct. 2356 (2019) ...................................................................... 21

*Forsyth v. Humana, Inc.,*
  114 F.3d 1467 (9th Cir. 1997), *overruled on other grounds
  by Lacey v. Maricopa Cnty*, 693 F.3d 896 (9th Cir. 2012) ............. 7, 27

*Greyhound Computer Corp., Inc. v. IBM Corp.,*
  559 F.2d 488 (9th Cir. 1977) ............................................................ 31

*LePage's Inc. v. 3M,*
  324 F.3d 141 (3d Cir. 2003) ............................................................ 16

*McWane, Inc. v. FTC,*
  783 F.3d 814 (11th Cir. 2015) ................................................... 18, 29

*Mylan Pharms., Inc. v. Warner Chilcott Pub. Ltd.,*
  838 F.3d 421 (3d Cir. 2016) ............................................................ 29

*Newcal Indus., Inc. v. Ikon Off. Sol.,*
  513 F.3d 1038 (9th Cir. 2008) ......................................................... 26

*Novell v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ...................................................... 9, 11

*O'Bannon v. NCAA*,
802 F.3d 1049 (9th Cir. 2015) ............................................................ 30

*Omega Env't, Inc. v. Gilbarco, Inc.*,
127 F.3d 1157 (9th Cir. 1997) .............................................................. 4

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
555 U.S. 438 (2009) ................................................................... 23, 24

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ..................................................... *passim*

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979) ........................................................................... 26

*Se. Mo. Hosp. v. C.R. Bard, Inc.*,
642 F.3d 608 (8th Cir. 2011) .............................................................. 15

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993) ............................................................................. 4

*Tampa Elec. Co. v. Nashville Coal Co.*,
365 U.S. 320 (1961) ............................................................... 14, 15, 20

*Town of Concord v. Bos. Edison Co.*,
915 F.2d 17 (1st Cir. 1990) ................................................................ 23

*United Air Lines, Inc. v. Austin Travel Corp.*,
867 F.2d 737 (2d Cir. 1989) ............................................................... 15

*United States v. Dentsply Int'l, Inc.*,
399 F.3d 181 (3d Cir. 2005) ............................................................... 16

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) .......................................................... 7, 29

*United States v. Syufy Enters.*,
903 F.2d 659 (9th Cir. 1990) ........................................................ 8, 26

iv

*U.S. Shoe Mach. Corp. v. United States*,
  258 U.S. 451 (1922) ................................................................... 14, 21

*U.S. Tel. Co. v. Cent. Union Tel. Co.*,
  202 F. 66 (6th Cir. 1913) .................................................................. 22

*Verizon Commcn's Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ......................................................... 4, 6, 9, 10, 23

*Whitwell v. Cont'l Tobacco Co.*,
  125 F. 454 (8th Cir. 1903) ................................................................. 22

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) .................................................... 13, 17, 20

## Administrative Decisions

*McWane, Inc.*,
  2014–1 Trade Cas. (CCH) ¶ 78670, 2014 WL 556261
  (F.T.C. Jan. 30, 2014) ....................................................................... 18

## Scholarly Authorities

Christopher R. Leslie, *Predatory Pricing and Recoupment*,
  113 Colum. L. Rev. 1695 (2013) .......................................................... 28

## Other Authorities

Areeda & Hovenkamp, *Antitrust Law* (Aug. 2023) .................... 22, 28, 31

Robert H. Bork, *The Antitrust Paradox* (1978) ....................................... 28

## Interest of *Amici Curiae*[1]

*Amici Curiae* are former antitrust officials and antitrust scholars who have spent decades enforcing and studying the Nation's antitrust laws, including the Sherman Act.  This significant experience, which includes leading both of the Federal Trade Commission's enforcement bureaus and serving as General Counsel of the FTC, has provided *amici* with a deep knowledge and understanding of the issues at the heart of this appeal.  Given their expertise and their knowledge of the Sherman Act and the antitrust laws generally, *amici* have a particular interest in this case.  *Amici* believe that the decision below correctly applied traditional antitrust principles and this Court's precedents to resolve the issues raised.  *Amici* also believe that the arguments advanced by Appellant and its *amicus*, if accepted, would upend these foundational antitrust principles and open the floodgates to baseless antitrust suits.

---

[1] All parties consent to the filing of this brief.  No party's counsel authored the brief in whole or part.  No party or party's counsel contributed money intended to fund preparing or submitting the brief.  No person other than *amici* or their counsel contributed money intended to fund preparing or submitting the brief.

*Amici* are the following:[2]

Timothy J. Muris, J.D., is a George Mason University Foundation Professor of Law at Antonin Scalia Law School, George Mason University, and a Senior Counsel at Sidley Austin LLP. He served as Chairman of the FTC from 2000-2004. Before being elevated to Chairman, Tim served as Director of the Bureau of Consumer Protection and Director of the Bureau of Competition. He is the only person ever to head both of the agency's enforcement bureaus.

Alden Abbott, J.D., is a Senior Research Fellow focusing on antitrust issues at the Mercatus Center at George Mason University. He served as General Counsel of the FTC from 2018-2021, where he represented the Commission in court and provided legal advice to its representatives.

Daniel J. Gilman, J.D., Ph.D., is a Senior Scholar of Competition Policy at the International Center for Law & Economics. He previously served as an attorney advisor in the FTC's Office of Policy Planning and

---

[2] *Amici* submit this brief in their personal capacities and, accordingly, speak only for themselves personally and not for any entity or other person.

as the Victor H. Kramer Foundation Fellow in antitrust law and economics at Harvard Law School.

Justin (Gus) Hurwitz, J.D., is the Director of Law & Economics Programs at the International Center for Law & Economics and a Senior Fellow and Academic Director of the Center for Technology, Innovation, and Competition at the University of Pennsylvania Carey Law School. He previously served as a trial attorney with the U.S. Justice Department Antitrust Division in the Telecommunications and Media Enforcement section.

Geoffrey A. Manne, J.D., is the President and Founder of the International Center for Law & Economics and serves as distinguished fellow at Northwestern University's Center on Law, Business, and Economics. Before founding ICLE in 2009, he served as a law professor at Lewis & Clark Law School and as a Bigelow Fellow and Lecturer in Law at the University of Chicago Law School.

## Introduction and Summary of Argument

The Sherman Act is the "Magna Carta of free enterprise." *Verizon Commcn's Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 (2004) (citation omitted). It directs itself "not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993). And it does so not to protect corporate or private interests, but from concern for consumer welfare and the public interest. *Id.* The goal of antitrust law thus "is not to redress losers of legitimate competition; [i]t is to proscribe actions with anticompetitive effect." *Apartments Nationwide, Inc. v. Harmon Publ'g Co.*, 78 F.3d 584 (6th Cir. 1996) (table); *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997) ("[T]he antitrust laws were not designed to equip [a] competitor with [its rival's] legitimate competitive advantage.").

For almost four decades, CoStar Group, Inc. and CoStar Realty Information, Inc. ("CoStar") have provided commercial real estate ("CRE") services, including CRE listings and auction services. Commercial Real Estate Exchange Inc. ("CREXi"), launched almost a decade ago, is attempting to build its own CRE platform. CoStar filed

4

suit against CREXi in September 2020, alleging that CREXi "harvests content, including broker directories, from CoStar's subscription database without authorization by using passwords issued to other companies." *See* Dist. Ct. Dkt. 1. In response, CREXi filed eight antitrust counterclaims for violations of the Sherman Act (seven claims) and the Cartwright Act (one claim). Dist. Ct. Dkt. 146. The district court dismissed them all.

In asking this Court to reverse the district court's decision, CREXi and its amicus make three critical errors. *First*, CREXi and the FTC try to recast the court's analysis as incorrectly applying a "refusal-to-deal framework." Doc. 24 ("FTC Br.") 10; Doc. 21 ("CREXi Br.") 32. But the district court did not apply any such framework. Nor did it borrow any of the elements this Court has found must be pleaded in refusal to deal cases. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 994–95 (9th Cir. 2020). Instead, the court did what courts do when considering antitrust claims—analyze contractual language and market realities in light of the bedrock antitrust principle that "a business generally has the right to refuse to deal with its competitors." Dist. Ct. Dkt. 340 ("Op.") 3. There is nothing improper about analyzing antitrust claims against the

5

backdrop of this (and other) "traditional antitrust principles." *Trinko*, 540 U.S. at 411.

*Second*, CREXi and the FTC argue that CoStar's contractual provisions with brokers are "de facto" exclusivity provisions that violate the Sherman Act. CREXi Br. 62–64; FTC Br. 17–19. Yet both fail to acknowledge that this Court has never "explicitly recognized a 'de facto' exclusive dealing theory." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016). A careful examination of this theory reveals that it lacks a doctrinal foundation, and that this Court's cases, historical context, and administrability concerns all counsel strongly against recognizing this theory. In any event, even if this were a viable theory, it is unavailable to CREXi here because CoStar's express contractual terms plainly do not "substantially foreclose[]" brokers from dealing with CREXi. *Id.*

*Third*, CREXi and the FTC both urge this Court to hold that allegations of supracompetitive prices alone are enough to adequately allege direct evidence of market power, and thus that the test applied in *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995), is "wrong as a matter of law." CREXi Br. 38. Not so. Direct evidence of

market power is "only rarely available." *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (en banc) (per curiam). And as the Supreme Court has made clear, market power is "the ability to raise prices profitably *by restricting output*. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018) (quoting Areeda & Hovenkamp § 5.01) (emphasis in original). "[H]igh price alone" thus is not enough to infer market power. *Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 503 (9th Cir. 2010); *see Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995) (Posner, J.). A plaintiff seeking to present direct evidence of market power needs to show more than prices above a competitive level. It must show "evidence of restricted output *and* supracompetitive prices." *Rebel Oil*, 51 F.3d at 1434 (emphasis added); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997) ("With no accompanying showing of restricted output," "hig[h] prices" and "high profits ... fail[ ] to present direct evidence of market power."), *overruled on other grounds by Lacey v. Maricopa Cnty*, 693 F.3d 896 (9th Cir. 2012).

The arguments pushed by CREXi and the FTC, if accepted, would open the floodgates to baseless antitrust suits. Recognizing claims based

on the de facto exclusive dealing theory would allow a competitor to transform its rival's plainly nonexclusive contractual language into exclusive dealing provisions and drag its rival into expensive, protracted discovery based on speculative allegations about third-party conduct. Indeed, there is no end to what a struggling competitor could do with such an amorphous doctrine. So too, permitting a party to establish direct evidence of market power through allegations of supracompetitive prices alone would contravene binding authority and bedrock antitrust principles.

In rejecting these arguments below, the district court properly concluded that CREXi failed to meet its pleading burden for its antitrust counterclaims. This Court should affirm.

## ARGUMENT

## I. Courts Properly Analyze Whether Alleged Misconduct Is Anticompetitive In Light Of The Bedrock Principle That A Business Has No Duty To Aid Its Competitors.

"It can't be said often enough that the antitrust laws protect competition, *not* competitors." *United States v. Syufy Enters.*, 903 F.2d 659, 668 (9th Cir. 1990); *see Brown Shoe Co. v United States*, 370 U.S. 294, 320 (1962). From this cornerstone principle, this Court has recognized, comes another: "businesses are free to choose the parties

with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Qualcomm*, 969 F.3d at 993 (quoting *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009)). These "traditional antitrust principles" form the foundation of a court's antitrust analysis, including its analysis of whether conduct is anticompetitive. *Trinko*, 540 U.S. at 411.

The district court properly applied these traditional antitrust principles in concluding that CREXi failed to allege that CoStar engaged in anticompetitive conduct. Though "anticompetitive conduct comes in too many forms and shapes to permit a comprehensive taxonomy," the question courts find themselves asking time and again "is whether, based on the evidence and experience derived from past cases, the conduct at issue … has little or no value beyond the capacity to protect the monopolist's market power." *Novell v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (Gorsuch, J.); *see Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008). In answering this question, the district court "evaluat[ed Costar's] alleged conduct in light of the recognition in antitrust law that a business generally has the right to refuse to deal with its competitors." Op. 3.

There is nothing improper about a court analyzing a party's conduct in light of this "traditional antitrust principle." *Trinko*, 540 U.S. at 411. CREXi and the FTC try to recast the court's analysis as "incorrectly" applying the "refusal-to-deal framework"—which governs claims challenging a firm's "purely unilateral" refusal to deal with a rival—to its claim targeting CoStar's alleged restraints "*on its customers* that prevented them from working" with CREXi and others. FTC Br. 10; CREXi Br. 32. But that charge plainly misses the mark because the district court simply did not apply the refusal-to-deal factors in disposing of CREXi's claim.

This Court has derived three key elements that must be present in refusal to deal cases. The plaintiff must plead that (1) the defendant has unilaterally terminated "a voluntary and profitable course of dealing" with its rival, (2) "the only conceivable rationale or purpose is 'to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition,'" and (3) "the refusal to deal involves products that the defendant already sells in the existing market to other similarly situated customers." *Qualcomm*, 969 F.3d at 994 (quoting *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir.

2004); *see Novell*, 731 F.3d at 1074.  Here, the district court did not even set out this framework, let alone apply it.

The case relied on by CREXi and the FTC reveals the error of their logic.  Both claim that the district court made the same mistake that was present in *Chase Manufacturing, Inc. v. Johns Manville Corp.*, 84 F.4th 1157 (10th Cir. 2023), where the Tenth Circuit held that the district court "erred in choosing the refusal-to-deal-with-rivals framework to measure the legality of" the defendant's exclusionary conduct, including its threats to stop selling its products to distributors if they worked with an upstart rival.  *Id.* at 1162, 1173.  But there the district court actually *applied* the refusal-to-deal framework in a case that did not involve a unilateral refusal to deal with one's rival.  *Chase Mfg., Inc. v. Johns Manville Corp.*, 601 F. Supp. 3d 911, 926 (D. Colo. 2022).  Even though the court recognized that this was not a refusal to deal case, the court analyzed the plaintiff's claim by "borrow[ing] as the claim's *prima facie* elements those from the refusal-to-deal context."  *Id.*

The district court's analysis here bears no resemblance to the lower court's analysis in *Chase Manufacturing*.  The court did not "borro[w[]" the "elements" from the "refusal-to-deal context" in analyzing whether

CoStar's alleged conduct was anticompetitive. *Id.* In fact, the court made no mention of the specific refusal-to-deal elements. *See generally* Op. Rather, the court analyzed CoStar's alleged misconduct piece-by-piece, taking into account contractual language and market realities, and concluded that none of the conduct "constitute[d] anticompetitive conduct." Op. 5–9; *cf. Chase Mfg.*, 601 F. Supp. 3d at 928 (concluding that, given the "few instances of threatened or actual refusals to supply and no evidence of resulting adverse effects," plaintiff could not prove the "exceptional situation" needed to establish a refusal a deal).

To be sure, the district court here "start[ed] its analysis" by "recogni[zing]" the foundational antitrust principle that "a business generally has the right to refuse to deal with its competitors." Op. 3. But as explained, there is nothing improper about recognizing this bedrock principle. Indeed, the Tenth Circuit did precisely the same in *Chase Manufacturing*, beginning its anticompetitive-conduct analysis by noting that it "must be mindful" of a few core antitrust principles, including that "businesses are free to choose whether or not to do business with others." 84 F.4th at 1170–71; *see id.* at 1171 ("With these principles in mind, we turn to … [the alleged] exclusionary conduct"). At bottom, the notion that

a court's recognition of foundational antitrust principles could constitute legal error is beyond wrong. There is not a single case in any Supreme Court or Federal Reporter that supports this half-baked idea.

## II. The De Facto Exclusive Dealing Theory Cannot Be Used To Transform Non-Exclusive Contract Provisions Into Exclusivity Provisions.

CREXi and the FTC argue that CoStar's contractual provisions with brokers are "de facto" exclusivity provisions that violate the Sherman Act. CREXi Br. 62–64. But CREXi and the FTC both fail to acknowledge that this Court has "not explicitly recognized a 'de facto' exclusive dealing theory." *Aerotec*, 836 F.3d at 1182. As a close examination of this theory's underpinnings reveals, the Court should not recognize this theory in Section 1 or Section 2 cases. In any event, as this Court noted in *Aerotec*, even if this theory were a viable path to relief, it is unavailable when—as here—the contractual terms plainly do not substantially foreclose brokers from dealing with one's competitor.

### A. The De Facto Exclusive Dealing Theory Lacks Any Doctrinal Foundation.

The "notion of de facto exclusive dealing" can be traced back to a century-old case involving Section 3 of the Clayton Act. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 329 (3d Cir. 2012) (Greenberg, J.,

13

dissenting) (discussing *United Shoe Mach. Corp. v. United States*, 258 U.S. 451, 457 (1922)). In *United Shoe*, the court held that a contract falls within the Clayton Act's section as to exclusivity, even though the contract does "not contain specific agreements not to use the [goods] of a competitor," if "the practical effect … is to prevent such use." 258 U.S. at 457. The Court noted that the provisions at issue there amounted to "tying agreements" and that, due to the "dominating position in supply shoe machinery" occupied by United Shoe, "effectually prevent[ed] [the lessee] from acquiring the machinery of a competitor," except "at the risk of forfeiting the right to use the machines furnished by" United Shoe. *Id.* at 457–58.

Though the notion of this theory starts with *United Shoe*, the few modern cases recognizing de facto exclusive dealing as a valid theory have relied on language from yet another case involving Section 3 of the Clayton Act—*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961). In *Tampa Electric*, the Court surveyed its cases "pass[ing] upon questions arising under [Section] 3" of the Clayton Act, including its holding in *United Shoe*, and concluded that a contract "found to be an exclusive-dealing arrangement" does not violate "[S]ection [3] unless the court

14

believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." *Id.* at 325, 327. Notably, the Court "assume[d], but d[id] not decide" that the requirements contract at issue in fact was "an exclusive-dealing arrangement within the compass of [Section] 3," *id.* at 330, and ultimately held that the contract did not violate Section 3. *Id.* at 335. So too, because the contract did not "fall within the broader proscription" of the Clayton Act, the court concluded that "it is not forbidden by" Section 1 and 2 of the Sherman Act. *Id.* at 335.

As this Court has explained, from these humble beginnings in Section 3 cases, two of this court's sister circuits have recognized the so-called *de facto* exclusive dealing theory. *See Aerotec*, 836 F.3d at 1182 (citing *ZF Meritor*, 696 F.3d at 282 n.14 & *McWane, Inc. v. FTC*, 783 F.3d 814, 833–35 (11th Cir. 2015)).[3] Under this theory, though a contract does not contain an agreement to deal exclusively, courts will "look 'past the terms of'" the non-exclusive contract "to ascertain the relationship

---

[3] A few other circuit courts have briefly examined this theory before rejecting such claims outright. *See United Air Lines, Inc. v. Austin Travel Corp.*, 867 F.2d 737, 742 (2d Cir. 1989); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1058–60 (8th Cir. 2000); *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 612–13 (8th Cir. 2011).

between the parties and the effect of the agreement in the real world." *Id.* at 1182 (quoting *ZF Meritor, LLC*, 696 F.3d at 270). This Court has never "explicitly recognized a 'de facto' exclusive dealing theory like that recognized in the Third Circuit and Eleventh Circuit." *Id.*

The Third Circuit became the first circuit since the turn of the century to bless this theory in *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (en banc). Though the court did not mention the theory by name, the court rejected 3M's argument that an arrangement "that contained no express exclusivity requirement" could not support an exclusive dealing claim under Section 2, and held that the arrangement—bundled rebates and discounts offered to major suppliers—were designed to and did operate as exclusive dealing arrangements. *Id.* at 157. Not long after, in another Section 2 case, the court similarly reasoned that "a series of independent sales" could be an "exclusive dealing arrangement" if accompanied by certain "economic elements"—*i.e.*, sufficiently large market share and exclusionary conduct. *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 193–94 (3d Cir. 2005).

In *ZF Meritor*—the case on which CREXi heavily relies, CREXi Br. 63–64—the Third Circuit offered its most thorough discussion of this

theory. There, the court held that "an exclusive dealing claim does not require a contract that imposes an express exclusivity obligation" or "a contract that covers 100% of the buyer's needs" because "*de facto* exclusive dealing may be unlawful." *ZF Meritor*, 696 F.3d at 282 & n.14. The legality of such a contract, the court reasoned, ultimately turns on "whether the agreement foreclosed a substantial share of the relevant market such that competition was harmed." *Id.* at 283. But even in crediting such a claim, the court acknowledged that "'partial' exclusive dealing is rarely a valid antitrust theory" because contracts that are not "100% exclusive" are "generally lawful because market foreclosure is only partial, and competing sellers are not prevented from selling to the buyer." *Id.* at 283 (collecting cases rejecting such claims).

Finally, in *McWane*, the Eleventh Circuit became only the second circuit court to recognize this theory.[4] McWane—a major player in the

---

[4] Though this Court in *Aerotec* described *McWane* as a *de facto* exclusive dealing case akin to the Third Circuit's decision in *ZF Meritor*, *McWane* did not involve the sort of *de facto* exclusive dealing theory that CREXi and the FTC press here. Like in *ZF Meritor*, CREXi here urges this Court to "look past the terms of the contract" to its "effect … 'in the real world,'" and conclude that—even though CoStar's agreements lack "an 'express exclusivity requirement'"—they amount to unlawful *de facto* exclusive dealing. CREXi Br. 63 (quoting *ZF Meritor*, 696 F.3d at 260). In

ductile iron pipe fittings market—implemented a "Full Support Program" in a letter to its distributors. *McWane*, 783 F.3d at 820. In this letter, McWane announced that, with limited exceptions, "unless [the distributors] bought all of their domestic fittings from McWane, they would lose their rebates and be cut off from purchases for 12 weeks." *Id.* at 819. The FTC brought an enforcement action under Section 5 of the FTC Act and ultimately found that McWane's actions "constituted an illegal exclusive dealing policy." *Id.* Critically, the Commission and the ALJ found that distributors were "essential to the domestic fittings

---

*McWane*, however, the FTC did not ask the Court to look past the terms of the contract; rather, the FTC argued—and the Court agreed—that McWane's exclusivity program, though short in duration, *did* constitute exclusive dealing. 783 F.3d at 834–35. Indeed, McWane argued not that its program did not constitute exclusive dealing, but that the characteristics of its mandate meant that it was "presumptively legal" and "[could not] harm competition." *Id.* at 833; *see McWane, Inc.*, 2014–1 Trade Cas. (CCH) ¶ 78670, 2014 WL 556261, at *24 (F.T.C. Jan. 30, 2014) ("McWane argues its program could not have foreclosed access to distributors because it did not require distributors to commit to purchasing McWane's fittings exclusively for a lengthy period of time."); *see id.* at *46 (Wright, J., dissenting) (agreeing that the program was an exclusive dealing arrangement). The Eleventh Circuit's discussion of the "practical effect" of the program thus concerned not whether the program constituted exclusive dealing, but whether the program substantially foreclosed competition. *McWane*, 783 F.3d at 833–35.

market" because there were no "viable alternate distribution channels, including direct sales to end users." *Id.* at 834.

Before the Eleventh Circuit, McWane argued that its exclusivity program was "presumptively legal" because it was "short-term and voluntary." *Id.* at 833. The Court noted that neither its precedent nor precedent from the Supreme Court spoke "specifically to this issue," but it ultimately agreed with the FTC that the de facto exclusive dealing approach from *Dentsply* and *ZF Meritor* was "consistent with the Supreme Court's instruction to look at the 'practical effect' of exclusive dealing arrangements." *Id.* at 834 (citing *Tampa Elec.*, 365 U.S. at 326–28). Grafting this framework from the Section 3 context onto its analysis, the court considered "market realities" rather than "formalistic distinctions" and rejected "McWane's argument that the specific form of its exclusivity mandate" made it "presumptively legal" and thus "insulated … from antitrust scrutiny." *Id.* at 835.

As all this makes clear, the theoretical underpinnings of the de facto exclusive dealing theory are threadbare. The Third Circuit is the only circuit court that has imported this doctrine into Section 2 cases. Only one opinion—*ZF Meritor*—has ever extended this doctrine to an exclusive

19

dealing claim under Section 1, and it offered nothing more than *ipse dixit* and its own Section 3 Clayton Act precedent to support its conclusion that "[a]n express exclusivity requirement" is "not necessary" to state a "cognizable [claim] under the antitrust laws," including the Sherman Act. 696 F.3d at 270. As noted, *Tampa Electric* declined to consider whether such a contract could violate Section 1 or Section 2, *see* 365 U.S. at 335, so its analysis offers no support for this doctrinal move.

**B.    This Court's Cases, Historical Context, and Administrability Concerns Counsel Strongly Against Recognizing The De Facto Dealing Theory.**

1.    This Court's cases cut sharply against the de facto exclusive dealing theory. As this Court held in *Aerotec*, "[a] prerequisite to *any* exclusive dealing claim is an agreement to deal exclusively." 836 F.3d at 1181 (emphasis added). And in evaluating these claims, this Court has made clear that courts must focus on "the actual terms of the agreements," including "whether there are requirements terms" or "volume of market share targets." *Id.* The de facto exclusive dealing theory urged by the FTC here is simply incompatible with this approach.

Indeed, this Court has already recognized as much. In *Aerotec*, this Court canvassed the *de facto* exclusive dealing cases, including the trio

of Third Circuit cases previously discussed. *Id.* at 1182–83. In doing so, the Court explained, that in "*any* exclusive dealing claim"—actual or *de facto*—"the court first [must] be satisfied that specific features of the agreement required exclusivity." *Id.* at 1183 (emphasis added). In *Qualcomm*, too, despite the FTC's urging that the agreements there "'easily' qualified as *de facto* exclusive-dealing agreements under *Tampa Electric*'s 'practical effect' test," the Court explained that agreements providing "substantial discounts" for customers who met volume requirements are "not exclusive dealing arrangements, *de facto or actual*, unless they 'prevent[ ] the buyer from purchasing a given good from any other vendor.'" 969 F.3d at 1003–04 (emphasis added).

Tellingly, no court that has adopted this theory has offered *any* rationale—let alone, a convincing one—for uncritically grafting *United Shoe*'s and *Tampa Electric*'s "practical effect" test for Clayton Act Section 3 cases onto Sherman Act cases. While this test arguably flows from the Clayton Act, *United Shoe*, 258 U.S. at 457, it is not clear that the same can be said for the Sherman Act. *See Aerotec*, 836 F.3d at 1181. Indeed, given that both *United Shoe* and *Tampa Electric* employ an "approach [that] is a relic from a 'bygone era of statutory construction," *Food Mktg.*

21

*Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019), courts should be—at the very least—skeptical that such a approach accords with the Sherman Act.

2.    Historical context likewise cautions against jettisoning the bright-line rule applied by the majority of circuits.  As the leading treatise has noted, the historical record shows that, before the Clayton Act, exclusive-dealing arrangements were analyzed under the Sherman Act and the vast majority were found lawful, "just as they had always been at common law."  Areeda & Hovenkamp, *Antitrust Law* ¶ 1800c (Aug. 2023); *see, e.g.*, *Whitwell v. Cont'l Tobacco Co.*, 125 F. 454, 461 (8th Cir. 1903) (approving tobacco company's granting of rebates to dealers who refused to sell competing brands because the arrangement left smaller rivals free to capture business by offering buying "lower prices" or "better terms"); *cf. U.S. Tel. Co. v. Cent. Union Tel. Co.*, 202 F. 66 (6th Cir. 1913) (condemning 99-year exclusive long-distance telephone contract under the Sherman Act).

So too, institutional and administrability concerns counsel restraint.  To be sure, "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue," *Trinko*,

540 U.S. at 411, and "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law," *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466–67 (1992). But the Supreme Court has "repeatedly emphasized the importance of clear rules in antitrust law." *Linkline*, 555 U.S. at 452; *see Town of Concord v. Bos. Edison Co.*, 915 F.2d 17, 22 (1st Cir. 1990) (Breyer, C.J.) (antitrust rules "must be clear enough for lawyers to explain them to clients"). Indeed, courts are "ill suited 'to act as central planners, identifying the proper price, quantity, and other terms of dealing.'" *Linkline*, 555 U.S. at 452 (quoting *Trinko*, 540 U.S. at 408).

3. Here, CREXi's argument effectively asks this Court to discard a clear, administrable rule—that "[a] prerequisite to any exclusive dealing claim is an agreement to deal exclusively," *Aerotec*, 836 F.3d at 1181—in favor of the amorphous *de facto* exclusive dealing theory. Worse still, CREXi asks this Court to apply this theory based not on the "actual terms of the agreements"—such as "requirements terms," "volume or market share targets," or other terms this court uses to evaluate exclusive dealing claims, *id.*—but instead based on the alleged "chilling

effect" CoStar's non-exclusive terms have on the brokers' willingness to work with CREXi. CREXi Br. 65; FTC Br. 19 (urging the court to apply this theory based on how brokers' "widely understood" CREXi's terms). Just as courts are "ill suited" to identify proper "terms of dealing," they are even more inadequately stationed to police "terms of dealing" based on third parties' reactions to non-exclusive contract terms. *See Linkline*, 555 U.S. at 452.

As all this makes clear, in deciding whether an agreement constitutes an agreement to deal exclusively, this Court has required that the specific agreement at issue actually "requir[e] exclusivity." *Aerotec*, 836 F.3d at 1183; *see id.* at 1182 ("[I]n the absence of any exclusive requirements on which the discount is conditioned, the sale remains nonexclusive."); *see Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996–97 (9th Cir. 2010) (rejecting Section 1 exclusive dealing argument where the agreements provided market-share pricing discounts but "did not contractually obligate Tyco's customers to purchase anything from Tyco"). This Court should reiterate its prior teaching and make clear that *any* exclusive dealing claims, de facto or actual, fail unless the specific terms and features of the

24

agreement require exclusivity. In doing so, the Court should reject outright CREXi's argument that the understandings of those not party to the contract can transform plainly non-exclusive arrangements into exclusive dealing arrangements, and affirm dismissal of this claim.

\*     \*     \*

While *amici* urge the Court to take this path and make clear that any exclusive dealing claim must fail unless the terms and features of the agreement require exclusivity, the Court could instead do here what it did in *Aerotec* and "not reach the issue" of whether to "explicitly recogniz[e]" de facto exclusive dealing theory as a viable theory. 836 F.3d at 1182. The Court did not reach the issue because "at bottom, a plaintiff must still show that contracts that were induced were exclusive rather than run-of-the-mill contracts, which inevitably 'foreclose[ ]' or 'exclude[ ]' alternative sellers from *some* portion of the market, namely the portion consisting of what was bought." *Id.* (quoting *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983)). In other words, whatever else might be said about the de facto exclusive dealing theory, it "does not provide [a plaintiff] an end run around the obligation to first show that express or implied contractual terms in fact

substantially foreclosed dealing with a competitor for the same good or service." *Id.* Here, as the district court explained, CREXi has plainly failed to make this showing. *See* Op. 6 ("CREXI's allegations confirm that over 500 existing brokers utilize *both* CoStar and CREXI's services.").

## III. Allegations Of High Prices, Standing Alone, Do Not Provide Direct Evidence Of Market Power Or Monopoly Power.

1.  "[A]ntitrust laws protect competition, *not* competitors." *Syufy Enters.*, 903 F.2d at 668. And while conduct that "eliminates rivals reduces competition," the "reduction of competition does not invoke the Sherman Act until it harms consumer welfare." *Rebel Oil*, 51 F.3d at 1433; *see Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979) (Congress designed the Sherman Act as a "consumer welfare prescription") (quoting Robert H. Bork, *The Antitrust Paradox* 66 (1978)). Without market power, a competitor's actions cannot "threaten consumer welfare." *Rebel Oil*, 51 F.3d at 1434. So to state a claim under Section 1 or Section 2 of the Sherman Act, a plaintiff "must allege both that a 'relevant market' exists and that the defendant has power within that market." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044 & n.3 (9th Cir. 2008).

"Market power is the ability to raise price profitably *by restricting output*." *Am. Express Co.*, 138 S. Ct. at 2288 (quoting Areeda &

Hovenkamp § 5.01) (emphasis in original).  Courts thus "cannot infer monopoly power just from higher prices." *Marshfield Clinic*, 65 F.3d at 1412 (Posner, J.); *see Coal. for ICANN Transparency, Inc.*, 611 F.3d at 503 ("[H]igh price alone is not an antitrust violation.").  Indeed, the "charging of a high price is, so far as potential competitors are concerned, an attracting rather than an excluding practice." *Marshfield Clinic*, 65 F.3d at 1413; *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 n.12 (2d Cir. 1979) (same).

Thus, when a plaintiff seeks to present direct evidence of market power—that is, "proof of actual detrimental effects on competition," *Am. Express*, 138 S. Ct. at 2284 (cleaned up)—it needs to show more than prices above a competitive level.  It must show, as this Court explained in *Rebel Oil*, "evidence of restricted output *and* supracompetitive prices." 51 F.3d at 1434 (emphasis added).  In other words, where a plaintiff points to "hig[h] prices and "high profits" with "no accompanying showing of restricted output," it "fail[s] to present direct evidence of market power." *Forsyth*, 114 F.3d at 1476.[5]

_____

[5] This legal test rests on the sound economic logic of looking at output over price.  Indeed, the supreme evil of antitrust is deadweight loss—*i.e.*,

The Supreme Court recognized precisely this in *American Express*, going so far as to italicize the language it quoted from Areeda and Hovenkamp: that "[m]arket power is the ability to raise price profitably *by restricting output*." 138 S. Ct. at 2288. A closer look at the Areeda and Hovenkamp treatise makes this point even clearer, as the authors go on to emphasize that "market power is the abilities (1) to price substantially above the competitive level *and* (2) to persist in doing so for a significant period without erosion by new entry or expansion." Areeda & Hovenkamp § 501 (emphasis in original).

Notably, the treatise explains that "[t]his is the meaning—though not the literal wording—of [the] standard legal formula" used by courts: that market power is "the ability (1) to control prices *or* (2) to 'exclude competition.'" *Id.* (emphasis in original) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391–92 (1956)). Thus, this phrasing of the test does not change the test's meaning or its application.

---

"underconsumption caused by a monopolist or cartel reducing output and increasing price, which results in consumers being denied access to a product despite their willingness to pay the efficient equilibrium price." Christopher R. Leslie, *Predatory Pricing and Recoupment*, 113 Colum. L. Rev. 1695, 1743–44 (2013); *see* Bork, *The Antitrust Paradox* at 101. If output stays the same with higher pricing, no deadweight loss occurs.

*Id.* In the end, no matter how the test is phrased, a plaintiff cannot show direct evidence of market power by pointing only to surpracompetitive (or above-competitive-level) prices—it must also show a reduction of output. Indeed, allowing a plaintiff to end run this showing and demonstrate market power by pointing to high prices alone is incompatible with the oft-repeated maxim that direct evidence of market power is "only rarely available." *Microsoft Corp.*, 253 F.3d at 51; *McWane*, 783 F.3d at 830; *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd.*, 838 F.3d 421, 434 (3d Cir. 2016).

2.     Against this backdrop, it is clear that the district court correctly concluded that, to sufficiently allege direct evidence of market power, CREXi needed to allege plausibly both "restricted output ***and*** supracompetitive prices." Op. 11 (quoting *Rebel Oil*, 51 F.3d at 1434). Before this Court, CREXi does not argue that *Rebel Oil* was wrong when decided. CREXi Br. 36–39. Instead, it says that "both the Supreme Court and this Court have made clear that plaintiffs need not allege reduced output in addition to supracompetitive pricing"—that is, that *Rebel Oil* is now "wrong as a matter of law." CREXi Br. 38–39; *see* FTC Br. 27–28 (arguing that the court "wrong[ly]" "construe[d]" *Rebel Oil*). In making

29

this argument, CREXi principally relies on the Supreme Court's supposed use of "the disjunctive 'or' to define sufficient direct evidence" in *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2284 (2018), and on two opinions from this Court.  CREXi Br. 39; *see Epic Games, Inc. v. Apple, Inc.*, 67 F. 4th 946, 983–84 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024); *O'Bannon v. NCAA*, 802 F.3d 1049, 1070 (9th Cir. 2015).

As *amici* have already shown, *American Express* provides no support for CREXi's argument.  The Court's passing use of "or" in listing detrimental effects on competition does not call into question *Rebel Oil*'s test for direct evidence, and the Court's later statement that "[m]arket power is the ability to raise price profitably *by restricting output*" confirms that the test is a correct statement of law.  That leaves CREXi in the unenviable position of convincing this Court that it silently overruled the *Rebel Oil* test in *Epic Games* or *O'Bannon*.  This Court did nothing of the sort.

CREXi and the FTC point to this Court's statement in *Epic Games* and *O'Bannon* that "a reduction in output is one form of direct evidence, but it 'is not the only measure.'"  CREXi Br. 38 (citation omitted); FTC Br. 27–28.  That is both true and completely irrelevant.  *Of course* there

are forms of direct evidence beyond reduction of output. But that does not change that, as this Court held in *Rebel Oil*, when a plaintiff seeks to show market power through direct evidence of supracompetitive prices, it must also show reduction of output. 51 F.3d at 1434; *see Am. Express*, 138 S. Ct. at 2288. These cases thus do nothing to cast doubt on this holding. In fact, they reaffirm that, in certain instances, "[a] showing of decreased output [i]s essential." *Epic Games*, 67 F.4th at 984; Areeda & Hovenkamp ¶ 1503b1 (explaining that "reduction in output" is "the most prevalent" measure of "anticompetitive effect"). As this court has held, one of those instances is when, as here, a plaintiff attempts to tries to provide direct evidence through supracompetitive prices.

Lastly, the FTC says in its amicus brief that this Court "long has recognized that a firm's 'ability to manage its prices with little regard to competition' 'support[s] an inference of market dominance.'" FTC Br. 25 (quoting *Greyhound Comput. Corp. v. IBM Corp.*, 559 F.2d 488, 497 (9th Cir. 1977)). Again, true but irrelevant.[6] As explained, supracompetitive prices—standing alone—are not enough to establish market power. 51

---

[6] Indeed, this language from *IBM*—the "ability to manage its prices"— recognizes that control over pricing necessarily requires "manage[ment]" of something—*i.e.*, output—not simply increasing the sticker price.

F.3d at 1434; *see Am. Express*, 138 S. Ct. at 2288. If such allegations were enough to plead market power, the FTC surely would have found a post-*Rebel Oil* case for this point instead of snipping language from different sentences in *IBM* to cobble together support for its preferred rule. *See* 559 F.2d at 497.[7]

---

[7] Having come up empty elsewhere, the FTC's amicus brief turns to two unpublished district court opinions purportedly showing that this Court has done away with *Rebel Oil*. FTC Br. 28–30. They do not. The first involves allegations of "suppress[ed] wages," not supracompetitive prices. *Chung Le v. Zuffa, LLC*, No. 2:15-cv-01045-RFB-BNW, 2024 WL 195994, at *5 (D. Nev. Jan. 18, 2024). And the second in fact found that the facts at hand plausibly implied a reduction in "marketwide output." *In re ATM Fee Antitrust Litig.*, No. C 04-2676 CRB, 2010 WL 2557519, at *10–11 (N.D. Cal. June 21, 2010) ("[T]he fact that Star, the market leader, has charged supracompetitive interchange fees *for two decades* implies that marketwide output—*i.e.*, the number of foreign ATM transactions—has been lower than it would have been had Star charged a competitive interchange fee.") (emphasis added).

## **CONCLUSION**

This Court should affirm the decision below.

April 29, 2024                                  Respectfully submitted,

                                                /s/ Cody L. Reaves
                                                Cody L. Reaves
                                                *Counsel of Record*
                                                Benjamin M. Mundel
                                                SIDLEY AUSTIN LLP
                                                1501 K Street, N.W.
                                                Washington, D.C. 20005
                                                Tel: (202) 736-8000
                                                cody.reaves@sidley.com

                                                *Counsel to Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and Circuit Rule 32-1(a) because it contains 6,729 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This Brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using the Microsoft Word 2016 word processing system in 14-point Century Schoolbook font.

 /s/ Cody L. Reaves
Cody L. Reaves
*Counsel to Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Cody L. Reaves
Cody L. Reaves
*Counsel to Amici Curiae*