No. 23-55662

# United States Court of Appeals
# for the Ninth Circuit

COSTAR GROUP, INC., CO STAR REALTY INFORMATION, INC.,
*Plaintiffs-Counter-Defendants-Appellees,*

v.

COMMERCIAL REAL ESTATE EXCHANGE, INC.,
*Defendant-Counter-Claimant-Appellant.*

Appeal from the United States District Court
Central District of California
The Honorable Consuelo B. Marshall, Presiding
Case No. 2:20-cv-08819-CBM-AS

## REPLY BRIEF OF APPELLANT COMMERCIAL REAL ESTATE EXCHANGE, INC.

ELLIOT R. PETERS, #158708
DAN JACKSON, #216091
WARREN A. BRAUNIG, #243884
NICHOLAS S. GOLDBERG, #273614
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

*Counsel for Defendant-Counter-Claimant-Appellant Commercial Real Estate Exchange, Inc.*

2641756

Table of Contents

Page

I.      INTRODUCTION ..................................................................1

II.     ARGUMENT .......................................................................3

    A.    CREXi alleged claims for monopolization. .......................3

        1.    CREXi alleged monopoly power. ............................. 3

            a.    CREXI alleged direct evidence of
                  monopoly power. ............................................. 4

                (i)    CREXI alleged supracompetitive
                       prices. ...................................................... 4

                (ii)   Additional    allegations    of
                       restricted    output    are
                       unnecessary. ........................................ 7

                (iii)  CREXI alleged restricted output.
                       ................................................................ 9

                (iv)   CREXi alleged exclusion of
                       competition. ........................................ 12

            b.    CREXi alleged circumstantial
                  evidence of monopoly power. ........................ 13

        2.    CREXi alleged that CoStar willfully
              maintained monopoly power. ............................... 18

            a.    CoStar's technological blockade is
                  anticompetitive. ............................................ 18

            b.    CoStar's terms of service are
                  anticompetitive. ............................................ 23

            c.    CoStar's false claims of intellectual

i

property ownership are anticompetitive. ........................................... 26

    d.   CoStar's trademark infringement is anticompetitive. ........................................... 27

B.   CREXi alleged claims for attempted monopolization. ................................................................ 28

C.   CREXi alleged claims under section 1 of the Sherman Act and the Cartwright Act. ............................ 29

D.   CREXi alleged intentional interference with contract and prospective economic advantage. ............... 34

E.   CREXi alleged unlawful and unfair competition. ........... 37

III.   CONCLUSION .......................................................................... 38

2641756

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) ............................................................. 30

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007) ...................................................... *passim*

*City of Mishawaka, Ind. V. Am. Elec. Power Co.*,
616 F.2d 976 (7th Cir. 1980) .............................................................. 27

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) ............................................................ 30

*Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*,
99 F.3d 937 (9th Cir. 1996) ........................................................ *passim*

*CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*,
479 F.3d 1099 (9th Cir. 2007) ............................................................ 36

*E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc.*,
637 F.3d 435 (4th Cir. 2011) .............................................................. 17

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) .................................................................... 18, 31

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ................................................ 5, 8, 37, 38

*F.T.C. v. Indiana Fed'n of Dentists*,
476 U.S. 447 (1986) ........................................................................ 8, 9

*Forsyth v. Humana, Inc.*,
114 F.3d 1467 (9th Cir. 1997), *overruled by Lacey v.
Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012) ...................................... 8

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) ............................................................ 18

iii

*Jensen Enterprises Inc. v. Oldcastle, Inc.*,
No. C 06-00247 SI, 2006 WL 2583681 (N.D. Cal. Sept. 7,
2006) ................................................................................ 36

*Lorain J. Co. v. United States*,
342 U.S. 143 (1951) ....................................................... 22

*McWane, Inc. v. F.T.C.*,
783 F.3d 814 (11th Cir. 2015) ................................. 23, 31

*In re Mercury Interactive Corp. Sec. Litig.*,
618 F.3d 988 (9th Cir. 2010) ................................... 12, 13

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
933 F.3d 1136 (9th Cir. 2019) ..................... 2, 15, 16, 35

*New York v. Meta Platforms, Inc.*,
66 F.4th 288 (D.C. Cir. 2023) ................................. 21, 22

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
513 F.3d 1038 (9th Cir. 2008) ................................ *passim*

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018) ........................................................ 8, 9

*Paramount Media Grp., Inc. v. Vill. of Bellwood*,
929 F.3d 914 (7th Cir. 2019) ......................................... 8

*PlusPass, Inc. v. Verra Mobility Corp.*,
No. 220CV10078SBSKX, 2021 WL 4775573 (C.D. Cal.
Aug. 9, 2021) ................................................................. 30

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
No. SACV 12-2102-JLS ANX, 2013 WL 6229141 (C.D.
Cal. Dec. 2, 2013) ......................................................... 31

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ............................. 6, 7, 8, 28

*Staley v. Gilead Scis., Inc.*,
446 F. Supp. 3d 578 (N.D. Cal. 2020) ........................... 9

iv

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
    676 F.2d 1291 (9th Cir. 1982) ............................................................ 30

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) .............................................................. 23

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ............................................................................ 7

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) .................................................. 19, 20, 26

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) .................................................. 31, 33, 34

**State Cases**

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ...................................................................... 37

**Federal Statutes**

15 U.S.C. § 15b ...................................................................................... 6

**State Statutes**

Cal. Bus. & Prof. Code § 17200 ............................................................ 37

**Rules**

Fed. R. Civ. P. 8(a)(2) ............................................................................ 6

Fed. R. Civ. P. 9(b) ................................................................................ 11

Fed. R. Civ. P. 12(b)(6) .......................................................................... 3

Fed. R. Civ. P. 15 .................................................................................. 36

2641756

## I.    INTRODUCTION

Appellees CoStar Group, Inc. and CoStar Realty Information, Inc. (CoStar) are entrenched monopolists in the internet listing, information, and auction services markets for commercial real estate (CRE). CoStar maintains its monopoly by, among other things, blocking brokers from sharing their own CRE listings, on their own websites, with CoStar's competitors, including appellant Commercial Real Estate Exchange, Inc. (CREXi). Based on that and other detailed factual allegations, CREXi asserted counterclaims for antitrust violations, interference with contract and prospective economic advantage, and violations of California's Unfair Competition Law (UCL). But the district court dismissed those claims. In doing so, it failed to accept CREXi's allegations as true and failed to draw all reasonable inferences in CREXi's favor. As CREXi demonstrated in its opening brief, the district court erred. This Court should reverse.

In its Answering Brief, CoStar commits the same errors as the district court. CoStar refuses to accept CREXi's allegations as true; offers its own version of the facts; and draws every inference in its *own* favor.

1

For example, CoStar argues that it "*never* blocked its customers from working with CREXi, either by contract or by technological means." Answering Brief (AB) 2. But CREXi alleged exactly the opposite. "CoStar employs technological measures to block brokers from sharing their own listing information with competitors, even on brokers' own websites." 4-ER-571, ¶42. "CoStar also imposes exclusionary contractual terms to prevent customers from using competing services." 4-ER-574, ¶50. The allegations in CREXi's First Amended Counterclaims (FACC) must be accepted as true and construed in the light most favorable to CREXi. *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1149 (9th Cir. 2019). Throughout its brief, CoStar does the opposite. But CoStar cannot avoid CREXi's counterclaims by disagreeing with CREXi's allegations.

The district court erred in dismissing CREXi's counterclaims. Nothing in CoStar's Answering Brief supports its contrary conclusion. This Court should reverse.

2641756

## II.  ARGUMENT

This Court has jurisdiction for the reasons stated in CREXi's opening brief and opposition to CoStar's motion to dismiss the appeal. *See* Dkt. 10.

### A.  CREXi alleged claims for monopolization.

The elements of CREXI's monopolization claims are (1) CoStar possesses monopoly power in the relevant markets; (2) CoStar willfully acquired or maintained that power; and (3) CoStar's conduct caused antitrust injury. *See Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 949 (9th Cir. 1996). CoStar does not dispute that CREXi alleged the relevant markets and antitrust injury. CREXi also alleged that CoStar has monopoly power and willfully maintained it.

### 1.  CREXi alleged monopoly power.

The existence or nonexistence of monopoly or market power "is a factual question." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1052 (9th Cir. 2008). "Resolution of the market power question on a Rule 12(b)(6) motion is therefore inappropriate in this case." *Id*. Market power need not be alleged with specificity. *Id*. at 1045.

Monopoly power may be pleaded through allegations of direct or circumstantial evidence. Either is sufficient and CREXi pleaded both.

3

> **a. CREXI alleged direct evidence of monopoly power.**
>
> **(i) CREXI alleged supracompetitive prices.**

Contrary to CoStar's assertions, CREXi alleged that CoStar imposes supracompetitive prices. For example, CREXi alleged that:

- "[B]rokers have consistently complained about CoStar's supracompetitive prices, but noted that they are forced to continue purchasing services from CoStar because of its monopoly share and anticompetitive conduct." 4-ER-622, ¶213.

- "Customers have been forced to pay increasingly inflated prices as CoStar acquires and drives competitors out of the relevant markets." 4-ER-623, ¶214.

- "After its acquisition of LoopNet, CoStar drastically raised its prices for both its information services and the listing services previously offered by LoopNet. Following the CoStar/LoopNet merger, one CoStar customer reported a price increase of a whopping 300% to 500%." *Id.*, ¶215.

- More recently, after driving Xceligent into bankruptcy, CoStar "again raised its average prices by another 80%, further

demonstrating CoStar's ability to raise prices above those that would be charged in a competitive market." 4-ER-624, ¶217.

- "CoStar imposes prices much higher than those of its competitors for years, and has not been forced to reduce them." 4-ER-626, ¶226; *see also* 4-ER-561-62, ¶6; 4-ER-564-65, ¶15; 4-ER-630, ¶243.

CoStar argues that supracompetitive prices means more than high prices. AB23. But CREXi alleged more than high prices. CREXi alleged that CoStar possesses and exercises the power to "raise prices above those that would be charged in a competitive market," 4-ER-624, ¶217, and has maintained those supracompetitive prices for "years." 4-ER-626, ¶226. That is sufficient to allege supracompetitive prices. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 984 (9th Cir. 2023) ("A supracompetitive price is simply a 'price[] above competitive levels.'") (quoting *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995)).

CoStar asserts that its 300% to 500% price increase occurred 12 years ago. AB24. But the fact that CoStar has been able to maintain supracompetitive prices for so long underscores its monopoly power. *See*

*Rebel Oil*, 51 F.3d at 1434. CoStar also dismisses its price increase of 80% as "pre-dat[ing] the counterclaims by five years." AB24, n.1. But it occurred in 2018, just three years before CREXi filed its initial counterclaims, and within the four-year statute of limitations. *See* 4-ER-618-619, ¶¶196-197; 3-ER-330-423; 15 U.S.C. § 15b.

CoStar also argues that CREXi should have provided additional details about CoStar's supracompetitive prices, including about CoStar's costs. *See* AB24. Without discovery, CREXi does not have information about CoStar's costs. CoStar is advocating an impossible standard whereby claims would be dismissed unless the party asserting them pleads facts that only the other party knows. That is not the law. "Antitrust claims … are subject to the notice-pleading standard of Federal Rule of Civil Procedure 8(a)(2), which requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 317 (3d Cir. 2007); *see also Newcal*, 513 F.3d at 1045 (antitrust claims need not be pleaded with specificity). CREXi's allegations are sufficiently specific; no further details are required. *See id.*

**(ii)** **Additional allegations of restricted output are unnecessary.**

Given CREXi's allegations of supracompetitive prices, no additional allegations of restricted output were required. CoStar relies on *Rebel Oil* for the contrary position, but *Rebel Oil* simply held that one way to provide direct evidence of market power is to put forth evidence of "restricted output and supracompetitive prices." 51 F.3d at 1434. *Rebel Oil* did not address the pleading standard at all, let alone hold that this is the *only* way to allege direct evidence of market power, as CoStar's own *amici* concede. *See id.*; *see also* Br. *Amici Curiae* at 30 (it is "true" that "a reduction in output is one form of direct evidence, but it is not the only measure") (citation omitted). In particular, *Rebel Oil* did not purport to overturn the Supreme Court's well-established definition of monopoly power as "the power to control prices or exclude competition." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (citation omitted). Under that formulation, alleging the power to control prices is sufficient; no additional output allegations are required. *See*, *e.g.*, *Cost Mgmt.*, 99 F.3d at 950.

2641756

Moreover, cases decided by this Court and the Supreme Court after *Rebel Oil*[1] have made clear that "a reduction in output is one form of direct evidence, but it 'is not the only measure.'" *Epic Games*, 67 F.4th at 983 (quoting *O'Bannon v. NCAA*, 802 F.3d 1049, 1070 (9th Cir. 2015)). "Direct evidence of anticompetitive effects" may include "reduced output, increased prices, *or* decreased quality in the relevant market…." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) (emphasis added).

CoStar tries to distinguish these cases on the basis that they address anticompetitive effects rather than market power. AB26-27. But "[a] plaintiff can establish that the defendant has monopoly power in a relevant market … by providing 'direct evidence of anticompetitive effects'…." *Paramount Media Grp., Inc. v. Vill. of Bellwood*, 929 F.3d 914, 922 (7th Cir. 2019) (quoting *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000)). Indeed, "the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition." *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986). "Market power,"

---

[1] And after *Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997), *overruled by Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012).

2641756

therefore, "is simply a way to assess whether the defendant's conduct has anticompetitive effects." *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 616 (N.D. Cal. 2020). Thus, allegations of anticompetitive effects in the form of supracompetitive prices **or** reduced output, *see Am. Express*, 585 U.S. at 542, suffice to plead market power. *See*, *e.g.*, *Indiana Fed'n of Dentists*, 476 U.S. at 460-61; *see also* FTC Br. 22-30.

### (iii) CREXI alleged restricted output.

In any event, CREXi alleged restricted output. CREXi alleged that "CoStar's dominant market position and the moat it creates for market entrants prevents competitors from increasing their output in the short run." 4-ER-613, ¶177. CoStar's dominant market position and anticompetitive conduct "rob market entrants of the capacity to increase the number of brokers and listings on their platform in the short run." *Id.* "Further, competitors cannot increase output in the short run to bring CoStar's prices down." 4-ER-626, ¶226. Indeed, "CoStar imposes prices much higher than those of its competitors for years, and has not been forced to reduce them. If it were possible for competitors to put downward pressure on prices, it would have happened by now." *Id.* Furthermore, CoStar's anticompetitive conduct "is purposefully designed to reduce

2641756

competitor output and to minimize rivals' ability to reduce prices in the market. This is so even when competitors, such as CREXi, have product features comparable or superior to those of CoStar." *Id.*

CoStar argues that only its *own* output is relevant. AB28. But to ignore *competitors'* output is to ignore the fact that "[i]f a firm can profitably raise prices without causing competing firms to expand output and drive down prices, that firm has monopoly power." *Broadcom*, 501 F.3d at 307. That is precisely what CREXi alleged. CoStar has imposed "prices much higher than those of its competitors for years," yet "competitors cannot increase output in the short run to bring CoStar's prices down." 4-ER-626, ¶226. Thus, CoStar "has monopoly power." *Broadcom*, 501 F.3d at 307.

Indeed, CoStar's *amici* emphasize that "market power is the abilities (1) to price substantially above the competitive level *and* (2) to persist in doing so for a significant period without erosion by new entry or expansion." Br. *Amici Curiae* 28 (quoting Areeda & Hovenkamp § 501). Again, that is exactly what CREXi alleged: "CoStar imposes prices much higher than those of its competitors for years, and has not been forced to reduce them." 4-ER-626, ¶226.

10

CoStar contends that CREXi's output allegations are "entirely conclusory." AB29. But that is incorrect. CREXi's allegations regarding restricted output are supported by its allegations that CoStar blocks "brokers from working with competitors" and "lock[s] brokers into *de facto* exclusive arrangements." 4-ER-561, ¶3. "As a result, CoStar has obstructed and continues to obstruct and restrain CREXi's ability to access brokers' listings and other public CRE data for the purpose of building products and services to compete with CoStar in the relevant markets." 4-ER-631, ¶247; *see also id.* ¶251. To require further details would be tantamount to imposing a particularity requirement as if this were a fraud case governed by Rule 9(b). It is not. *See Newcal*, 513 F.3d at 1045.

CoStar misconstrues CREXi's allegations to argue that they show "substantial *expanded* output." AB30. CoStar argues that CREXi "amassed hundreds of CoStar's brokerage customers," citing paragraph 257 of the FACC. AB29. The point of paragraph 257 is that over 500 CREXi customers have been *unable* to share their listings with CREXi because "CoStar has blocked CREXi from accessing [the CRE listings] on those brokers' own websites." 4-ER-633, ¶257. That is not "*expanded*

11

output." AB30. It is *restricted* output because CREXi is unable to access those listings. 4-ER-633, ¶257.

CoStar also argues that CREXi forfeited the argument that it alleged restricted output. AB28. But an issue will not be deemed waived if it was "raised sufficiently for the trial court to rule on it." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010) (citations omitted). CoStar argued below that the reduced output of CoStar's competitors was "legally irrelevant." Dkt. 198 at 18. CREXi argued the opposite. SER-143 n.4. The issue was raised sufficiently for the district court to rule on it. In any case, this Court should exercise its discretion to decide the issue because it "has been sufficiently briefed and the record has been sufficiently developed." *Mercury Interactive*, 618 F.3d at 993.

### (iv) CREXi alleged exclusion of competition.

CREXi also alleged that CoStar excluded competition. *See* 4-ER-600-01, ¶¶136-39. CoStar argues that a company can exclude competition without market power—for example, if it holds a patent. AB29. But there is no such allegation here. On the contrary, CREXi alleged that, given CoStar's dominant market share, "the vast majority of brokers in these markets are subjected to CoStar's anticompetitive practices." 4-ER-600-

2641756

01, ¶139. Those practices are "designed to drive CREXi out of the markets." *Id.* And there are "no other substantial viable competitors in these markets besides CREXi." *Id.* Thus, "CoStar's exclusionary conduct forecloses competition in a substantial share of the relevant markets." *Id.* These allegations are more than sufficient. *See Cost Mgmt.*, 99 F.3d at 950 (allegation that defendant's practices "made it impossible for others to compete" sufficient to show that those practices "excluded competition").

### b. CREXi alleged circumstantial evidence of monopoly power.

CREXi also alleged circumstantial evidence of CoStar's monopoly power, beginning with CoStar's own assertion that "nearly 90% of all CRE activity occurs on a CoStar network." 4-ER-621, ¶210. CoStar now complains that "CRE activity" is "undefined." AB31. But the term comes from *CoStar's own website.* 4-ER-621, ¶210 n.49. There is nothing mysterious about it.

CoStar also has a dominant share of website visitors in the internet CRE listing services market:

2641756



4-ER-622, ¶ 211.

CoStar pretends to be confused about "which websites this relates to." AB31. Again, however, it is *CoStar's own data*. And CoStar's graphic explicitly states that it relates to CoStar's LoopNet website. *Id.* Consistent with CoStar's own assertions, brokers and other industry participants conclude that "CoStar possesses monopoly power." 4-ER-624, ¶219; *see also* 4-ER-622-624, ¶¶213-218.

The same conclusion is compelled by CREXi's calculations of CoStar's market shares in the national markets: over 90% for the internet CRE listing services market; over 90% for the internet CRE information services market; and 95% for the internet CRE auction services market. 4-ER-624, ¶¶220-222.

CoStar feigns confusion about what "market share" means. AB31. But again, there is no mystery. CoStar's market share is its estimated percentage of total market revenues.

CoStar argues that the national market shares are irrelevant because they do not correspond to the Metropolitan Statistical Area (MSA) markets. As CREXi explained, however, high national market shares imply high market shares in most MSAs. *See* 4-ER-624-625, ¶223. CoStar does not dispute this principle, but argues that CREXi's MSA market calculations "disprove any direct link between national and MSA-specific market share" because CoStar's market share in just one of the fifty MSAs is 57.6%. AB30-31. CoStar misses the point, which is that "high aggregate market share implies high market shares in *most* disaggregated areas." 4-ER-624-625, ¶223 (emphasis added). Many of the MSA-specific market shares are above 90%. *See* 2-ER-185-87. That others are below 90% simply implies that the MSA figures are *conservative*—which they are. That is the inference that must be drawn in CREXi's favor. *See NFL Sunday Ticket Antitrust Litig.*, 933 F.3d at 1149.

CREXi also provided estimates of CoStar's market shares for internet CRE listings in each of the 50 MSAs, using information available

without discovery. 4-ER-624-25, ¶223. These market shares were calculated by estimating the dollar value of for-sale listings on CoStar's listings platform in relation to the total value of closed CRE sales transactions in each MSA. *Id.* CoStar's market share equals or exceeds 90% in 12 of the MSAs; 80% in 31 of the MSAs; 70% in 38 of the MSAs; 60% in 46 of the MSAs; and 57% in all 50 MSAs. *Id.*; 2-ER-185-87.

CoStar argues that these market share estimates are implausible because "many websites can advertise the same listing." AB33. According to CoStar, this overestimates market share because if five sites listed the same property, the market share would be 500%. *Id.* If CoStar were correct, one would expect to see many market shares over 100%; there are none. *See* 2-ER-185-87. The reason CoStar's theory does not match the data is that CoStar's premise is wrong. The numerator of the calculation does *not* include "many websites." Instead, it is the estimated dollar value of for-sale listings on *CoStar's listings platform*. 4-ER-624-25, ¶223.

CoStar also argues that market shares may be overestimated because not all listings lead to sales at the listed prices. CoStar posits that if it advertised five $1 million properties but only one sold at that

16

price, it would have 500% market share. That is not how the calculation works, as can be seen from the results: again, none of the market shares exceed 100%. *See* 2-ER-185-87. CoStar's speculation about the calculation raises factual questions that cannot be resolved on a motion to dismiss. *Newcal*, 513 F.3d at 1052.

CoStar points out that leases are omitted from the calculations. AB33. Data for closed lease transactions was not publicly available. As in *E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc.*, 637 F.3d 435 (4th Cir. 2011), CREXi provided "extensive factual allegations" that are more than sufficient "at the pre-discovery, motion-to-dismiss stage," when CREXi "has insufficient information" to provide further detail. *Id.* at 452 n.12.

The district court erred in finding that CREXi's calculation of MSA market shares "does not represent CoStar's market share in the *listing services* market." 1-ER-021. The calculation uses available data—pre-discovery—about CRE sales to estimate CoStar's market shares in 50 MSAs. 4-ER-624-25, ¶223. The district court's criticisms, and CoStar's, present factual issues that should not have been resolved in CoStar's favor on its motion to dismiss. *See Newcal*, 513 F.3d at 1052.

2641756

In sum, although *either* is sufficient, CREXi alleged *both* direct and circumstantial evidence of monopoly power.

**2. CREXi alleged that CoStar willfully maintained monopoly power.**

"The second element of a § 2 claim is the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482-83 (1992) (quotation marks omitted). "Under § 2, behavior that might otherwise not be of concern to the antitrust laws—or that might even be viewed as procompetitive—can take on exclusionary connotations when practiced by a monopolist." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1217 (9th Cir. 1997) (quotation marks and brackets omitted). "Conduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive." *Broadcom*, 501 F.3d at 308.

**a. CoStar's technological blockade is anticompetitive.**

CoStar technologically blocks brokers from working with CREXi, which is anticompetitive. CoStar offers a web tool called LoopLink that allows brokers to display their own CRE listings on their own publicly

18

2641756

available websites using database functionality offered by LoopNet. 4-ER-570, ¶39. For many brokers, the only copies they have of their listings are on their LoopLink-powered websites. 4-ER-571, ¶41. After intertwining the listings data between LoopLink and LoopNet, CoStar employs technological measures to block brokers from sharing their own listing information with competitors, even on the brokers' own websites. *Id.*, ¶42. And CoStar deploys its technological blocking measures without informing the brokers to whom the listings belong. 4-ER-572, ¶43. Thus, unbeknownst to brokers who use LoopLink, CoStar imposes a technological blockade to prevent CREXi from accessing brokers' own CRE listings on brokers' own websites, even though CREXi is directed to those listings by the brokers themselves. *Id.*

CoStar's technological blockade is similar to the "technological shackles" found to be anticompetitive in *United States v. Microsoft Corp.*, 253 F.3d 34, 64 (D.C. Cir. 2001). Microsoft bound Internet Explorer to Windows, which had the effect of discouraging original equipment manufacturers (OEMs) from pre-installing other browsers. *Id.* at 64-65. "Because Microsoft's conduct, through something other than competition on the merits, has the effect of significantly reducing usage of rivals'

products and hence protecting its own operating system monopoly, it is anticompetitive[.]" *Id.* at 65.

Likewise here, CoStar's technological block on brokers' ability to share their own listings on their own websites is not competition on the merits. It has the effect of significantly reducing usage of rivals' products. And it protects CoStar's monopoly. Thus, it is anticompetitive. *See id.*

CoStar argues that "CREXi has not plausibly alleged that working with CoStar prevents brokers from working with CREXi" because "CREXi has 'many more' than '500 existing customers' who are 'signed up with CoStar' too." AB43 (quoting 4-ER-633, ¶257). But the actual allegations are that "CREXi has over 500 existing customers who use CoStar's LoopLink tool and *whose CRE listings CoStar has blocked CREXi from accessing on those brokers' own websites*." 4-ER-633, ¶257 (emphasis added). "CREXi also has many more customers who have directed CREXi to access their listings on LoopNet, but *whose listings CREXi is unable to access due to CoStar's technological blocks*. CoStar has interfered with CREXi's ability to work with countless other prospective customers through the same means." *Id.* (emphasis added).

Thus, CREXi indeed alleged that CoStar prevents brokers from working with CREXi.

CoStar cites several cases for the proposition that businesses are generally free to choose with whom they will deal (AB44-45) but *this is not a refusal-to-deal case*. 4-ER-563-64, ¶12; *see also* FTC Br. 8-17. This case is not about CoStar refusing to deal with CREXi; it is about CoStar preventing *brokers* from dealing with CREXi. *See id.*

Thus, CoStar's refusal-to-deal cases, including *New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023), are inapposite. In *Meta*, Facebook prohibited applications developers from "using Facebook's Platform to duplicate Facebook's core products." *Id.* at 305. Here, in contrast, CREXi does not seek to use CoStar's platform to duplicate CoStar's products. CREXi seeks access to *brokers' own listings on brokers' own websites, at brokers' invitation*. Yet CoStar blocks brokers from sharing their own listings on their own websites. That is anticompetitive.

CoStar ignores CREXi's allegations to contend that "CREXi would like to be able to copy LoopNet listings, using CoStar's platforms, to compete against CoStar." AB46. CREXi has no interest in copying from CoStar's platforms. 4-ER-563-64, ¶12. CREXi seeks to access brokers'

2641756

own listings on brokers' own websites at brokers' request, but CoStar blocks that access. *See* 4-ER-561-62, ¶¶4-6; 4-ER-567-68, ¶29; 4-ER-570-73, ¶¶39-49; 4-ER-575-79, ¶¶55-69; 4-ER-600, ¶136; 4-ER-633, ¶¶257-58. Again, the blocking occurs *on the brokers' websites*, not on CoStar's websites. *See id.* It is an "effective prohibition," *Lorain J. Co. v. United States*, 342 U.S. 143, 153 (1951), against brokers sharing their listings with CREXi because the only way for many brokers to share listings is to direct CREXi to their website. 4-ER-571, ¶41.

CoStar argues that this is not "a *Lorain Journal* case." AB48. CoStar is wrong. *Lorain Journal* stands for the principle that it is anticompetitive for a monopolist to block its customers from dealing with its rivals. *See* 342 U.S. at 149-57. That principle governs here. *See* FTC Br. 8-17.

CoStar argues that brokers are "free" to list properties on CREXi by means other than their websites. AB49. Again, however, in many cases "the only original copies the brokers have of their listings are on the broker's LoopLink-powered website." 4-ER-571, ¶41. CoStar argues that the brokers, or CREXi, should incur the cost of recreating the listings. AB49. But that just underscores the anticompetitive nature of

CoStar's conduct, which enables it "to maintain its monopoly power by raising its rivals' costs sufficiently to prevent them from growing into effective competitors." *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 832 (11th Cir. 2015). The question is not whether brokers can recreate their listings, but whether asking them to do so "poses a real threat to defendant's monopoly." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 193 (3d Cir. 2005) (quotation marks omitted). It does not. *See* 4-ER-571-73, ¶¶41, 45, 47.

### b.  CoStar's terms of service are anticompetitive.

CoStar's terms of service are also anticompetitive. *See* 4-ER-561-79, ¶¶6, 28-30, 50-69. CoStar contends that its terms "are expressly 'non-exclusive'" because they say, in part, that brokers who submit listings to LoopNet "retain any applicable ownership rights" in their "Submitted Content." AB36 (quoting 4-ER-574-75, ¶¶52-54); *see also id.* at 44. But CoStar only tells half the story. As CREXi alleges, "CoStar induces brokers and other third parties to provide information to CoStar and LoopNet by expressly disavowing any ownership in or claim to the data," but CoStar's "promises are illusory and contradicted by CoStar's actions as well as other CoStar contractual terms." 4-ER-574, ¶52.

CoStar's other contractual terms—which CoStar either ignores or elides in its Answering Brief—"restrict brokers' ability to do whatever they want with their data, including work with CoStar's rivals." 4-ER-575, ¶55. For example, the LoopNet terms require brokers to "*treat all information from the Service*, including LoopNet Materials, *listings*, member directory, and any information otherwise made available to You in the Service [defined as the 'Content'] *as proprietary to LoopNet*." 2-ER-201 (emphasis added); *see also* 4-ER-577, ¶61. The terms go on to restrict brokers from using or reproducing "any Content that is obtained from the Service, or that is otherwise made available to You in the Service, for or in connection with any other … listing service," which would include CREXi or any other CoStar competitor. 2-ER-202. Moreover, brokers must agree that it "shall constitute a prima facie breach" if CoStar determines that "any third party," including a competitor, "has access to property listings" provided by brokers and modified by CoStar. 2-ER-201.

In other words, just as CREXi alleges, "CoStar simply declares information *provided by brokers* as 'proprietary to LoopNet' and forbids brokers from using that same listing information and photographs with

24

competitors of CoStar. Then, CoStar threatens that brokers are in 'prima facie breach' of contract simply by sharing brokers' own listing information and photographs with CoStar's competitors." 4-ER-577, ¶62. "CoStar's contractual restrictions are widely understood by brokers to foreclose their ability to work with competing platforms, including CREXi." 4-ER-578, ¶65.

CoStar contradicts CREXi's allegations and attempts to re-interpret its separate CoStar terms of service. *See* AB36. CoStar argues that its CoStar terms only prevent brokers from transmitting CoStar's "Product" to competitors, and that "Product" "does not mean 'brokers' own listings and other information.'" *Id*. CoStar thus contradicts CREXi's allegations and CoStar's own terms of service, which broadly define "Product" to include CoStar's "Site, Content, Database, Information, Software and any portion of the foregoing." 2-ER-231. "Content," in turn, is broadly defined to include any "information, data, text, software, photographs, images, forms, agreements, graphics, organization, layout, design, and other content contained on or provided through this Site," which includes information, data, text, photographs, etc., provided to CoStar by brokers. *Id*. Yet even when that information is provided by

brokers, CoStar again declares that it is "proprietary to CoStar" and prohibits its users from "disclos[ing] or transmit[ting] any portion of the Product to any direct or indirect competitor of CoStar," which includes "Internet listing services or other real estate information services and employees." 2-ER-231, 235.

"These terms, by design, limit brokers' ability to use other listing platforms while they are signed up for CoStar's services, and have a chilling effect on brokers' willingness to work with competitors, for fear that they will run afoul of CoStar's overbroad terms." 4-ER-577, ¶60.

Because CoStar's terms of service have "a substantial effect in protecting [CoStar's] market power, and do[] so through a means other than competition on the merits, [they are] anticompetitive." *Microsoft*, 253 F.3d at 62; *see also* FTC Br. 17-22.

### c. CoStar's false claims of intellectual property ownership are anticompetitive.

CoStar's anticompetitive scheme is furthered by its false claims of intellectual property ownership. 4-ER-588-93, ¶¶92-111. CoStar argues that CREXi's allegations are all about conduct by CREXi. AB52. But "*CoStar* demanded that CREXi hire a vendor to install an image filter to run on CREXi's website" and "*CoStar* insisted that CREXi use one of two

vendors that had a relationship with CoStar." 4-ER-588, ¶92 (emphases added). As CREXi alleged, "*CoStar* falsely represented that the filter contained *only* CoStar's copyrighted images." *Id.*, ¶93 (first emphasis added). "The filter routinely flags for removal from CREXi's website CRE images submitted to CREXi by brokers, based on *CoStar's* false assertion that CoStar owns a copyright in such images." 4-ER-588-89, ¶94 (emphasis added). Yet "*CoStar* dismissed CREXi's concerns and refused to remedy the filter errors" and "continues to insist to this day that CREXi implement the filter, at significant cost to CREXi." 4-ER-589, ¶95 (emphasis added). As CREXi alleged, CoStar's false claims of intellectual property ownership are anticompetitive.

### d. CoStar's trademark infringement is anticompetitive.

CoStar also intentionally infringes CREXi's trademarked name, which must be considered along with CoStar's other anticompetitive conduct because "[i]t is the mix of the various ingredients of [CoStar's] behavior in a monopoly broth that produces the unsavory flavor." *City of Mishawaka, Ind. V. Am. Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980). CoStar contends that "none of CoStar's alleged conduct is anticompetitive." AB52. But the opposite is true, as demonstrated above.

Thus, the district court erred in dismissing CREXi's claims for monopolization.

## B.   CREXi alleged claims for attempted monopolization.

The elements of a claim for attempted monopolization are "(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and (4) causal antitrust injury." *Cost Mgmt.*, 99 F.3d at 950. CoStar does not dispute that CREXi alleged specific intent to control prices or destroy competition and antitrust injury. CREXi also alleged anticompetitive conduct, as discussed in the prior section. That leaves the dangerous probability of obtaining monopoly power, which is "a particularly fact-intensive inquiry." *Broadcom*, 501 F.3d at 318.

As this Court held in *Rebel Oil*, "market share of 44 percent is sufficient as a matter of law to support a finding of market power, if entry barriers are high and competitors are unable to expand their output in response to supracompetitive pricing." 51 F.3d at 1438. CREXi alleged national market shares above 90% and MSA market shares all above 57%—well over the 44% held to be sufficient as a matter of law in *Rebel Oil*. *See* 4-ER-624-25, ¶223. CREXi also alleged high barriers to entry—

28

which CoStar does not dispute. *See* 4-ER-608-13, ¶¶166-78. And CREXi alleged that competitors are unable to expand their output in response to supracompetitive pricing. *See* 4-ER-613, ¶177; 4-ER-626, ¶226.

Thus, the district court erred in dismissing CREXi's claims for attempted monopolization.

## C. CREXi alleged claims under section 1 of the Sherman Act and the Cartwright Act.

CREXi also stated claims under section 1 of the Sherman Act and the Cartwright Act. The contracts in restraint of trade—CoStar's terms of service—have already been discussed. *See* § II.A.2.b, *supra*. Although nominally "non-exclusive," the terms of service bind brokers to a *de facto* exclusive arrangement with CoStar. "CoStar conditions access to its CoStar, LoopNet, and Ten-X websites, as well as brokers' LoopLink-hosted websites, on a sweeping agreement to not support, or even share equivalent data with, CoStar's competitors." 4-ER-577, ¶60.

CoStar suggests, and its *amici* argue, that this Court should not recognize *de facto* exclusive dealing. They assert that this Court has never "explicitly recognized a 'de facto' exclusive dealing theory." AB37; Br. *Amici Curiae* 6 (quoting *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016)). But, while this Court did not explicitly

adopt a *de facto* exclusive dealing theory in *Aerotec*, the Court was open to the theory and recognized that some situations may involve "'de facto' exclusive dealing contracts." *Aerotec*, 836 F.3d at 1182. Moreover, in *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291 (9th Cir. 1982), this Court held that exclusive dealing case law applied even though the case did not involve "exclusivity per se." *Id.* at 1301-02. As the Court held, exclusive dealing law is "applicable whether the specific issue involves exclusivity per se, or whether it involves … the methods used to procure exclusive contracts and the nature and extent of the anticompetitive influence of these contracts on a substantial share of the relevant market." *Id.* at 1302; *see also Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1058 (8th Cir. 2000) ("Section 1 claims that allege only de facto exclusive dealing may be viable.") (citing *Twin City*, 676 F.2d at 1301-02).

According to CoStar's *amici*, recognizing *de facto* exclusive dealing "would open the floodgates to baseless antitrust suits." Br. *Amici Curiae* 7. But the district courts in this Circuit already recognize *de facto* exclusive dealing and the floodgates remain under control. *See*, *e.g.*, *PlusPass, Inc. v. Verra Mobility Corp.*, No. 220CV10078SBSKX, 2021 WL

4775573, at *7 (C.D. Cal. Aug. 9, 2021); *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, No. SACV 12-2102-JLS ANX, 2013 WL 6229141, at *7 (C.D. Cal. Dec. 2, 2013).

Furthermore, the Third and Eleventh Circuits are right to recognize *de facto* exclusive dealing. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012); *McWane*, 783 F.3d at 833-35. As the Third Circuit explained in *ZF Meritor*, express exclusivity is not required "because we look past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement 'in the real world.'" 696 F.3d at 270 (quoting *Dentsply*, 399 F.3d at 194). A defendant cannot avoid antitrust scrutiny simply by—like CoStar— inserting the words "non-exclusive" into a contract that is exclusive in the real world. *See* 4-ER-574, ¶52. That would exalt form over substance. "Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." *Eastman Kodak*, 504 U.S. at 466-67.

CoStar argues that it is "implausible" that its terms are "widely understood by brokers" to require exclusivity. AB38. CoStar contends that there are only three brokers who "allegedly misread CoStar's terms,"

whereas CREXi "has over 500 existing customers who also use LoopLink." *Id.* at 38-39. CoStar mischaracterizes CREXi's allegations in multiple ways. *First*, CREXi does not allege that the brokers "misread" CoStar's terms. On the contrary, CoStar's terms are *designed* to limit brokers' ability to use other listing platforms. 4-ER-577, ¶60. *Second*, many more than three brokers understood CoStar's terms to prevent them from working with CREXi; the three brokers are exemplary, not exhaustive. *See* 4-ER-578-79, ¶¶65-69. Again, "CoStar's contractual restrictions are *widely* understood by brokers to foreclose their ability to work with competing platforms, including CREXi." 4-ER-578, ¶65 (emphasis added). *Third*, CREXi did not, as CoStar falsely suggests, allege that CREXi has CRE listings from 500 customers who also use LoopLink. *See* AB38-39. On the contrary, "CoStar has blocked CREXi from accessing [CRE listings] on those brokers' own websites." 4-ER-633, ¶257.

Claiming to "credit" CREXi's allegations, CoStar asserts that "the practical effect of the terms is *not* to preclude brokers from working with CoStar's competitors." AB39 (cleaned up). But that *contradicts* CREXi's allegations: "brokers signed up for CoStar's services are foreclosed from

working with a competing company like CREXi, due to CoStar's anticompetitive contractual terms. CoStar's *de facto* contractual exclusivity squelches meaningful competition between different platforms, resulting in inflated prices, suppressed output, and smothered innovation." 4-ER-579, ¶69.

CoStar argues that there is no analogue in the cases to CREXi's allegation that brokers widely understand that CoStar's contractual restrictions foreclose their ability to work with CREXi. *See* AB39-40. But in *ZF Meritor*, "despite the fact that [the defendant] did not actually terminate the agreements on the rare occasion when an OEM failed to meet its target, *the OEMs believed that it might*." 696 F.3d at 282-83 (emphasis added). Likewise, brokers believe that CoStar might sue them if they provide their listings to CREXi. 4-ER-578-79, ¶¶66-67.

CoStar contends that CREXi failed to allege foreclosure of competition in a substantial share of the market. AB40-41. But CREXi alleged that "CoStar's exclusionary conduct forecloses competition in a substantial share of the relevant markets." 4-ER-600-01, ¶139; *see also id.*, ¶¶136-39. CoStar does not address those allegations, instead returning to its misreading of CREXi's allegation about 500 customers.

33

AB40-41. Once again, the point there is that CoStar blocked more than 500 brokers from sharing their CRE listings with CREXi. 4-ER-633, ¶257. That supports CREXi's allegation that CoStar foreclosed competition. *See id.*; 4-ER-600-01, ¶¶136-39.

Thus, the district court erred in dismissing CREXi's claims under section 1 of the Sherman Act and the Cartwright Act.

**D.  CREXi alleged intentional interference with contract and prospective economic advantage.**

CREXi more than adequately alleged its claims for interference with contract and prospective economic advantage. CoStar asserts that CREXi did not allege conduct "*by CoStar*." AB56. Not true. *First*, CoStar has engaged in "intentional and deliberate efforts to block CREXi from brokers' websites hosted by LoopLink." 4-ER-634, ¶259. *Second*, "CoStar's false claims of copyright ownership over photographs and other CRE listing information [have] led to multiple interruptions of service for CREXi's customers." *Id.*, ¶260. *Third*, "CoStar's anticompetitive conduct and use of exclusionary contracts has interfered with CREXi's prospective business relationships." *Id.*, ¶261.

CoStar contends that the allegation that CoStar intended to block brokers from working with CREXi is "irreconcilable" with CoStar's terms

2641756

making brokers responsible for maintaining back-up copies of their listing information. AB56. CoStar is yet again taking inferences in its own favor. In many cases, "the only original copies to brokers have of their listings are on the broker's LoopLink-powered website." 4-ER-571, ¶41. CoStar's "actions have the intended effect of locking brokers who use LoopLink into exclusive relationships with CoStar, making it near-impossible for those brokers to work with CoStar's competitors." 4-ER-561, ¶5.

CoStar asserts that the allegations about its false claims of ownership all relate to conduct by CREXi. AB56. But the customer relationships were disrupted by *CoStar*'s insistence on an image filter populated by *CoStar* that flagged images for removal despite *CoStar* having no legitimate ownership rights in those images. 4-ER-588-94, ¶¶91-117. CoStar also asserts that its contracts are not exclusionary. AB56. Yet again, CoStar contradicts CREXi's allegations, which must be accepted as true. *See* 4-ER-574-79, ¶¶50-69; *NFL Sunday Ticket Antitrust Litig.*, 933 F.3d at 1149.

CoStar argues that CREXi failed to allege independently wrongful conduct in support of its prospective economic advantage claim. AB56.

But CREXi alleged antitrust violations, which are independently wrongful. *See*, *e.g.*, *Jensen Enterprises Inc. v. Oldcastle, Inc.*, No. C 06-00247 SI, 2006 WL 2583681, at *9 (N.D. Cal. Sept. 7, 2006). CREXi also alleged that CoStar violated the UCL, which is independently wrongful. *See CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F.3d 1099, 1111 (9th Cir. 2007).

CoStar contends that CREXi did not have leave to amend to add its interference claims. But CREXi was granted "leave to amend to correct the deficiencies identified in" the district court's first dismissal order. 1-ER-44. One of those deficiencies was that "[s]ignificantly, CREXi does not bring a claim for tortious interference with contractual relations." 1-ER-43. Accordingly, CREXi amended to add such a claim.

CoStar argues that the district court was not describing a deficiency but merely distinguishing a case. AB54. But the district court's order indicated that a claim for interference with contractual relations could cure the purported deficiencies identified in the order. *See* 1-ER-43. Consistent with Rule 15, the district court should have construed its order granting leave to amend liberally and allowed the addition of the interference claims. *See* Fed. R. Civ. P. 15.

36

Thus, the district court erred in dismissing CREXi's claims for interference with contract and prospective economic advantage.

**E.   CREXi alleged unlawful and unfair competition.**

The UCL broadly prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. CREXi stated a claim under the "unlawful" prong because it stated claims for antitrust violations and tortious interference. And CREXi stated a claim under the "unfair" prong because CREXi's conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).

The district court erroneously held that CREXi's claim under the "unfair" prong could not survive the dismissal of its antitrust and interference claims. 1-ER-024. This Court held the opposite in *Epic Games*, 67 F.4th at 1001. CoStar argues that this Court "recognized" in *Epic Games* that a UCL action may be precluded if an antitrust claim was dismissed based on "antitrust *theory*." AB57. That is not what *Epic*

37

*Games* held. Rather, *Epic Games* held that a UCL claim may be precluded by "a *categorical legal bar*." 67 F.4th at 1001. No such bar is at issue here; instead CREXi's claims were dismissed for purported pleading deficiencies. CREXi's claim under the "unfair" prong of the UCL therefore survives the dismissal of CREXi's antitrust and interference claims. *See id.*

Accordingly, the district court erred in dismissing CREXi's claims under the "unlawful" and "unfair" prongs of the UCL.

### III.  CONCLUSION

Thus, this Court should reverse the district court's dismissal of CREXi's counterclaims.

DATED:  May 13, 2024

_____
Dan Jackson
Keker, Van Nest & Peters LLP
Counsel for Defendant-Counter-Claimant-Appellant Commercial Real Estate Exchange, Inc.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-55662

I am the attorney or self-represented party.

**This brief contains** | 6,997 | **words,** including | 43 | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Dan Jackson | **Date** | May 13, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**          *Rev. 12/01/22*